UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MONTE SILVER and MONTE SILVER, LTD., an Israeli corporation, | ) ) ) | Case No.: _____ |
| | ) | |
| *Plaintiffs,* | ) ) | |
| vs. | ) ) | COMPLAINT |
| | ) | |
| INTERNAL REVENUE SERVICE; UNITED STATES DEPARTMENT OF THE TREASURY; CHARLES RETTIG, in his official capacity as Commissioner of Internal Revenue; and STEVEN MNUCHIN, in his official capacity as United States Secretary of the Treasury, | ) ) ) ) ) ) ) ) | |
| *Defendants* | ) | |

## **INTRODUCTION**

1.      This action arises under the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq,*

the Regulatory Flexibility Act (RFA), 5 U.S.C. § 601, *et seq,* and the Paperwork Reduction

Act (PRA). 44 U.S.C. § 3501, *et seq.*   At issue is an extensive set of regulations issued by

the United States Department of Treasury ("Treasury") and the Internal Revenue Service

(the "IRS") that interpret the complex international tax  provisions of the Tax Cut and

Jobs Act, Pub. L. 115–97 (2017) (the "TCJA").[1]  Rather than attempt to find potential

---

[1]      The following acronyms and short titles are employed in this complaint:

| | |
|---|---|
| APA | Administrative Procedure Act, 5 U.S.C. §551 *et seq.* |
| Code | Internal Revenue Code, 26 U.S.C. |
| CFC | Controlled Foreign Corporation, as described in Code, Section 957 |
| Decision Document | As issued on January 15, 2019 |
| Final Regulations | As issued on January 15, 2019 |
| IRFA | Initial Regulatory Flexibility Analysis, as described in 5 U.S.C §603 |

solutions for small businesses with regard to the TCJA as required by law,  Defendants

issued impenetrable regulations on or about January 15, 2019  (the "Final Regulations")

that impose many unreasonably complicated burdens upon a vast number of small

businesses and small business owners like Plaintiffs.  In issuing the Final Regulations,

Defendants made no effort to examine the helpless situation of small business, and did

not attempt to address alternatives which would allow small business to comply with

the law without undue burden.   Thus, in promulgating the Final Regulations, the

defendants unlawfully failed to comply with the governing provisions of the RFA, APA,

and PRA.  Accordingly, this Court should render a judgment remanding the regulations

to the Treasury and the IRS, and deferring enforcement of Code section 965 and the

Final Regulations against the plaintiffs and other small businesses to the fullest degree

allowable by law, until Treasury and the IRS comply with the RFA, APA, and PRA.

## PARTIES

2.     Monte Silver (Silver) is a United States citizen residing in Israel.  He received a Bachelor's

degree from the University of California at Los Angeles and earned a law degree at

---

| IRS | Internal Revenue Service |
| Limited | Monte Silver, Ltd., an Israeli entity |
| Notice | Notice of Proposed Rulemaking for regulations for the Proposed Regulations for Guidance Regarding the Transition Tax Under Section 965 and Related Provisions, 83 Fed. Reg. 39514 |
| PRA | Paperwork Reduction Act, 44 U.S.C. §3501 *et seq* |
| RFA | Regulatory Flexibility Act, 5 U.S.C. §601 *et seq* |
| Silver | Monte Silver, a United States citizen |
| SBAct | Small Business Act, 15 U.S.C. §601 |
| TCJA | Tax Cut and Jobs Act, Pub. L. 115-97 (2017) |
| Treasury | United States Department of Treasury |

Boston University School of Law.  He became a member of the California Bar in 1994.  In 1997, he moved to Israel where he practices law, primarily representing international clients with issues relating to United States law.

3.    Monte Silver LTD ("Limited") is organized as an Israeli corporation.  It is treated as a corporation for United States tax purposes.  Silver is the sole shareholder in Limited. The one-person business operated through Limited is organized for profit and is primarily focused on providing legal services to clients worldwide on matters involving United States law.  Since 2012, Limited has maintained a place of business location in both Israel and California.

4.    Through both locations, Silver and Limited have engaged in activities which contribute significantly to the U.S. economy in many regards, including but not limited to (i) payment of taxes, (ii) use of American-based goods, services, and labor, and (iii) generation of investments in large U.S. commercial real estate which by itself contribute significantly to the American economy.

5.    Limited and Silver have annual receipts of less than $1,000,000. Accordingly, they are treated as small businesses for purposes of the Small Business Act. 15 U.S.C. §601 *et seq* (the "SBAct"), and other statutes which employ the SBAct definition of "small business."

6.    As a United States citizen, Silver annually files IRS Form 1040 individual income tax returns, attaching an IRS Form 5471 "Information Return of U.S. Persons with Respect to Certain Foreign Corporations" with respect to Limited.

7.      The IRS is an executive agency of the United States within the meaning of the

Administrative Procedure Act, 5 U.S.C. §551 *et seq*. (the "APA").  Its headquarters are

located in Washington, D.C.

8.      The Treasury is an executive agency of the United States within the meaning of the APA.

Its headquarters are located in Washington, D.C.

9.      Defendant Charles Rettig is the Commissioner of Internal Revenue.  He is sued in his

official capacity.

10.     Defendant Steven Mnuchin is the Secretary of the Treasury.  He is sued in his official

capacity.

## JURISDICTION AND VENUE

11.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this case

involves violations of the APA, the PRA, and the RFA.

12.     Venue is proper in this Court under 28 U.S.C. §1391(e)(1) because the defendants are

agencies of the United States and officers of those agencies based in the District of

Columbia.

## BACKGROUND

13.     Historically, Sections 951 *et seq* of the Internal Revenue Code (the "Code") established a

special tax regime for United States "controlled foreign corporations ("CFCs")" owned

by "United States Shareholders."[2]  In general, these corporations and persons were not

---

[2]      The terms "controlled foreign corporation" and "United States person" are further defined in
Code Section 957.

subject to United States taxation on the earnings of the CFCs until the earnings were repatriated to the United States shareholder.

14. Limited is a CFC and Silver is a United States shareholder within the meaning of these statutes.

15. The TCJA created new and highly complex tax regimes for United States Shareholders who owned interests in controlled foreign corporations.  The Transition Tax, codified in Code Section 965, is the principal subject matter of this action.  It generally requires United States shareholders who own an interest in a controlled foreign corporation to: (i) treat as income their pro rata shares of the accumulated post-1986 deferred foreign income, and (ii) pay the resulting taxes on such income starting in 2018, all as set forth in Code Section 965 and related provisions.

16. The principal focus of the new statutory provisions was large multi-national corporations which operated through foreign subsidiaries that for years had earned more than $2 trillion in profits overseas and continued to hold those profits overseas. Prior law incentivized these corporations to avoid taxation by not repatriating those profits to their U.S. parent corporation where such profits would be subject to high U.S. corporate tax rates.   This portion of TCJA was designed to encourage multi-nationals to repatriate the profits earned abroad to the United States for reinvestment in domestic operations.

17. Many of the terms and concepts employed in the Transition Tax were very complex, not well-defined and were left for future agency regulations. For example, among the many terms first employed in Code Section 965 are "deferred foreign income corporation",

"accumulated post-1986 deferred foreign income",  "8 percent rate equivalent percentage", "aggregate foreign cash position", "15.5 percent rate equivalent percentage",  and "Specified Foreign Corporation."  The Transition Tax also gives rise to highly complex restrictions and computations related to allowable foreign tax credits.

18.    Recognizing the difficulty that smaller businesses would encounter in understanding and complying with the Transition Tax, Code Section 965(i) provided for a potentially perpetual deferral of any Transition Tax to individual U.S. Shareholders if they held the interests in a CFC by way of a pass-through "S" corporations.[3]

19.    Upon learning that individual U.S. Shareholders who directly owned CFCs through which they operated small businesses were subject to the Transition Tax and that tax returns and payments with respect to the Transition Tax were due in April 15, 2017, Silver and hundreds of impacted small businesses started contacting senior IRS and Treasury officials to request relief.  As a result of this public outcry, on March 20, 2018, Silver travelled to Washington, D.C. to meet with senior government officials to discuss this issue.

20.    In recognition of the unique concerns of small businesses and after months of Silver's dealing with Treasury and the IRS, on June 4, 2018, Secretary Mnuchin personally

---

[3]    "S" corporations are a type of smaller entity subject to a special tax regime under Code Section 1361 *et seq*.  An "S" corporation is defined as having only a limited number of shareholders and a limited amount of assets.   An S corporation does not pay corporate income tax on its earnings but instead reports the income they earn to their shareholders, who are required to treat those earnings as income on their individual tax returns and to pay individual income tax on the resulting increased amount of taxable income.  In contrast, income earned by a larger "C" corporation is subject to so-called double taxation—corporate income tax paid by the corporation on its earnings and individual income tax paid by corporate shareholders on the dividends they receive from the corporation.

approved a one year extension – until June 15, 2019 - for small businesses to commence

making payments under Code Section 965.

## ISSUANCE OF THE PROPOSED REGULATIONS

21.   On August 9, 2018, Treasury issued a notice of proposed rulemaking, 83 Fed Reg. 39514,

(the "Notice of Proposed Rulemaking") announcing proposed regulations (the "Proposed

Regulations") implementing Code Section 965 and related provisions.   The Notice of

Proposed Rulemaking was massive and included a lengthy preamble explaining many of

the concepts, rules, and determinations employed in the Proposed Regulations.   In its

entirety, the Notice of Proposed Rulemaking was 248 pages long.

### *Regulatory Flexibility Act (RFA) treatment in the Proposed Regulations*

22.   The RFA requires Treasury and the IRS to include an Initial Regulatory Flexibility Analysis

("IRFA") in the Notice of Proposed Rulemaking and established detailed requirements

regarding the content of that analysis.[4]   Under 5 U.S.C. §603, the IRFA was required to

---

[4]      The governing statute, 5 U.S.C. §603, describes the required content of an Initial
Regulatory Flexibility Analysis as follows--

**(b)**            Each initial regulatory flexibility analysis required under this section shall
contain—
 **(4)**       a description of the projected reporting, recordkeeping and other compliance
requirements of the proposed rule, including an estimate of the classes of small entities
which will be subject to the requirement and the type of professional skills necessary for
preparation of the report or record;
 **(c)**             Each initial regulatory flexibility analysis shall also contain a description of any
significant alternatives to the proposed rule which accomplish the stated
objectives of applicable statutes and which minimize any significant economic
impact of the proposed rule on small entities. Consistent with the stated
objectives of applicable statutes, the analysis shall discuss significant
alternatives such as—
 **(1)**       the establishment of differing compliance or reporting requirements or
timetables that take into account the resources available to small entities;

discuss and explore alternatives which would minimize the economic impact exemption

of the proposed rule upon small businesses entities.

23.    The Notice of Proposed Rulemaking did not contain an Initial Regulatory Flexibility

Analysis as described in the statute.

24.    Instead, the Notice of Proposed Rulemaking avoided the IRFA requirement by certifying

that the Proposed Regulations would not have "a significant economic impact on a

substantial number of small entities", this despite the Treasury having recognized the

burdens of small business compliance two months earlier. The certification did not

provide any factual support as required by law, but rather simply set forth conclusory

assertions that: (i) the proposed regulations "do not impose a collection of information

on small entities" and (ii) "[t]he ownership of sufficient stock in specified foreign

corporations in order to constitute a United States shareholder generally entails

significant resources and investment, such that businesses that are United States

shareholders are generally not small businesses." Likewise, certification did not describe

any alternatives or limitations to the Proposed Regulations considered by the IRS and

Treasury to ease the burden of compliance upon small businesses.

---

**(2)**    the clarification, consolidation, or simplification of compliance and reporting
requirements under the rule for such small entities;

**(3)**    the use of performance rather than design standards; and

**(4)**    an exemption from coverage of the rule, or any part thereof, for such small
entities.

***Paperwork Reduction Act (PRA) treatment in the Proposed  Regulations***

25.     The PRA imposes specific obligations on Federal agencies which seek to impose

"collection of information" or "recordkeeping requirements."

26.     Under the PRA, agencies are required to engage in various activities to reduce

compliance burdens resulting from new collection of information and recordkeeping

requirements, particularly with respect to small entities.[5]

27.     For example, agencies like Treasury and the IRS are required to certify (and provide a

record supporting such certification, including public comments received by the agency)

---

[5]     The PRA requires agencies to –

certify (and provide a record supporting such certification, including public comments received by the agency) that each collection of information . . .

    (C)     reduces to the extent practicable and appropriate the burden on persons who shall provide information to or for the agency, including with respect to small entities, as defined under section 601(6) of title 5, the use of such techniques as—
        (i)     establishing differing compliance or reporting requirements or timetables that take into account the resources available to those who are to respond;
        (ii)     the clarification, consolidation, or simplification of compliance and reporting requirements; or
        (iii)     an exemption from coverage of the collection of information, or any part thereof;
    (D)     is written using plain, coherent, and unambiguous terminology and is understandable to those who are to respond;
    (E)     is to be implemented in ways consistent and compatible, to the maximum extent practicable, with the existing reporting and recordkeeping practices of those who are to respond;
    (F)     indicates for each recordkeeping requirement the length of time persons are required to maintain the records specified;

44 U.S.C. § 3506 (c)(3).  "In addition to the requirements of this chapter regarding the reduction of information collection burdens for small business concerns (as defined in section 3 of the Small Business Act (15 U.S.C. 632)), make efforts to further reduce the information collection burden for small business concerns with fewer than 25 employees." *Id.* at §3506(c)(4).  Also, the OMB may not approve a collection of information for a period in excess of 3 years.  *Id.* at §3507(g)

that each <u>collection of information</u> reduces to the extent practicable and appropriate

the <u>burden</u> on persons who shall provide information to or for the agency, including

with respect to small entities,. . .  44 U.S.C. §3506(c)(3).

28.   With respect to the PRA, the Notice of Proposed Rulemaking stated that the estimated number

of taxpayers subject to the Proposed Regulations was 100,000 and that the average taxpayer

would require five hours each year to comply with the Proposed Regulations.

29.   The Notice of Proposed Rulemaking did not provide any factual support for how it

reached this effort estimation, or what efforts were undertaken to reduce the burden of

the collection of information on small businesses.

***Administrative Procedure Act (APA) treatment in the Proposed  Regulations***

30.   Compliance with the APA was not separately addressed in the Notice of Proposed

Rulemaking.

### PRIOR TO ISSUANCE OF THE FINAL REGULATIONS

31.   Beginning almost immediately following issuance of the Notice of Proposed Rulemaking

and Proposed Regulations, Silver, Limited, and other small businesses submitted

comments advising Treasury and the IRS of the issues the Proposed Regulations posed

for small businesses.

32.   During the sixty-day comment period on the Proposed Regulations, Silver submitted

detailed comments outlining the legal and factual bases for his allegation that in issuing

the Proposed Regulations Defendants violated the RFA and PRA.

33.   Nearly one hundred other small business owners submitted formal comments

addressing the tremendous hardships that Code Section 965 and the Proposed

Regulations were creating for small business entities and their owners.  These

submissions represented more than half of the total comments on the Proposed

Regulations.

34.     Finally, in the period between the end of the comment period on October 9, 2018, and

the issuance of the Final Regulations, a large number of small business owners

informally contacted Secretary Mnuchin, and senior officials from Treasury, the IRS and

other relevant Federal agencies, all describing the hardship they were experiencing as a

result of Code Section 965 and the Proposed Regulations.

ISSUANCE OF THE FINAL REGULATIONS

35.     On or about January 15, 2019, the Treasury issued a document (the "Decision

Document") containing a preamble which explained many of the concepts, rules, and

determinations employed by Treasury and the IRS, along with the text of the Final

Regulations it was promulgating (the "Final Regulations").[6]  The Decision Document and

Final Regulations were even more lengthy and detailed than the Notice of Proposed

Rulemaking and Proposed Regulations.

36.     The Decision Document contained the text of the Final Regulations and a lengthy

preamble explaining many of the concepts, rules, and determinations employed in the

Final Regulations.  In its entirelt, the Decision Document was even more massive than

the Notice of Proposed Rulemaking.

---

[6]     The Decision Document and Final Regulations were circulated in the trade press on January 15, 2019.
They were not contemporaneously published in the Federal Register because of the recent closing of the
Government Printing Office during the government shutdown.  Presumably, they will be formally published soon.

***Regulatory Flexibility Act (RFA) non-compliance***

37.     The RFA required Treasury to issue a Final Regulatory Flexibility Analysis in conjunction

with issuance of the Decision Document and Final Regulations.[7]

38.     Neither the Decision Document nor the Final Regulations contained a Final Regulatory

Flexibility Analysis.

39.     Instead, the Decision Document included a, the certification stated—

> Pursuant to the Regulatory Flexibility Act (5 U.S.C. chapter 6), it is hereby certified that the
> final regulations will not have a significant economic impact on a substantial number of
> small entities within the meaning of section 601(6) of the Regulatory Flexibility Act ("small
> entities"). . . .
> Regardless of the number of small entities potentially affected by section 965 or the final
> regulations, the Treasury Department and the IRS have concluded that there is no significant
> economic impact on such entities as a result of the final regulations.

---

[7]     Under 5 U.S.C. Section 604(b), the Final Regulatory Flexibility Analysis was required to
contain—

> (2)     a statement of the significant issues raised by the public comments in response
> to the initial regulatory flexibility analysis, a statement of the assessment of the agency
> of such issues, and a statement of any changes made in the proposed rule as a result of
> such comments;
>
> (3)     the response of the agency to any comments filed by the Chief Counsel for
> Advocacy of the Small Business Administration in response to the proposed rule, and a
> detailed statement of any change made to the proposed rule in the final rule as a result
> of the comments;
>
> (4)     a description of and an estimate of the number of small entities to which the
> rule will apply or an explanation of why no such estimate is available;
>
> (5)     a description of the projected reporting, recordkeeping and other compliance
> requirements of the rule, including an estimate of the classes of small entities which will
> be subject to the requirement and the type of professional skills necessary for
> preparation of the report or record;
>
> (6)      a description of the steps the agency has taken to minimize the significant
> economic impact on small entities consistent with the stated objectives of applicable
> statutes, including a statement of the factual, policy, and legal reasons for selecting the
> alternative adopted in the final rule and why each one of the other significant
> alternatives to the rule considered by the agency which affect the impact on small
> entities was rejected; and

40.     Neither the Decision Document nor the Final Regulations contained an explanation or disclosure

        of the factual basis and analysis underlying the certification that the Final Regulations will not

        have a significant economic impact on a substantial number of small entities.  Likewise, neither

        the Decision Document nor the Final Regulations contained any provisions specifically

        directed to the unique circumstances of small businesses, any provisions designed to

        minimize the economic impact of the proposed rule on small entities, or any provisions

        designed to minimize the compliance burden imposed upon small entities.

        ***Paperwork Reduction Act (PRA) non-compliance***

41.     The Final Regulations specifically imposed "collection of information" and

         "recordkeeping obligations" within the meaning of the PRA.

42.     The IRS and the Treasury are required to comply with the requirements of the PRA in

        connection with the release of the Decision Document and Final Regulations.

        For example, under the PRA, agencies are required to certify and provide a supporting

        record establishing that they have considered and taken appropriate steps to reduce

        compliance burdens resulting from new collection of information and recordkeeping

        requirements, particularly with respect to small entities.

43.     With respect to the PRA, the Decision Document stated that—

                The collection of information [required] by these final regulations [are
        estimated to apply to] 100,000 respondents [and] will require 5 hours per
        response for a total reporting burden of 500,000 hours.  A valuation of the
        burden hours at $95/hour ($2017) leads to a PRA-based estimate of the
        reporting costs to taxpayers of $47,500,000. . . .  These burden estimates
        capture only those burdens imposed by the final regulations and do not include
        burden estimates for forms associated with the statute.

Comments suggested that the burden reported in connection with the collection of information requirements under the proposed regulations did not appropriately take into account the time necessary for determining net tax liability under section 965 and performing other computations related to the determination of such net tax liability.   However, the collections of information under the proposed regulations do not relate to such computations; they relate solely to the making of elections, filing of transfer agreements, and reporting of positions concerning the application of anti-abuse rules.

. . . .

In addition to the collection of information requirements in the final regulations, the enactment of section 965 necessitated the creation and modification of certain forms, which are needed to capture changes solely made by the Act and do not reflect a burden imposed by the final regulations. . . .

. . . .

The burdens associated with the information collections in the forms . . . represents a total estimated burden time, including all other related forms and schedules for corporations, of 3.157 billion hours and total estimated monetized costs of $58.148 billion ($2017) and . . . a total estimated burden time, including all other related forms and schedules for individuals, of 1.784 billion hours and total estimated monetized costs of $31.764 billion ($2017).

### *Administrative Procedure Act (APA) violations*

44.     Compliance with the APA was not separately addressed in the Decision Document and

Final Regulations.

### COUNT I—VIOLATION OF THE REGULATORY FLEXIBILITY ACT (RFA)

45.     Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

46.     Treasury and IRS violated the RFA by failing to publish and make available for public

comment an Initial Regulatory Flexibility Analysis describing the impact of the proposed

rule on small entities and the alternatives considered by the agencies in drafting the

Proposed Regulations.

47.     Treasury and IRS violated the RFA by failing to publish and make available for public

        comment a Final Regulatory Flexibility Analysis describing the impact of the Final

        Regulations proposed rule on small entities and the alternatives considered by the

        agencies.

48.     The conclusory certification that no Initial Regulatory Flexibility Analysis was required

        because the Proposed Regulations did not have a significant economic impact on a

        substantial number of small entities was legally and factually inadequate.  The

        certification failed to provide the factual basis for the certifications regarding the impact

        of the Proposed Regulations and the number of small entities effected by the Proposed

        Regulations.

49.     The conclusory certification that no Final Regulatory Flexibility Analysis was required

        because the Final Regulations did not have a significant economic impact on a

        substantial number of small entities was legally and factually inadequate.  The

        certification failed to provide the factual basis for the certifications regarding the impact

        of the Final Regulations and the number of small entities effected by the Final

        Regulations.

50.     The failure of the IRS and Treasury to comply with the Regulatory Flexibility Act is part of

        a consistent pattern of non-compliance.  A recent General Accountability Office Report

        found that the agencies complied with the Regulatory Flexibility Act with respect to only

        two of the over 200 tax regulations issued between 2013 and 2015.

51.     The RFA, 5 U.S.C. §611, provides that a small entity that is adversely affected or

        aggrieved by final agency action is entitled to judicial review of agency compliance with

        the requirements of the RFA.

52.     The RFA authorizes this court to order the agency to take corrective action . . . including,

        but not limited to—

        a.      remanding the rule to the agency, and

        b.      deferring the enforcement of the rule against Plaintiffs unless the court finds

                that continued enforcement of the rule is in the public interest.

In addition, RFA states that "[n]othing in this subsection shall be construed to limit the

authority of any court to stay the effective date of any rule or provision thereof under any other

provision of law or to grant any other relief in addition to the requirements of this section."

### COUNT II—VIOLATION OF THE PAPERWORK REDUCTION ACT (PRA)

53.     Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

54.     The Final Regulations specifically imposed "collection of information" and

         "recordkeeping obligations" within the meaning of the PRA.

55.     Treasury and the IRS failed to comply with multiple obligations imposed by the PRA.

56.     The claims in the Decision Document regarding the compliance burden imposed by the

        Final Regulations upon small businesses are inadequately documented and are

        premised upon unstated and unreasonable assumptions.

57.     The Decision Document did not provide any support for its assertions that the Final

        Regulations reduced to the extent practicable and appropriate the burden on small

        businesses by the use of such techniques as - (i) establishing differing compliance or

reporting standards based on resources available to those who are to respond; (ii) exempting or partially exempting mall businesses from certain collection of information requirements; or (iii) using plain, coherent, and unambiguous terminology and is understandable to those who are to respond.

58. The Decision Document did not demonstrate that Treasury and the IRS made efforts to further reduce the information collection burden for small business concerns with fewer than 25 employees.   Silver and Limited, as well as many other small businesses subject to the Final Regulations are tiny, and in many cases, one-person operations.

59. Finally, the Final Regulations create collection of information obligations that extend far beyond three years in violation of the PRA.

60. The failure of the IRS and Treasury to comply with the Paperwork Reduction Act is part of a consistent pattern of non-compliance.  A recent General Accountability Office Report found that only a few tax regulations were submitted for Office of Management and Budget review as required by the PRA.

61. This court should issue such an order to protect the plaintiffs from the agencies' unlawful conduct.

## COUNT III—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT (APA)

62. Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

63. In promulgating the Final Regulations, Treasury and the IRS violated the APA by failing to observe the procedures required by law in promulgating regulations.  Those violations include: (a) failure to comply with the RFA and PRA; (b) failing to respond to the comments submitted by Silver, Limited, and other small businesses; and (c) failing to

provide factual support for their conclusions regarding the burden imposed upon small

businesses and the number of small businesses effected by the Final Regulations.

64.     Plaintiffs and other small businesses have no other adequate remedy at law to redress

the violations by Treasury and the IRS within the meaning of 5 U.S.C. §704.

65.     Under 5 U.S. C. §706, this court has authority to set aside the Final Regulations because

of the unlawful actions taken Treasury and the IRS.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray this Court will:

a)      Declare that Treasury's RFA Section 605(b) certifications are invalid.

b)      Remand the Proposed Regulations and Final Regulations to Defendants to

comply with their statutory duties under the RFA, PRA and APA.

c)      To the extend permissible by law, stay the enforcement of the Final Regulations

and Section 965 against Plaintiffs and other small businesses until such time as

Defendants comply with their statutory duties.

d)      Award Plaintiffs reasonable attorney fees and cost; and

e)      Award Plaintiffs such other relief as the Court deems just and proper.


DATED:   January 30, 2019

                                                    Respectfully submitted,


                                                     /s/  Stuart J. Bassin
                                                    STUART J. BASSIN
                                                    The Bassin Law Firm PLLC
                                                    1629 K Street, NW, Suite 300
                                                    Washington, DC  20006
                                                    202/895-0969
                                                    sjb@bassinlawfirm.com