UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MONTE SILVER and MONTE SILVER, LTD, an Israel corporation,<br><br>*Plaintiffs,*<br><br>vs.<br><br>INTERNAL REVENUE SERVICE; UNITED STATES DEPARTMENT OF THE TREASURY; CHARLES RETTIG, in his official capacity as Commissioner of Internal Revenue; and STEVEN MNUCHIN, in his official capacity as United States Secretary of the Treasury,<br><br>*Defendants* | Case No.  1:19-cv-00247-APM<br><br>FIRST AMENDED COMPLAINT<br><br>Judge Amit P. Mehta |

**INTRODUCTION**

1.       This action arises under the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq,*

and the Regulatory Flexibility Act (RFA), 5 U.S.C. §601 *et seq*.   At issue is an extensive

set of regulations issued by the United States Department of Treasury ("Treasury") and

the Internal Revenue Service (the "IRS") that primarily interpret certain complex

international tax  provisions of the Tax Cut and Jobs Act, Pub. L. 115–97 (2017) (the

"TCJA").[1]  Defendants issued these impenetrable regulations on or about January 15,

---

[1]       The following acronyms and short titles are employed in this complaint:

| | |
|---|---|
| APA | Administrative Procedure Act, 5 U.S.C. §551 *et seq.* |
| Code | Internal Revenue Code, 26 U.S.C. |
| CFC | Controlled Foreign Corporation, as described in Code, Section 957 |
| Decision Document | As issued on January 15, 2019, and published in the Federal Register on February 5, 2019, 84 Fed.  Reg. 1838 |

2019, and published them in the Federal Register on February 5, 2019,  84 Fed.  Reg.

1838 (the "Final Regulations") without considering the unique implications of the

regulations for small businesses.  The regulations impose many unreasonably

complicated burdens upon a large number of small businesses and small business

owners like Plaintiffs.  In issuing the Final Regulations, Defendants made no effort to

examine the situation of small businesses, and did not attempt to address alternatives

which would allow a small business to comply with the law without undue burden.

Thus, in promulgating the Final Regulations, the defendants unlawfully failed to comply

with the governing provisions of the APA, RFA, and the Paperwork Reduction Act (PRA),

44 U.S.C. §3501 *et seq*.  Accordingly, this Court should render a judgment remanding the

regulations to Treasury and IRS and deferring enforcement of Code sections 965 and

962 and the Final Regulations against the plaintiffs until Treasury and IRS comply with

the APA, RFA, and PRA.

---

| | |
|---|---|
| Final Regulations | As issued on January 15, 2019, and published in the Federal Register on February 5, 2019, 84 Fed.  Reg. 1838 |
| IRFA | Initial Regulatory Flexibility Analysis, as described in 5 U.S.C §603 |
| IRS | Internal Revenue Service |
| Limited | Monte Silver, Ltd., an Israeli entity |
| Notice | Notice of Proposed Rulemaking for regulations for the Proposed Regulations for Guidance Regarding the Transition Tax Under Section 965 and Related Provisions, 83 Fed. Reg. 39514 |
| PRA | Paperwork Reduction Act, 44 U.S.C. §3501 *et seq* |
| RFA | Regulatory Flexibility Act, 5 U.S.C. §601 *et seq* |
| Silver | Monte Silver, a United States citizen |
| SBAct | Small Business Act, 15 U.S.C. §601 |
| TCJA | Tax Cut and Jobs Act, Pub. L. 115-97 (2017) |
| Treasury | United States Department of Treasury |

**PARTIES**

2.      Monte Silver (Silver) is a United States citizen residing in Israel.  He received a Bachelor's

degree from the University of California at Los Angeles and earned a law degree at

Boston University School of Law.  He became a member of the California Bar in 1994.  In

1997, he moved to Israel.  He practices law, primarily representing international clients

with issues relating to United States law.

3.      Monte Silver LTD ("Limited") is organized as an Israeli corporation.  It is treated as a

corporation for United States tax purposes.  Silver is the sole shareholder in Limited.

The one-person business operated through Limited, is organized for profit, and is

primarily focused on providing legal services to worldwide on clients matters involving

United States law.  Since 2010, Silver has maintained a place of business in both Israel

and California.  Since 2012, Limited has maintained a place of business in both locations.

4.      Through both locations, Silver and Limited have engaged in activities which contribute

significantly to the U.S. economy in many regards, including but not limited to (i)

payment of taxes, (ii) use of American-based goods, services and labor and (iii)

generation of investments in large U.S. commercial real estate.

5.      Limited and Silver have annual receipts of less than $1,000,000. Accordingly, they are

treated as small businesses for purposes of the Small Business Act. 15 U.S.C. §601 *et seq*

(the "SBAct"), and other statutes which employ the SBAct definition of "small business."

6.      As a United States citizen, Silver annually files IRS Form 1040 individual income tax

returns, attaching an IRS Form 5471 "Information Return of U.S. Persons with Respect to

Certain Foreign Corporations" with respect to Limited.

7.      The IRS is an executive agency of the United States within the meaning of the

        Administrative Procedure Act, 5 U.S.C. §551 *et seq*. (the "APA").  Its headquarters are

        located in Washington, D.C.

8.      The Treasury is an executive agency of the United States within the meaning of the APA.

        Its headquarters are located in Washington, D.C.

9.      Defendant Charles Rettig is the Commissioner of Internal Revenue.  He is sued in his

        official capacity.

10.     Defendant Steven Mnuchin is the Secretary of the Treasury.  He is sued in his official

        capacity.

## JURISDICTION AND VENUE

11.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this case

        involves violations of the APA, the PRA, and the RFA.

12.     Venue is proper in this Court under 28 U.S.C. §1391(e)(1) because the defendants are

        agencies of the United States and officers of those agencies based in the District of

        Columbia.

## BACKGROUND

13.     Historically, Sections 951 *et seq* of the Internal Revenue Code (the "Code") established a

        special tax regime for United States "controlled foreign corporations ("CFCs")" owned

        by "United States persons."[2]  In general, these corporations and persons were not

---

[2]      The terms "controlled foreign corporation" and "United States person" are further defined in
Code Section 957.

subject to United States taxation on the earnings of the CFCs until the earnings were

repatriated to the United States persons.

14.     Limited is a CFC and Silver is a United States person within the meaning of these

statutes.

15.     The TCJA created two new and highly complex tax regimes for United States persons

who owned interests in controlled foreign corporations – the Transition Tax and a

separate tax upon Global Intangible Low Taxed Income (GILTI).[3]  The Transition Tax,

codified primarily in Code Section 965 is the principal subject matter of this action.

Code Section 965 generally requires United States persons who own an interest in a

controlled foreign corporation to (i) treat as income their pro rata shares of the

accumulated post-1986 deferred foreign income, and (ii) pay the resulting taxes on such

income starting in 2018, all as set forth in Code Section 965 and related provisions.

Code Section 962 involves a complex and little-known election that is relevant to the

Plaintiffs as relating to the Transition Tax and GILTI regimes.

16.     The principal focus of the Transition tax was large multi-national corporations which

operated through foreign subsidiaries that for years had earned more than $2 trillion in

profits overseas and continued to hold those profits overseas.  Prior law incentivized

these corporations to avoid taxation by not repatriating those profits to their U.S.

parent corporation where such profits would be subject to high U.S. corporate tax rates.

This portion of TCJA was designed to encourage multi-national corporations to

---

[3]     The GILTI tax regime, codified in Code Section 951A, is not a direct subject of this litigation.

repatriate the profits earned abroad to the United States for reinvestment in domestic operations.

17.   Many of the terms and concepts employed in the Transition Tax are very complex, not well-defined by statute, and are left for future agency regulations. For example, among the many terms first employed in Code Section 965 are "deferred foreign income corporation", "accumulated post-1986 deferred foreign income", "8 percent rate equivalent percentage", "aggregate foreign cash position", "15.5 percent rate equivalent percentage", and "Specified Foreign Corporation." The Transition Tax also gives rise to highly complex restrictions and computations related to allowable foreign tax credits.

18.   Section 962, very seldomly used, generally allows individual U.S. shareholders to elect and be treated as a U.S. domestic corporation with regard to Subpart F income, for the year of election.  Considering to make the Section 962 election involves consideration of many intricate and complex tax law issues.

19.   Recognizing the difficulty that small businesses would encounter in understanding and complying with the Transition Tax, Code Section 965(i) provided for a potentially perpetual deferral of any Transition Tax to individual U.S. persons if they held the interests in a CFC by way of a pass-through "S" corporations.[4]

---

[4]      "S" corporations are a type of smaller entity subject to a special tax regime under Code Section 1361 *et seq*.  An "S" corporation is defined as having only a limited number of shareholders and a limited amount of assets.   An S corporation does not pay corporate income tax on its earnings but instead reports the income they earn to their shareholders, who are required to treat those earnings as income on their individual tax returns and to pay individual income tax on the resulting increased amount of taxable income.  In contrast, income earned by a larger "C" corporation is subject to so-called double

20. Upon learning that individual U.S. persons who directly owned interests in CFCs through which they operated small businesses were subject to the Transition Tax and that tax returns and payments with respect to the Transition Tax were due in April 15, 2017, Silver and hundreds of impacted small businesses began contacting senior IRS and Treasury officials to request relief.  As a result, on March 20, 2018, Silver travelled to Washington, D.C. to meet with senior Treasury and IRS officials to discuss this issue.

21. In recognition of the unique concerns raised by these small businesses and after months of Silver's interactions with Treasury and IRS, on June 4, 2018, Secretary Mnuchin personally approved a one year extension – until June 15, 2019 -  for small businesses to commence making payments under Code Section 965 ("June Relief").

## ISSUANCE OF THE PROPOSED REGULATIONS

22. On August 9, 2018, Treasury issued a notice of proposed rulemaking, 83 Fed Reg. 39514, (the "Notice of Proposed Rulemaking") announcing proposed regulations (the "Proposed Regulations") that implemented Code Section 965 and related provisions and amended existing regulations under Code Section 962.  The Notice of Proposed Rulemaking was massive and included a lengthy preamble explaining many of the concepts, rules, and determinations employed in the Proposed Regulations.  In its entirety, the Notice of Proposed Rulemaking was 248 typed pages long.

---

taxation—corporate income tax paid by the corporation on its earnings and individual income tax paid by corporate shareholders on the dividends they receive from the corporation.

***Regulatory Flexibility Act (RFA) treatment in the Proposed Regulations***

23.     The required discussion of RFA was well hidden in the middle of the voluminous Notice

of Proposed Rulemaking.  The RFA requires all executive branch agencies, including

Treasury and IRS, to include an Initial Regulatory Flexibility Analysis ("IRFA") in the

Notice of Proposed Rulemaking and established detailed requirements regarding the

content of that analysis.[5]   Under 5 U.S.C. §603, the IRFA is required to discuss and

explore alternatives which would minimize the economic impact of the proposed rule

upon small businesses entities.

24.     The Notice of Proposed Rulemaking did not contain an Initial Regulatory Flexibility

Analysis (an "IFRA") as described in the statute.

---

[5]     The governing statute, 5 U.S.C. §603, describes the required content of an Initial
Regulatory Flexibility Analysis as follows--

**(b)**          Each initial regulatory flexibility analysis required under this section shall
contain—
 **(4)**     a description of the projected reporting, recordkeeping and other compliance
requirements of the proposed rule, including an estimate of the classes of small entities
which will be subject to the requirement and the type of professional skills necessary for
preparation of the report or record;
 **(c)**          Each initial regulatory flexibility analysis shall also contain a description of any
significant alternatives to the proposed rule which accomplish the stated
objectives of applicable statutes and which minimize any significant economic
impact of the proposed rule on small entities. Consistent with the stated
objectives of applicable statutes, the analysis shall discuss significant
alternatives such as—
 **(1)**     the establishment of differing compliance or reporting requirements or
timetables that take into account the resources available to small entities;
 **(2)**     the clarification, consolidation, or simplification of compliance and reporting
requirements under the rule for such small entities;
 **(3)**     the use of performance rather than design standards; and
 **(4)**     an exemption from coverage of the rule, or any part thereof, for such small
entities.

25.  Instead, the Notice of Proposed Rulemaking avoided the IRFA requirement by having Secretary Mnuchin certify that the Proposed Regulations would not have "a significant economic impact on a substantial number of small entities", this despite the fact that Secretary Mnuchin provided small businesses the June Relief two months earlier. The Secretary's certification did not provide any factual support as required by law, but rather simply set forth conclusory assertions that: (i) the proposed regulations "do not impose a collection of information on small entities" and (ii) "[t]he ownership of sufficient stock in specified foreign corporations in order to constitute a United States shareholder generally entails significant resources and investment, such that businesses that are United States shareholders are generally not small businesses." Likewise, certification did not describe any alternatives or limitations to the Proposed Regulations considered by IRS or Treasury to ease the burden of compliance upon small businesses.

***Paperwork Reduction Act (PRA) treatment in the Proposed Regulations***

26.  The PRA imposes specific obligations on Federal agencies which seek to impose "collection of information" or "recordkeeping requirements."

27.  Under the PRA, agencies are required to engage in various activities to reduce compliance burdens resulting from new collection of information and recordkeeping requirements, particularly with respect to small entities.[6]

---

[6]  The PRA requires agencies to –

certify (and provide a record supporting such certification, including public comments received by the agency) that each collection of information . . .

28.    For example, agencies like Treasury and IRS are required to certify (and provide a record

supporting such certification, including public comments received by the agency) that

each collection of information reduces to the extent practicable and appropriate

the burden on persons who shall provide information to or for the agency, including

with respect to small entities,. . .  44 U.S.C. §3506(c)(3).

29.    With respect to the PRA, the Notice of Proposed Rulemaking stated that the estimated

number of taxpayers subject to the Proposed Regulations was 100,000 and that the

average taxpayer would require five hours each year to comply with the Proposed

Regulations.

---

(C)    reduces to the extent practicable and appropriate the burden on persons who shall
provide information to or for the agency, including with respect to small entities, as
defined under section 601(6) of title 5, the use of such techniques as—
(i)    establishing differing compliance or reporting requirements or timetables that
take into account the resources available to those who are to respond;
(ii)    the clarification, consolidation, or simplification of compliance and reporting
requirements; or
(iii)    an exemption from coverage of the collection of information, or any part
thereof;
(D)    is written using plain, coherent, and unambiguous terminology and is understandable to
those who are to respond;
(E)    is to be implemented in ways consistent and compatible, to the maximum extent
practicable, with the existing reporting and recordkeeping practices of those who are to
respond;
(F)    indicates for each recordkeeping requirement the length of time persons are required to
maintain the records specified;

44 U.S.C. § 3506 (c)(3).  "In addition to the requirements of this chapter regarding the reduction of
information collection burdens for small business concerns (as defined in section 3 of the Small Business
Act (15 U.S.C. 632)), make efforts to further reduce the information collection burden for small business
concerns with fewer than 25 employees." Id. at §3506(c)(4).  Also, the OMB may not approve
a collection of information for a period in excess of 3 years.  Id. at §3507(g)

30.     The Notice of Proposed Rulemaking did not provide any factual support for how it

reached this estimate of compliance burden or what efforts were undertaken to reduce

the burden of the collection of information on small businesses.

***Administrative Procedure Act (APA) treatment in the Proposed Regulations***

31.     Compliance with the APA was not separately addressed in the Notice of Proposed

Rulemaking.

## PRIOR TO ISSUANCE OF THE FINAL REGULATIONS

32.     Immediately following issuance of the Notice of Proposed Rulemaking and Proposed

Regulations, Silver initiated a month of written communications with senior Treasury

and IRS officials in which he detailed their alleged violation of the RFA, PRA, and

numerous executive orders.  One senior Treasury official replied in writing that the RFA

simply did not apply to the Proposed Regulations.

33.     During the sixty-day comment period to the Proposed Regulations, Silver submitted

detailed comments outlining (i) the legal and factual basis for his allegation that in

issuing the Proposed Regulations Defendants violated the RFA and PRA, and (ii) the

many ways in which the Transition Tax and Proposed Regulations imposed significant

burdens on Plaintiffs and other small businesses.

34.     Nearly one hundred other small business owners submitted formal comments

describing the tremendous hardships that Section 965 and the Proposed Regulations

were creating for small business entities and their owners.  These submissions

represented more than half of the total comments on the Proposed Regulations.  Most

of these comments detailed how the Proposed Regulations were:    (i) utterly

incomprehensible to the small business owner and his/her tax preparers;    (ii) forced

small businesses to spend enormous amounts of time in futile efforts just to try and

understand what they meant, let alone try and comply with them;  and (iii) forced small

businesses to expend significant funds to try and comply with Section 965 and the

Proposed Regulations.

35.    Finally, in the period between the close of the comment period on October 9, 2018 and

the issuing of the Final Regulations, a large number of small business owners informally

contacted Secretary Mnuchin, and senior officials from Treasury, IRS and other relevant

Federal agencies, all describing the extreme hardship they were experiencing as a result

of Code Section 965 and the Proposed Regulations.

## ISSUANCE OF THE FINAL REGULATIONS

36.    Early in 2019, Treasury issued a document (the "Decision Document") containing a

preamble which explained many of the concepts, rules, and determinations employed

by Treasury and IRS, along with the text of the Final Regulations.[7]  The Decision

Document and Final Regulations were even more lengthy and detailed than the Notice

of Proposed Rulemaking and the original Proposed Regulations.

37.    The Decision Document contained the text of the Final Regulations and a lengthy

preamble explaining many of the concepts, rules, and determinations employed in the

---

[7]    The Decision Document and Final Regulations were circulated in the trade press on January 15, 2019.
They were not contemporaneously published in the Federal Register because the Government Printing Office was
closed during the government shutdown.  They were formally published on February 5, 2019.

Final Regulations.  In its entirely, the Decision Document was even more massive than

the Notice of Proposed Rulemaking.

***Regulatory Flexibility Act (RFA) non-compliance***

38.    The RFA required Treasury to issue a Final Regulatory Flexibility Analysis in conjunction

with issuance of the Decision Document and Final Regulations.[8]

39.    Neither the Decision Document nor the Final Regulations contained a Final Regulatory

Flexibility Analysis.

40.    Instead, the Decision Document included a certification stating—

> Pursuant to the Regulatory Flexibility Act (5 U.S.C. chapter 6), it is hereby certified that
> the final regulations will not have a significant economic impact on a substantial number of
> small entities within the meaning of section 601(6) of the Regulatory Flexibility Act ("small
> entities"). . . .

---

[8]    Under 5 U.S.C. Section 604(b), the Final Regulatory Flexibility Analysis was required to contain—

> (2)    a statement of the significant issues raised by the public comments in response
> to the initial regulatory flexibility analysis, a statement of the assessment of the agency
> of such issues, and a statement of any changes made in the proposed rule as a result of
> such comments;
> (3)    the response of the agency to any comments filed by the Chief Counsel for
> Advocacy of the Small Business Administration in response to the proposed rule, and a
> detailed statement of any change made to the proposed rule in the final rule as a result
> of the comments;
> (4)    a description of and an estimate of the number of small entities to which the
> rule will apply or an explanation of why no such estimate is available;
> (5)    a description of the projected reporting, recordkeeping and other compliance
> requirements of the rule, including an estimate of the classes of small entities which will
> be subject to the requirement and the type of professional skills necessary for
> preparation of the report or record;
> (6)     a description of the steps the agency has taken to minimize the significant
> economic impact on small entities consistent with the stated objectives of applicable
> statutes, including a statement of the factual, policy, and legal reasons for selecting the
> alternative adopted in the final rule and why each one of the other significant
> alternatives to the rule considered by the agency which affect the impact on small
> entities was rejected; and . . .

> Regardless of the number of small entities potentially affected by section 965 or the final regulations, the Treasury Department and the IRS have concluded that there is no significant economic impact on such entities as a result of the final regulations.

41.     Neither the Decision Document nor the Final Regulations contained an explanation or disclosure of the factual basis and analysis underlying the certification that the Final Regulations will not have a significant economic impact on a substantial number of small entities.  Likewise, neither the Decision Document nor the Final Regulations contained any provisions specifically addressing the unique circumstances of small businesses, any provisions designed to minimize the economic impact of the proposed rule on small entities, or any provisions designed to minimize the compliance burden imposed upon small entities.

### *Paperwork Reduction Act (PRA) non-compliance*

42.     The Final Regulations specifically imposed "collection of information" and "recordkeeping obligations" within the meaning of the PRA.

43.      IRS and Treasury were required to comply with the requirements of the PRA in connection with the release of the Decision Document and Final Regulations.   For example, under the PRA, agencies are required to certify and provide a supporting record establishing that they have considered and taken appropriate steps to reduce compliance burdens resulting from new collection of information and recordkeeping requirements, particularly with respect to small entities.

44.     With respect to the PRA, the Decision Document stated that—

> The collection of information [required] by these final regulations [are estimated to apply to] 100,000 respondents [and] will require 5 hours per response for a total

reporting burden of 500,000 hours.  A valuation of the burden hours at $95/hour ($2017) leads to a PRA-based estimate of the reporting costs to taxpayers of $47,500,000. . . .   These burden estimates capture only those burdens imposed by the final regulations and do not include burden estimates for forms associated with the statute.

Comments suggested that the burden reported in connection with the collection of information requirements under the proposed regulations did not appropriately take into account the time necessary for determining net tax liability under section 965 and performing other computations related to the determination of such net tax liability. However, the collections of information under the proposed regulations do not relate to such computations; they relate solely to the making of elections, filing of transfer agreements, and reporting of positions concerning the application of anti-abuse rules.

. . . .

In addition to the collection of information requirements in the final regulations, the enactment of section 965 necessitated the creation and modification of certain forms, which are needed to capture changes solely made by the Act and do not reflect a burden imposed by the final regulations. . . .

. . . .

The burdens associated with the information collections in the forms . . . represents a total estimated burden time, including all other related forms and schedules for corporations, of 3.157 billion hours and total estimated monetized costs of $58.148 billion ($2017) and . . . a total estimated burden time, including all other related forms and schedules for individuals, of 1.784 billion hours and total estimated monetized costs of $31.764 billion ($2017).

54.   The Final Regulations specifically imposed "collection of information" and

"recordkeeping obligations" within the meaning of the PRA.

55.   The claims in the Decision Document regarding the compliance burden imposed by the

Final Regulations upon small businesses are inadequately documented and are

premised upon unstated assumptions.

56.   The Decision Document did not provide any support for its assertions that the Final

Regulations reduced, to the extent practicable and appropriate, the burden on small

businesses by the use of such techniques as:  (i) establishing differing compliance or

reporting standards based on resources available to those who are to respond;

(ii) exempting or partially exempting small businesses from certain collection of

information requirements; or (iii) using plain, coherent, and unambiguous terminology

and is understandable to those who are to respond.

57.    The Decision Document did not demonstrate that Treasury and IRS made any efforts to

further reduce the information collection burden for small business concerns with fewer

than 25 employees.   Silver and Limited, as well as many other small businesses subject

to the Final Regulations are tiny, and in many cases, one-person operations.

58.    Finally, the Final Regulations create collection of information obligations that extend far

beyond three years in violation of the PRA.

***Administrative Procedure Act (APA) violations***

59.    Compliance with the APA was not separately addressed in the Decision Document and

Final Regulations.

## COUNT I—VIOLATION OF THE REGULATORY FLEXABILITY ACT (RFA)

60.    Plaintiffs repeat and reallege each of the foregoing allegations in this First Amended

Complaint.

61.    Treasury and IRS violated the RFA by failing to publish and make available for public

comment an Initial Regulatory Flexibility Analysis describing the impact of the proposed

rule on small entities and the alternatives considered by the agencies in drafting the

Proposed Regulations.

62.   Treasury and IRS violated the RFA by failing to publish and make available for public comment a Final Regulatory Flexibility Analysis describing the impact of the Final Regulations proposed rule on small entities and the alternatives considered by the agencies.

63.   The Secretary's conclusory certification that no Initial Regulatory Flexibility Analysis was required because the Proposed Regulations did not have a significant economic impact on a substantial number of small entities was legally and factually inadequate.  The certification failed to provide the factual basis for the certifications regarding the impact of the Proposed Regulations and the number of small entities impacted.

64.   The Secretary's conclusory certification that no Final Regulatory Flexibility Analysis was required because the Final Regulations did not have a significant economic impact on a substantial number of small entities was legally and factually inadequate.  The certification failed to provide the factual basis for the certifications regarding the impact of the Final Regulations and the number of small entities impacted.

65.   The failure of both IRS and Treasury to comply with the Regulatory Flexibility Act is consistent with a long-standing pattern of non-compliance.  A recent Government Accountability Office report found that the agencies complied with the Regulatory Flexibility Act with respect to only two of the over 200 tax regulations issued between 2013 and 2015.  In response, both agencies and the Office of Management and Budget agreed to revisit their long-standing practice of exempting tax guidance and regulations from Office of Management and Budget oversight, including review of the agencies' compliance with the APA, RFA, and PRA.

66.    The RFA, 5 U.S.C. §611, provides that a small entity that is adversely affected or

aggrieved by final agency action is entitled to judicial review of agency compliance with

the requirements of the RFA.

67.    The RFA authorizes this court to order the agency to take corrective action . . . including,

but not limited to—

    a.   remanding the rule to the agency, and

    b.   deferring the enforcement of the rule against Plaintiffs unless the court finds

       that continued enforcement of the rule is in the public interest.

In addition, RFA states that "[n]othing in this subsection shall be construed to limit the

authority of any court to stay the effective date of any rule or provision thereof under

any other provision of law or to grant any other relief in addition to the requirements of

this section."

### COUNT II—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT (APA)

68.    Plaintiffs repeat and reallege each of the foregoing allegations in this First Amended

Complaint.

69.    In promulgating the Final Regulations, Treasury and IRS violated the APA by: (i) failing to

observe the procedures required by law in promulgating regulations; (ii) engaging in

actions which are arbitrary, capricious and an abuse of discretion; and (iii) acting in

excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

70.    Plaintiffs have no other adequate remedy at law to redress the violations by Treasury

and IRS within the meaning of 5 U.S.C. §704.

71.     Under 5 U.S. C. §706, this court has authority to set aside the Final Regulations because

of the unlawful actions taken Treasury and IRS.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray this Court will:

a)      Declare that Treasury's RFA Section 605(b) certifications are invalid.

b)      Remand the Proposed Regulations and Final Regulations to Defendants to

comply with their statutory obligations under the APA, RFA and PRA.

c)      To the extend permissible by law, stay the enforcement of the Final Regulations

and Sections 965 and 962 against Plaintiffs and other small businesses until such time as

Defendants comply with their statutory duties.

d)      Award Plaintiffs reasonable attorney fees and cost; and

e)      Award Plaintiffs such other relief as the Court deems just and proper, including

but not limited ordering Defendants to comply with the APA, RFA, and PRA.

DATED:  March 26, 2019

                                        Respectfully submitted,

                              _    /s/  Stuart J. Bassin
                                   STUART J. BASSIN
                                   The Bassin Law Firm PLLC
                                   1629 K Street, NW, Suite 300
                                   Washington, DC  20006
                                   202/895-0969
                                   sjb@bassinlawfirm.com