IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MONTE SILVER and MONTE SILVER, )
LTD, an Israeli corporation, )
          )
     Plaintiffs, )
          )
  vs. )
          )
INTERNAL REVENUE SERVICE; )
UNITED STATES DEPARTMENT OF )
THE TREASURY; CHARLES RETTIG, in )
his official capacity as Commissioner of )
Internal Revenue; and STEVEN MNUCHIN, )
in his official capacity as United States )
Secretary of the Treasury, )
          )
     Defendants )
          )

CASE NO. 1:19-cv-247-APM

PLAINTIFFS' OPPOSITION TO
MOTION TO DISMISS

## INTRODUCTION

This case centers around Defendants' violation of three federal statutes—the

Administrative Procedure Act (APA), the Regulatory Flexibility Act (RFA), and the Paperwork

Reduction Act (PRA)--establishing procedural safeguards designed to protect small businesses

which federal agencies must follow when they promulgate regulations.  Defendants violated

these statutes when they issued proposed and final regulations that interpreted the international

tax provisions enacted as part of the Tax Cuts and Jobs Act ("TCJA") in December 2017.[1]  The

---

[1]  The following acronyms and short titles are employed throughout this brief:

  APA       Administrative Procedure Act, 5 U.S.C. §551 *et seq.*
  AIA       Anti-Injunction Act, 26 U.S. C. §7421
  Code      Internal Revenue Code, 26 U.S.C.

TCJA included a transition tax, now codified in Section 965 of the Internal Revenue Code (the "Code"). Defendants promulgating voluminous regulations implementing and interpreting Code Section 965. Those regulations are the subject of this litigation.

The Regulatory Flexibility Act ("RFA") is the primary statutory safeguard designed to protect small businesses from the overwhelming compliance burdens imposed upon small business created by statutes and regulations designed for large companies.[2] Amongst other provisions, the RFA required Defendants to publish a regulatory flexibility analysis containing an in-depth analysis and description of any possible alternatives and exemptions that the regulations could employ to reduce the burdens upon small businesses. Where an agency issues proposed or final regulation without complying with the RFA, the reviewing court is required to remand the regulation to the agency and provide other equitable relief as it deems appropriate.

Defendants have moved to dismiss the first amended complaint, contending that (i) the Plaintiffs lack standing to pursue their challenge to the regulations and (ii) that the Anti-Injunction Act ("AIA") prohibits the Court from providing the relief requested in this suit. As explained below, the Supreme Court and the D.C. Circuit have regularly rejected both

---

| | |
|---|---|
| CFC | Controlled Foreign Corporation, as described in Code, Section 957 |
| Final Regulations | As issued on January 15, 2019, and published in the Federal Register on February 5, 2019, 84 Fed. Reg. 1838 |
| Proposed Regulations | Notice of Proposed Rulemaking for regulations for the Proposed Regulations for Guidance Regarding the Transition Tax Under Section 965 and Related Provisions, 83 Fed. Reg. 39514 |
| PRA | Paperwork Reduction Act, 44 U.S.C. §3501 *et seq* |
| RFA | Regulatory Flexibility Act, 5 U.S.C. §601 *et seq* |
| TCJA | Tax Cut and Jobs Act, Pub. L. 115-97 (2017) |

[2]    The APA and PRA also contain provisions designed to protect the interests of small business during the rulemaking process. These statutes, although violated by the Defendants, are not the primary focus of this action.

arguments.

Plaintiffs have standing under two different lines of authority.  First, Plaintiffs have

suffered injuries-in-fact in the form of added compliance costs and other burdens as a result of

the Final Regulations.  They have "procedural standing" because they seek to enforce a

procedural requirement the disregard of which could impair a concrete interest of theirs.  Here,

Defendants had a duty to comply with the procedural safeguards of the RFA and related statutes

designed to protect the interests of small business when they issued the Proposed and Final

Regulations.  Their failure to do so imposed compliance burdens and costs upon small businesses

like Plaintiffs, which establishes Plaintiffs' standing to bring this suit under the RFA

Second, Plaintiffs have standing even under the authorities cited by Defendants.  Small

businesses like Plaintiffs have incurred (and will continue to incur) injuries through compliance

costs which are directly traceable to the failure of Defendants to consider accommodations for

protecting small business when they issued the Regulations.  That violation is redressable

because under the RFA, in the case of a statutory violation,  the court "**shall** order the agency to

take corrective action including, but not limited to, remanding the rule to the agency and

deferring the enforcement of the rule against small entities." 5 U.S.C §611(a)(4)(emphasis

added).

Defendants' reliance upon the AIA to avoid the merits of this case is likewise misplaced

for three reasons.  First, the Supreme Court and the D.C. Circuit Court of Appeals have ruled that

the AIA does not apply where Plaintiffs have no alternative forum to pursue their claims.  Here,

Plaintiffs owe no transition tax, are not the subject of a tax audit, and thus cannot sue for a

refund—the only potential alternative remedy identified by Defendants.  Second, as

demonstrated by the same authorities, this suit does not "restrain" the "assessment" or

"collection" of taxes within the meaning of the AIA. Third, the legislative history of the RFA demonstrates that any friction between the RFA and AIA should be resolved in favor of allowing Plaintiffs to pursue their RFA claims in this case.

## BACKGROUND

A.    The statutes shielding small business during the rulemaking process.

Congress has enacted three different statutes governing the procedures agencies must follow in promulgating regulations, which focus upon protecting the interests of small business in those regulations—the RFA, the PRA, and the APA.  Defendants have violated all three statutes in promulgating the challenged regulations.

### Regulatory Flexibility Act (RFA)

The principal legislation dealing with the protection of small business during regulation development is the RFA.  In enacting the RFA in 1980, Congress codified its goal of protecting small business from unduly burdensome regulations, stating that:

(i)     regulations designed for large entities get applied uniformly to small businesses even if the problems that gave rise to government action are not caused by smaller entities;

(ii)    uniform regulatory and reporting requirements impose unnecessary and disproportionately burdens on small businesses;

(iii)   the practice of treating all businesses as equivalent may lead to inefficient use of regulatory resources; and

(iv)    alternative approaches may be available which minimize the significant economic impact on small businesses.

5. U.S.C. § 601.  Agencies are required to prepare and make available for public comment an initial regulatory flexibility analysis at the time they published a proposed rule. That analysis must discuss a number of required elements, including:

4

(1)     the establishment of differing compliance or reporting requirements that
        take into account the resources available to small businesses;

(2)     the simplification of compliance and reporting requirements for small
        businesses; and

(3)     an exemption for small businesses.

5 U.S.C. § 603(a).  In addition, when issuing a final regulation, agencies are required to prepare a

final regulatory flexibility analysis.  That analysis must include a description of the steps that the

agency--

> has taken to minimize the significant economic impact on small entities
> consistent with the stated objectives of applicable statutes, including a
> statement of the factual, policy, and legal reasons for selecting the alternative
> adopted in the final rule and why each one of the other significant alternatives
> to the rule considered by the agency which affect the impact on small entities
> was rejected.

5 U.S.C. § 604.  An agency may avoid these requirements only if the head of the agency

"certifies that the rule will not, if promulgated, have a significant economic impact on a

substantial number of small entities." 5 U.S.C. § 605(b). If the agency head so certifies, the

agency must publish the certification, "along with a statement providing the factual basis for

such certification." *Id.* [3]

    The RFA includes a procedure for judicial review of agency compliance with these

requirements.  Any "small entity that is adversely affected or aggrieved by final agency action

is entitled to judicial review of agency compliance with the requirements of sections 601, 604,

605(b), . . . and 610 in accordance with [the APA]." 5 U.S.C. § 611(a).  In granting relief under

---

[3]     In this case, the IRS did not prepare an Initial Regulatory Flexibility Report or a Final
Regulatory Flexibility Report.  Instead, the IRS relied upon certifications by the Secretary of
Treasury that the Final Regulations would not have a significant impact upon any significant
number of small businesses.  Plaintiffs contend that those bare-bones certifications do not
contain an adequate statement of the factual basis for the certification and that the evidence in
the administrative record does not support the certification.  Rather, they reflect the
continuation of Defendants' consistent practice of ignoring the RFA when they issue
regulations.

the RFA, a court **shall** order the agency to take corrective action including, but not limited to,

remanding the rule to the agency and deferring the enforcement of the rule against small

entities. 5 U.S.C. § 611(a)(4) (emphasis added). "Nothing in this subsection shall be construed

to limit the authority of any court to stay the effective date of any rule or provision thereof

**under any other provision of law or to grant any other relief in addition to the**

**requirements of this section**."   5 U.S.C. § 611(a)(5) (emphasis added).

The Paperwork Reduction Act ("PRA")

The PRA imposes its own requirements upon agencies issuing regulations to

protect the concerns of small business and requires that agencies certify (and provide

a supporting factual record) that a regulation's requirements reduce the compliance

burdens on small business by--

> (C)   reducing to the extent practical and appropriate the burden on persons
>       who need comply by using such techniques as—
>       (i)    establishing differing compliance or reporting requirements or
>       timetables that take into account the resources available to those who
>       are to respond;
>       (ii)   the clarification, consolidation, or simplification of compliance
>       and reporting requirements; or
>       (iii)  an exemption from coverage of the collection of information,
>       or any part thereof;
> (D)   [and ensuring that the regulation] is written using plain, coherent, and
>       unambiguous terminology and is understandable to those who are to
>       respond.

44 U.S.C. § 3506   The agency must publicly disclose its analysis.

The Administrative Procedure Act (APA)

The APA provides for judicial review of new regulations and provides reviewing courts

with authority to—

> (2)   hold unlawful and set aside agency action, findings, and conclusions
>       found to be—

(A)   arbitrary, capricious, an abuse of discretion, or otherwise not in
accordance with law;
…
(D)   without **observance of procedure required by law**; (or)]
(E)   unsupported by substantial evidence. . .

5 U.S.C. §706 (emphasis added).  The procedures required by law include compliance with the

RFA and the PRA.  Therefore, regulations promulgated in violation of the RFA and PRA's

mandatory procedures for development of regulations also breach the APA and are thus

unlawful. [4]

B.       The disputed tax statutes and regulations.[5]

Historically, large U.S. corporations such as Google and Apple have not been subject to

United States taxation on the earnings of their foreign subsidiaries (which are referenced as

"controlled foreign corporations", or "CFCs") until the earnings were repatriated to the United

States parent company.  Using sophisticated tax-planning techniques, U.S. multinational

corporations shifted huge amounts of income to their CFCs located in low tax jurisdictions,

thereby indefinitely deferring U.S. taxation of the income.

The transition tax, codified through Section 965 and other statutes, changed this.  For the

2017 tax year, shareholders of these CFCs - e.g. the U.S. parent corporations – were required to

include as their income all earnings that had accumulated in their subsidiaries since 1986.

---

[4]      While some circuits have interpreted the PRA to provide an injured party a stand-alone
provision for judicial review, the DC circuit does not.  The PRA however, does create significant
procedural safeguards for small businesses which were violated in this case.  Accordingly,
Plaintiffs simply seek a judicial remedy that includes ordering Defendants to comply with the
PRA procedures under the APA.

[5]      Factual assertions in this brief are supported by the referenced paragraphs of the First
Amended Complaint (Docket Item 5) or the contemporaneously-filed Declaration of Monte
Silver (the "Declaration") and documents attached thereto as Exhibits.

Unfortunately, the Transition tax did not distinguish between shareholders like Google and

Apple, and individual U.S. citizens conducting even the smallest business via a foreign

company.[6] *See generally* Report of the House of Representatives Committee on Ways and

Means on the TCJA at 375 (H.Rpt. 115-409, Nov. 13, 2017).

On August 9, 2018, Defendants issued a notice of proposed rulemaking, 83 Fed Reg.

39514, ("Proposed Regulations") implementing Code Section 965 and related provisions.

(Amended Complaint ¶22)   The Proposed Regulations--a 248 page double-spaced document

addressing highly complex corporate tax matters—did not contain an Initial Regulatory

Flexibility Analysis, as required by the RFA.  (Amended Complaint ¶24).  Instead, the Proposed

Regulations avoided that statutory requirement by having Secretary Mnuchin certify that the

Proposed Regulations would not have "a significant economic impact on a substantial number of

small entities."  No factual support whatsoever was provided for that certification, although it

was required by the RFA.[7] (Amended Complaint ¶25).

Almost immediately following issuance of the Proposed Regulations, Plaintiffs and many

other small businesses began informed Defendants of the tremendous problems that the Proposed

Regulations posed for them.  About one hundred small businesses submitted formal comments

during the 60-day comment period.  (Amended Complaint ¶32-34). Some commenters, including

Plaintiffs, made specific simple proposals as to how to modify the proposed regulations to

resolve the problem.  (Declaration ¶15.).

On or about January 15, 2019, the Defendants issued a document announcing the Final

---

[6]     Making the situation even more egregious for small business, the tax rates applied to
individual shareholders are higher than those applied to Google and Apple in many instances.
[7]     Notably, Defendants have yet to provide Plaintiffs or the Court with the administrative
record.  Moreover, the sketchy "Certified list of the Contents of the Administrative Record."
(Docket entry 22-2) provided by the Defendants does not identify a single item indicating that
Defendants even attempted to comply with the RFA, PRA or APA, as required by law.

Regulations, which filled 98 pages of fine print in the Federal Register, 84 Fed. Reg. 1838. The Final Regulations did not contain a final regulatory flexibility analysis, any evidence that the Defendants had considered easing the regulatory burdens imposed upon small businesses, or any response to the regulatory comments submitted by Plaintiffs and other small businesses. (Amended Complaint ¶39). Instead, as with the Proposed Regulations, the Final Regulations relied upon a new certification that they did not have a significant economic impact upon a substantial number of small businesses. (Amended Complaint ¶40). Little (if any) factual support was presented for that certification.

### FACTS

Silver is a United States citizen residing in Israel. He studied, lived and practiced law in the United States before moving to Israel in 1997. (Amended Complaint ¶2). Monte Silver LTD ("Limited") is an Israeli corporation and is treated as a corporation for U.S. tax purposes. Silver is and has always been the sole shareholder and sole employee of Limited. (Amended Complaint ¶3). (Amended Complaint ¶5). Silver and Limited are treated as small businesses for purposes of the RFA. Limited is a CFC, and Silver is a United States Shareholder under Code Section 965 and the Final Regulations.

Plaintiffs filed their 2017 tax returns to the best of their ability, given the complexity of the statute and the utter impenetrability of the Proposed and Final Regulations. Ultimately, Plaintiffs did not have a liability for transition tax. However, the compliance costs and time the Plaintiffs have spent and will continue to spend in the coming years to merely comply with the Final Regulations will have a significant impact on Plaintiffs' business. (Declaration ¶18). Plaintiffs are not the subject of any audit, enforcement, or collection effort by the Defendants with regard to the tax or any other matter relating to the 2017 tax year. (Declaration. ¶19).

## STANDARD OF REVIEW

A complaint may not be dismissed under Fed. R. Civ. P. 12(b) so long as it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when it contains factual allegations that, if proven, would allow the court to draw the reasonable inference that the defendant is liable for the misconducted and injury alleged. *Banneker Ventures, LLC v. Graham*, 798 F. 3d 1119, 1129 (D.C. Cir. 2015).

## ARGUMENT

Silver and many other small business owners have told Defendants on countless occasions that they find the Proposed and Final Regulations utterly impenetrable. (Amended Complaint ¶34, Declaration ¶9). As a result, they have only two options for filing tax returns which comply with the Final Regulations: (i) retain a large global accounting or law firm at tremendous expense; or (ii) guess what the Final Regulations mean and repeatedly amend returns upon learning their meaning over time. (Declaration ¶18). Either way, the Final Regulations have imposed and will continue impose substantial compliance costs and other burdens upon Plaintiffs and many other small businesses.

At the very minimum, had Defendants complied with the RFA, the Final Regulations would have "established differing compliance or reporting requirements that take into account the resources available to small businesses, or the simplification of compliance and reporting requirements for small businesses." 5 U.S.C. § 603(a). For example, Defendants could have published a summary of the Final Regulations, written in plain language that Plaintiffs and other small business owners could readily understand. This would have reduced compliance costs and

the likely need to amend returns due to errors in understanding the Final Regulations.[8]

At best, Defendants could and should have engaged in the requisite regulatory flexibility analysis and crafted alternatives or exemptions for small businesses, or explained why they did not. Defendants' claim (Brief at 11) that "Plaintiffs do not, and cannot, plausibly allege *any* lawful tweaks to the regulations that would mitigate the burden on them while also complying with the tax statutes, because — as the Complaint itself repeatedly suggests — the burdens are inherent in the statutes." However, a simple comparison of the word count of Section 965 to the massive volume of the Final Regulations belies Defendant's contention that the Final Regulations do nothing more than repeat the statutory provisions. Further, the Final Regulations contain broad regulatory relief for the oil and gas industry which has no basis in the statutory language. (See Declaration, Exhibit F). Silver, in fact, submitted comments suggesting simple tweaks which would have reduced the burdens upon small business, but Defendants ignored or rejected these and other proposals and alternatives for undisclosed reasons. See Declaration ¶16.

1. Plaintiffs Have Procedural Standing

Because this lawsuit involves a procedural challenge to an agency's failure to comply with the required procedures in crafting a regulation, a relaxed set of standing rules govern this case. A party alleging a procedural injury is not required to meet all the normal standards for redressability and immediacy." *Swanson Group Mfg. LLC vs. Jewell,* No. 13-5268 (D.C. Cir. 2015) citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 (1992). That litigant must only show a causal connection between the act and the alleged injury.); *Summers vs. Earth Island*

---

[8]     The PRA explicitly requires Defendants to certify (and provide a supporting factual record) that the regulations are written using plain, coherent, and unambiguous terminology and are understandable to those required to comply.

*Institute*, 555. U.S. 488, 496 (2009); and *WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013).

To establish procedural standing, plaintiffs must be seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs. "A violation of the procedural requirements of a statute is sufficient to grant a plaintiff standing to sue, so long as the procedural requirement was designed to protect some threatened concrete interest of the plaintiff." *City of Waukesha v. EPA*, 320 F.3d 228, 234 (D.C. Cir. 2003). They must also establish two links of causation: (i) connecting the omitted procedure to some substantive government decision that may have been wrongly decided because of the lack of the procedure, and (ii) connecting that substantive decision to the plaintiff's particularized injury. *Defenders of Wildlife v. Perciasepe*, 714 F. 1317, 1323 (D.C. Cir. 2013) and *Fla. Audubon Soc'y v. Bentsen* 94. F.3d 658, 668 (D.C. Cir. 1996)(en banc);  The first link does not require the plaintiff to show that but for the alleged procedural deficiency the agency would have reached a different substantive result. *WildEarth, Guardians v. Jewell,* 738 F.3d 298, 306 (D.C. Cir. 2013). "All that is necessary is to show that the procedural step was connected to the substantive result*." Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002).

In this case, it is undisputed that the violation of the RFA involves a substantive government action, namely the publication of the Proposed and Final Regulations. In fact, these regulations were designated as a Significant Regulatory Action.  Proposed Regulations at 107. Here, compliance with the RFA could have resulted in addition of provisions reducing the burdens imposed upon small businesses.  Thus, there is a direct connection between (1) Defendants violations of the RFA, PRA, and APA, and (2) the compliance costs and other

burdens small businesses like Plaintiffs incurred and will continue to incur.

### 2. **Plaintiffs have standing even under the case law cited by Defendants.**

Defendants have relied upon a more generally applicable set of standing rules in their

brief (Brief at 6).  Under those cases, plaintiffs generally must show "(1) that the party suffered

an injury in fact, (2) that the injury is fairly traceable to the challenged action of the defendant

and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a

favorable decision.".  Here, Plaintiffs easily satisfy all three requirements.

In evaluating the "injury-in-fact" requirement, courts ask simply whether the plaintiff has

"asserted a present or expected injury that is legally cognizable and non-negligible." *Huddy v.*

*FCC*, 236 F.3d 720, 722 (D.C. Cir. 2001).  Economic harms sufficient to establish an injury-in-

fact include compliance costs. *Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301,

308 (D.C. Cir. 2001); *Am. Farm Bureau Fed'n v. EPA*, 792 F.3d 281, 293 (3d Cir. 2015)

(compliance costs are a "classic injury- in-fact" for standing purposes).  Indeed, a single dollar

of economic harm suffices to prove injury-in-fact for standing purposes. *Carpenters Indus.*

*Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017).  Here, Plaintiffs have suffered and will

continue to suffer injury through concrete additional compliance costs due to the Regulations.

(Declaration. ¶18).

Plaintiffs also satisfy the traceability requirement because their injury is directly traceable

to the choices made by Defendants in promulgating the Regulations.  For example, had

Defendants complied with their statutory obligations to consider alternatives to their

encyclopedic set of rules, small businesses may not have faced the same burdens.  Common

sense exceptions or rules of thumb designed to reduce the regulatory burden imposed upon small

business should have at least been considered and the Proposed and Final Regulations should

have been written or summarized in plain language that owners of small businesses could readily understand.  Then, any tax professional of small businesses (many times a one-person firm of a CPA or enrolled agent) could assist and advise their clients compliance with the law at nominal expense.

Finally, Plaintiffs satisfy the redressability requirement.  "Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff." *West v. Lynch*, 845 F.3d 1228 (D.C. Cir. 2017) Here, the RFA specifically states that the court <u>shall</u> provide specific relief if it finds that Defendants failed to comply with the RFA.   In addition, the RFA states that nothing "shall be construed to limit the authority of any court to stay the effective date of any rule or provision thereof under any other provision of law or to grant any other relief in addition to the requirements of this section." 5 U.S.C. § 611.   Requiring the Defendants to revise the Final Regulations after complying with the procedural safeguards of small business would likely alleviate the injuries suffered by small businesses and reduce their compliance costs and other burdens.[9]

B.    **The Anti-Injunction Act (AIA) does not bar this action.**

1.    <u>Controlling case law establishes that the AIA does not apply where, as here, its application would leave an aggrieved taxpayer without an alternative forum in which to pursue its claims.</u>

Both the Supreme Court and the D.C. Circuit have consistently rejected the contention

---

[9]      Defendants incorrectly contend (Brief at 9) that a "substantial likelihood" of redressability in required.   The cases cited by Defendants dealt with indirect injury or situations where the plaintiff's injuries were speculative and contingent on third party behavior.  Here, linkage between an ordering Defendant's compliance with the RFA, PRA, and APA and a reduction of the compliance costs and burdens imposed upon small business is far more direct.

now advanced by Defendants that the AIA applies to virtually all cases involving matters of taxation.  In the leading case, *South Carolina vs. Regan,* 465 U.S. 367 (1994), a federal tax statute limited the tax-free status of bonds issued by the state and made it practically impossible for South Carolina to sell its bonds to investors.[10]  South Carolina brought suit and sought an injunction against enforcement of the federal tax law.  The defendants in *South Carolina* sought dismissal based upon the AIA.

In a unanimous decision rejecting the assertion of the AIA, the Supreme Court reviewed the history of the AIA and reached the conclusion that "the Anti-Injunction Act's purpose and the circumstances of its enactment indicate that Congress did not intend the Act to apply to actions brought by aggrieved parties for whom it has not provided an alternative remedy." *South Carolina,* 465 U.S. at 378.  As the state was not subject to income tax, and had no duty to rely on an investor who might or might not independently incur the expense of challenging the tax law, the Court observed that the "state will be unable to utilize any statutory procedure to contest the constitutionality of [the tax statute].  Accordingly, the Act cannot bar this action." *South Carolina,* 465 U.S. at 380.  The practical unavailability of any other vehicle for judicial resolution of South Carolina's challenge to the federal tax statute was the critical factor that led the Court to reject the Defendants' proposed application of the AIA.

More recently, the D.C. Circuit, sitting *en banc*, followed the *South Carolina* decision in rejecting another Government assertion of the AIA. *Cohen v. United States,* 650 F. 3d. 717 (D.C. Cir. 2011), In that case, the IRS acknowledged that it had wrongly collected excise tax on phone calls, but nonetheless created an unwieldy refund procedure that effectively denied taxpayers the

---

[10]   After all, if questions existed regarding whether earnings on the bonds would be tax free, investors would avoid the bonds and the state would be unable to raise money by issuing bonds.

opportunity to recover the wrongly-collected taxes.  When a taxpayer brought suit to challenge

the procedure, the government sought dismissal of the suit based upon the AIA.  The court

agreed with the taxpayer that the anti-injunction act did not apply, explaining that the AIA "was

intended to apply only when Congress has provided an alternative avenue for an aggrieved party

to litigate its claims on its own behalf."  *Cohen,* 650 F.3d at 732, quoting *South Carolina,* 465

U.S. at 381.  Observing that no practical alternative avenue existed for litigating plaintiff's

challenge to the IRS's action, the D.C. Circuit concluded that the AIA did not apply.

The D.C. Circuit further expanded this line of authority in *Z Street v. Koskinen*, 791 F.3d

24 (D.C. Cir. 2015).  That case involved an organization's contention that the IRS had

improperly delayed in ruling upon its application for tax exempt status.  The Government

asserted the AIA and attempted to avoid the *South Carolina/Cohen* line of cases by outlining

several procedures which they contended could provide the organization with some (but not all)

of the relief it sought.  Determining that the organization could not fully vindicate its rights

without injunctive relief, the D.C. Circuit ruled that the AIA did not apply and that the

organization's suit could proceed.  Indeed, the court rejected the Defendants' contention that a

procedure which the organization could invoke to obtain judicial review only after a wait of 270

days was not a sufficiently robust alternative remedy to support invocation of the AIA.

Here, application of the AIA would leave plaintiffs with no alternative for raising their

claims.  Plaintiffs owe no tax under Section 965 and are unlikely to be audited on this issue.

(Declaration. ¶18)  Nonetheless, Defendants argue that Plaintiffs must wait until the Defendants

assess a tax liability against them, and only then can Plaintiffs challenge the Regulations in a

refund suit.  They argue that—

> if the Defendants determine that Plaintiffs have taxable income based on an application
> of the regulation and issues a notice of deficiency asserting a tax liability, Plaintiffs may

then challenge the Defendant determination in the Tax Court before paying the deficiency… These legal remedies are the appropriate vehicles for Plaintiffs to raise their challenges to the Treasury regulation at issue.

(Brief at 15) (citations omitted). Just as in the cited cases, this is an illusory alternative for several reasons. Plaintiffs do not owe tax and are not the current subject of an audit or refund proceeding. Even if Plaintiffs could pursue a refund or deficiency case, they would likely not be able to raise an argument based upon the RFA because the RFA has a one-year statute of limitation, starting from the date that the Final Regulation were published. No audit controversy could ever advance to a court proceeding before that statute of limitations had expired. Accordingly, Plaintiffs have no alternative forum for raising their claims and the AIA does not apply.

Defendants rely on the divided decision in *Florida Bankers Ass'n vs. Treasury,* 799 F.3d 1065 (D.C. Cir. 2015), as authority for nonetheless dismissing this case under the AIA. The *Florida Bankers* case involved a situation where the taxpayers could easily bring their claims through a deficiency or refund proceeding. As that court observed—

> The Act requires plaintiffs to seek such challenges in refund suits after the tax has been paid, or in a deficiency proceeding… A bank may decline to submit a required report, pay the penalty and then sue for a refund. At that time, the court may consider the legality of the regulation.

*Id.* at 1067. That case is, therefore, distinguishable because Plaintiffs' ability to posture the issues in this case in the form of a deficiency or refund proceeding is far more speculative.

2. Regardless, the Supreme Court and the D.C. Circuit have rejected Defendants' construction of the statutory language of the AIA.

Under the AIA, Defendants must establish that plaintiffs' claim is brought "for the purpose of restraining the assessment or collection of any tax." In the leading case, the Supreme

Court construed the statutory language in the context of a state law requiring non-resident on-line retailers to advise purchasers of the sales tax due from the purchaser on their transactions and to file information reports summarizing this information with the state. *Direct Marketing Association v. Brohl,* 135 S. Ct. 1124 (2015). When the association representing the retailers brought suit to challenge the legislation, the state asserted that federal court injunctive relief was not available because of a statute patterned upon the AIA.[11]

Allowing the suit to proceed, the Supreme Court observed that the tax law "has long treated information gathering as a phase of tax administration procedure that occurs before assessment, levy or collection." 135 S. Ct.. at 1130. Assessment is "an official action taken based on information already reported to the taxing authority." The AIA applies only to assessment and collection phases of the taxation process; it does not apply to antecedent steps like filing of tax returns. In addition, the statutory context provides several clues that lead the Court to conclude that the TIA uses the word "restrain" in its narrower sense, stating

> Looking to the company "restrain" keeps, we first note that the words "enjoin" and "suspend" are terms of art. . .
>
> To give "restrain" the broad meaning selected by the Court of Appeal … would be to defeat the precision of that list, as virtually any court action related to any phase of taxation might be said to "hold back" "collection."

135 S.Ct. at 1141. Following that ruling, the D.C. Circuit has required a more nuanced inquiry into the nature of the plaintiffs claim in determining whether the anti-injunction act applies. The

---

[11]     *Brohl* arose under the Tax Injunction Act, 28 U.S.C. §1341, which applies to federal court actions seeking injunctions against state tax laws. That statute provides that federal courts "shall not enjoin suspend or restrain the assessment, levy or collection of any tax under State law." Given the similarity between the statutory language of the Tax Injunction Act and the AIA, the courts have construed the statutes as "coterminous." Florida Bankers, 799 F.3d at 1065, quoting *Cohen,* 650 F.3d at 730–31.

law "requires a careful inquiry into the remedy sought, the statutory basis for that remedy, and any implication the remedy may have on assessment and collection." *Cohen,* 650 F.3d at 727 and *Z Street*, 791 F.3d at 28.

Such a careful inquiry in this case demonstrates that Plaintiffs' suit lies outside the intended reach of the AIA. Plaintiffs are seeking to ensure full compliance with the procedural safeguards of the RFA—not any particular provision of the Code. The statutory authority for the relief Plaintiffs seek also lies in the administrative law arena, not the Code. No audit has begun, so the Defendants cannot contend that Plaintiffs' suit has anything other than the most indirect, hypothetical, and tangential effect upon "assessment" and "collection." Accordingly, the Court must reject the Defendants' strained construction of the AIA.[12]

3. Congress has made clear that any tension between the AIA and the RFA must be resolved by limiting the reach of the AIA in actions brought under the RFA.

At least in theory, the AIA and the RFA can both be viewed as applicable to cases involving an RFA challenge to a tax regulation. To the extent that there is tension between the two statutes, the rules of statutory construction generally require the Court to reconcile the two statutes in a way that allows them to co-exist to the extent possible and to avoid a construction which would effectively render either statute as meaningless surplusage.

The correct reconciliation of the two statutes is based upon consideration of the principal focus of the two statutes. The RFA and related statutes focus upon the process of developing

---

[12]     Defendants suggest that *Florida Bankers* supports a broader reading of the statutory language which would stretch the terms assessment and collection to reach virtually all aspects of taxation. As explained above, the facts of that case are easily distinguishable and the unique facts of the *Florida Bankers* case indicate that those taxpayers were much closer to assessment and collection than is the case here. More to the point, the reading of *Florida Bankers* urged by Defendants would put that case into direct conflict with the rules enunciated in *South Carolina* and *Cohen.* Nothing in the *Florida Bankers* opinion suggests that the panel was so directly attacking these controlling precedents.

regulations, while the focus of the AIA is upon interference with assessment and collection of

taxes.  Thus, it makes sense to reconcile the statutes by allowing the RFA to apply in situations

which arise before assessment and collection have begun, while allowing the AIA to control in

situations which arise during assessment and collection.  In contrast, Defendants' position of

treating the AIA as trumping the RFA in all situations involving tax regulations would leave no

situation in which a tax regulation could ever be subject to RFA scrutiny.  Nothing in either

statute suggests that Congress intended this result.

In contrast, Congress weighed in on the relationship between the two statutes during its

consideration of the 1996 amendments to the RFA.  A contemporaneous statement[13]

summarizing the provisions of the amendments demonstrates that Congress intended for the

courts to subject IRS regulations to review under the RFA (albeit with some consideration of the

purposes of the AIA in limiting the remedies imposed upon finding of an RFA violation by the

agency), stating--

> The act provides for judicial review of the RFA and the courts generally
> are given broad discretion to formulate appropriate remedies under the
> facts and circumstances of each individual case.  The rights of judicial
> review and remedial authority of the courts provided in the Act as to IRS
> interpretive rules should be applied in a manner consistent with the
> purposes of the AIA which may limit remedies available in particular
> instances.

Congressional Record March 29, 1996, page 3245 (emphasis added). Later, the same

statement reinforced a comparable point, stating--

> Most IRS interpretative rules involve some aspect of defining or establishing
> requirements for compliance with the Code or otherwise maintain records to
> comply with the Code, or otherwise require small businesses to maintain records to
> comply with the Code, and would now be covered by the RFA.  One of the primary

---

[13]     Formal committee reports were not prepared in connection with the amendments.  The quoted language is
taken from a section-by-section description of the law inserted into the Congressional Record to memorialize the
purpose and intent of the legislation.

> purposes of the RFA is to reduce the compliance burdens on small entities
> whenever possible under the statute.  To accomplish this purpose, <u>the IRS should</u>
> <u>take an expansive approach … when considering whether to conduct a regulatory</u>
> <u>flexibility analysis.</u> "

*Id.* (emphasis added).  Through this language, Congress demonstrated that it intended for the

RFA to apply during the development of tax regulations and that courts should allow for

judicial review of compliance with the RFA.  More to the point, the legislative history is

inconsistent with a construction under which the AIA forever foreclosed a challenge to the

Defendants' compliance with the RFA.  Thus, the tension between the two statutes must be

resolved in favor of permitting pre-audit challenges to tax regulations under the RFA.[14]

## CONCLUSION

One final note before Plaintiffs conclude.  Defendants' deviation from the requirements

of the RFA in this case is not an isolated oversight.  Rather, it reflects the Defendants' pattern of

ignoring the requirements of the RFA and the interests of small business when it promulgates

regulations.  A recent report by the General Accountability Office found that Defendants

complied with the RFA in only two of the over 200 tax regulations they issued between 2013 and

2015.[15]  Plaintiffs submit that allowing the Defendants to avoid scrutiny of that record through

invocation of the anti-injunction act would serve to reward the agency for so blatantly

disregarding its procedural obligations in developing regulations.

---

[14]    "It is a commonplace of statutory construction that the specific governs the general. That
is particularly true where Congress has enacted a comprehensive scheme and has deliberately
targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v.
Amalgamated Bank*, 566 U.S. 639 (2012).  See also *U.S. v. Estate of Romani*, 523 U.S. 517, 518
(1998).

[15]    "Regulatory Guidance Processes:  Treasury and OMB Need to Reevaluate Long-
standing Exemptions of Tax Regulations and Guidance" (GAO Report 16-720, September 2016)
at 22 (copy provided as Declaration, Exhibit C).

For the foregoing reasons, Plaintiffs urge the court to deny Defendants' motion to dismiss.  A proposed order is attached.

Respectfully submitted,


/s/  Stuart J. Bassin

STUART J. BASSIN
The Bassin Law Firm PLLC
1629 K Street, NW, Suite 300
Washington, DC  20006
202/895-0969
sjb@bassinlawfirm.com

July 15, 2019