**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SILVER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-247-APM |
| | ) | |
| INTERNAL REVENUE SERVICE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**REPLY IN SUPPORT OF MOTION TO DISMISS FOR LACK OF JURISDICTION**

The Court lacks jurisdiction to award Plaintiffs declaratory and injunctive relief from the challenged regulations for two independent reasons: Plaintiffs lack standing to maintain this action, and the Anti-Injunction Act prohibits it. Either reason is sufficient to dismiss Plaintiffs' claims, and the Court may address them in the order it sees fit. Whether for lack of standing or because of the Anti-Injunction Act (or both), the Court should dismiss Plaintiffs' claims for lack of jurisdiction.

On the issue of standing, the Court should dismiss the Amended Complaint because it does not contain plausible allegations of a concrete injury, causation, or redressability related to the *regulations* that Plaintiffs are challenging. As in their Amended Complaint, Plaintiffs continue in their opposition to the Motion to Dismiss to speak of alleged harm from the regulations and the underlying statute *together*. They do not challenge the statute, though, and fail to plausibly state why relief from the regulations, but not the statute, would lessen the burden of which they complain. Indeed, suspending the regulations (and the guidance they provide) may make it harder for Plaintiffs to determine their tax burden under the statute, thereby only increasing Plaintiffs' alleged troubles.

1

As for the Anti-Injunction Act, Plaintiffs' requested remedy — invalidation of the regulations issued in support of section 965 — would interfere with the assessment and collection of the transition tax that is determined under section 965.  As a result, the Anti-Injunction Act bars Plaintiffs' claims.  And no exception to the Anti-Injunction Act applies because Congress has given Plaintiffs alternative means to challenge the regulations issued in support of section 965.

## ARGUMENT

**A.   This Court lacks jurisdiction because Plaintiffs lack standing to pursue their regulatory challenge.**

   *1.   Plaintiffs' "procedural injury" claim does not relieve them from the standing requirements of concrete injury, causation and redressability.*

Contrary to Plaintiffs' claim, this action is not subject to a "relaxed set of standing rules." Plaintiffs still must make plausible allegations that they have (a) suffered an injury in fact that is (b) "fairly traceable" to the actions of the defendant and (c) likely to be redressed by a favorable decision by the Court.  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015); *see also Coalition for Mercury-Free Drugs v. Sibelius*, 671 F.3d 1275, 1279 (D.C. Cir. 2012).  After all, this is "the irreducible constitutional minimum of standing," as the D.C. Circuit recognizes, even in the *Swanson* decision that Plaintiffs cite to support their "relaxed standard." *See Swanson Grp. Mfg., LLC v. Jewell*, 790 F.3d 235, 239-240 (D.C. Cir. 2015).

Both parties agree that a plaintiff presenting a procedural injury claim, in order to establish standing, need not "show that proper procedures would have caused the agency to take a different substantive action."  *See also Renal Physicians Ass'n v. U.S. Dept. of Health and Human Services*, 489 F.3d 1267, 1279 (D.C. Cir. 2007).  And in this way —and only this way— a procedural injury plaintiff need not meet the otherwise "normal standards for redressability and immediacy."  *See Swanson*, 790 F.3d at 240, 244.  But in no way are the standards so relaxed

that plaintiffs asserting a procedural injury are also freed from the obligation to allege a concrete and particularized injury that will *likely*, as opposed to speculatively, be redressed by a favorable court decision.  In addition to *Swanson*, most of the other cases on standing that Plaintiffs cite, including those which involve only allegations of "procedural injury," expressly affirm this bedrock requirement, too.  *See, e.g.*, *West v. Lynch*, 845 F.3d 1228, 1235 (D.C. Cir. 2017); *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017); *Defenders of Wildlife v. Peciasepe*, 714 F.3d 1317, 1323 (D.C. Cir. 2005); *City of Waukesha v. EPA*, 320 F.3d 228, 234 (D.C. Cir. 2003); *Am. Farm Bureau Fed'n v. U.S. E.P.A.*, 792 F.3d 281, 293 (3d Cir. 2015).

Plaintiffs' procedural injury claim runs aground on this bedrock requirement.  They fail to allege a cognizable injury and, what is more, fail to plausibly explain how granting relief from the regulations, but not from the statute, would "likely redress" the alleged burden of the transition tax.

## 2. *The costs of understanding and calculating their tax burden do not give Plaintiffs standing.*

By Plaintiffs' own calculations, they do not owe any transition tax.  Instead, they complain about the "calculation costs" involved in understanding the new law and preparing their tax returns in light of it.  However, the costs of calculating their tax liability under the new transition tax law (and associated regulations) is not a concrete and particularized injury that gives Plaintiffs standing.  The cases that Plaintiffs cite regarding economic harms and compliance costs (Doc. 23 at 13) do not stand for the proposition that incurred calculation costs — that is, those costs associated with understanding the law and determining if and how it applies — are themselves an injury that gives rise to standing to challenge the law.  In *Carpenters Indus. Council v. Zinke*, 854 F.3d 1 (D.C. Cir. 2017), lumber companies claimed an economic injury from a decrease in timber supply, caused by an agency designation of critical

3

habitat under the Endangered Species Act.  In *Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301 (D.C. Cir. 2001), a manufacturer of PVC medical products alleged an economic harm when it challenged an agency upgrade of a chemical, which PVC emits when incinerated, to a category of known carcinogens.  And in *Am. Farm Bureau Fed'n v. EPA*, 792 F.3d 281 (3d Cir. 2015), farming trade associations challenged water pollution regulations expected to impose costly requirements on members of the trade associations.  In none of those cases did the alleged economic harm stem from costs incurred just to understand or determine how to comply with the challenged regulations.

At bottom, Plaintiffs allege that they have suffered an Article III injury because a federal tax law and its related regulations are difficult to understand and require paying for professional tax services.[1]  Allowing Plaintiffs to proceed on such a broad proposition would give nearly anyone the ability to challenge nearly any tax law in court, without following the refund or deficiency procedures established by Congress for this purpose.  Any person (whether an individual or other legal entity) that is potentially subject to U.S. tax will inevitably have to spend time familiarizing itself with the requirements of federal tax law.  If merely spending money to determine one's obligations under a law were sufficient to confer standing, Article III's requirement of concrete injury would have little meaning.  As the D.C. Circuit has held, "just as an individual lacks standing to assert generalized grievances about the conduct of Government, so an organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III."  *Spann v. Colonial Vill., Inc.*,

---

[1] Plaintiffs' need to hire tax professionals in this arena is speculative, given that Plaintiffs profess to specialize in "providing U.S. tax advice to Americans residing outside the United States." (Doc. 23-2 ¶ 2.)

899 F.2d 24, 27 (D.C. Cir. 1990) (internal citations and quotations omitted).  Here, Plaintiffs allege that they have and will continue to incur costs to determine the application of a law that they say is difficult to understand.  Such a broad allegation is similar to the type of "general grievance" with the law that is insufficient to support standing.

> ### 3. *Plaintiffs fail to allege harms that stem from the regulations they challenge, as opposed to the statutes that underlie those regulations.*

Even *if* the cost involved in understanding and calculating an entity's transition tax liability is a "concrete, particularized harm" that supports standing, Plaintiffs still fail in their response to identify any aspect of the regulations that harms them independently of the statute, section 965.  In other words, even as to the burden of "understanding" the law, Plaintiffs make no distinction between the alleged harm from the regulations as opposed to the underlying statute (which they do not challenge).

Plaintiffs never suggest that the statute would be easier to understand absent the regulations, or that they would not have hired tax professionals to determine their liabilities under section 965, absent the regulations.  Rather, as in their Amended Complaint, Plaintiffs continue to speak of the difficulty of complying with the statute and the regulations, together.  For example, in his declaration submitted in response to the Motion to Dismiss, Plaintiff Monte Silver repeatedly refers to the harms he allegedly faces from "the Transition tax and the Proposed Regulations" and from "the statute and regulations."  (*See* Silver Decl., Doc. 23-2, ¶¶ 13, 14, 15, 18, 20.)[2]  And though Plaintiffs' opposition brief sometimes refers generally to the

---

[2] Those proposed regulations have since become final, and Silver is challenging the regulations as finalized.

5

"problems that the Proposed Regulations posed" (Dismiss Opp., Doc. 23, at 8[3]), nowhere do Plaintiffs explain what harms arise from the allegedly improper regulations *rather* than the statute. Plaintiffs' passing observation that the regulations contain more words than the statute (Doc. 23 at 11) hardly meets their burden of establishing that their compliance burden is "likely to be redressed" by suspending enforcement of regulations, while (in Silver's words) the "overwhelming burden" and "countless hardships" stemming from the "complexity" of the statute remain. *See* Silver Decl. at ¶¶ 13, 18 and 20.

After wading through Plaintiffs' general complaints that the statute and regulations are too complicated, it is clear that Plaintiffs' real quarrel is with section 965. *See id.* Throughout the comments that Plaintiffs submitted to the IRS in response to the proposed rules,[4] Plaintiffs refer repeatedly to "the problem" as they see it: the imposition of the transition tax itself. For example, Plaintiffs speak of "the draconian 965/951A/962 taxes" (Doc. 24-2 at 3), the small businesses that are allegedly "devastated by the Repatriation . . . taxes" (Doc. 24-2 at 3), and the Americans abroad who are "impacted by the Transition tax" (Doc. 24-2 at 7). Perhaps most tellingly, Plaintiffs complain of the financial burden of *paying the tax*. (Doc. 24-2 at 16 ¶¶ g-i.)

And Plaintiffs' own documents underscore that what they really want is complete relief from the statute, notwithstanding their rhetoric about problems with the *regulations*. Plaintiffs' own "specific simple proposals" "to resolve the problem" (Doc. 23 at 8.) confirms that, for Plaintiffs, "the problem," is being subject section 965 in the first place. While, Plaintiffs'

---

[3] Citations to page numbers in filed documents refer to the page numbers assigned by the ECF system in the upper right-hand corner of each page.

[4] Plaintiffs' comments to the proposed rules are attached to Plaintiffs' opposition brief as Exhibit D, which appears at Doc. 24-2 at 1-17.

opposition brief avoids disclosing this, Plaintiffs' communications with Governmental officials make it clear: their proposed modification to "the regulations" was simply the request to be exempt from the section 965 transition tax. (Ex. 1, e-mail dated March 3, 2018, at 1.)

Plaintiffs want to be free of section 965, but they do not challenge it. Nor could they do so under the APA and the Regulatory Flexibility Act. The APA provides review of agency action, which generally does not include action by Congress. 5 U.S.C. § 701(b)(1)(A). And the Regulatory Flexibility Act, as noted above, applies when agencies are engaged in rulemaking.[5] 5 U.S.C. § 603(a). Neither of those provisions offers judicial review of statutes sought by the Plaintiffs in this case.

---

[5] Although Plaintiffs now claim an additional procedural injury, this one under the Paperwork Reduction Act (Doc. 23 at 7), this Court does not have jurisdiction to review any alleged violations of that Act. The Paperwork Reduction Act ("PRA") addresses various procedures that an agency must meet when it proposes to "conduct or sponsor the collection of information." *See* 44 U.S.C. § 3507(a). But the Act also mandates that "[t]he decision by the Director to approve or not act upon a collection of information contained in an agency rule shall not be subject to judicial review." *Id*. § 3507(d)(6). As a result, courts do not have jurisdiction to hear standalone challenges to agency action based on the PRA. *See Alegent Health-Immanuel Med. Ctr. v. Sebelius*, 34 F. Supp. 3d 160, 170 (D.D.C. 2014) (noting that the Paperwork Reduction Act "does not create a private cause of action"). Plaintiffs themselves acknowledge that the PRA does not give them an avenue to judicial review of the regulations here. (Doc. 23 at 7 n.4.)

Indeed, when Plaintiffs amended their complaint, they no longer alleged that their action arose under the PRA, in addition to the Administrative Procedure Act and the Regulatory Flexibility Act. (*Compare* Doc. 1 ¶ 1 *with* Doc. 5 ¶ 1.) Yet Plaintiffs still ask the Court to order Defendants to correct alleged violations of the PRA. Plaintiffs are wrong when they suggest (Doc. 23 at 7 n.6) that the Administrative Procedure Act ("APA") provides a vehicle for review of PRA procedures. Judicial review under the APA is not available when another statute, such as the PRA, precludes judicial review. *See* 5 U.S.C. § 701(a)(1); *Tozzi v. EPA*, 148 F. Supp. 2d 35, 48 (D.D.C. 2001) (finding that "no amount of statutory parsing or backdoor foray invoking the private suit provision of the APA can overcome such statutory clarity and command" as found in the PRA's bar to judicial review).

So, unable to challenge the statute itself, Plaintiffs try to mask their request for a statutory-exemption as a "simple specific proposal" for modifying the proposed *regulations*, and one that Treasury failed to adequately consider.[6] But this rhetorical trick cannot establish standing.

Granted, the Regulatory Flexibility Act provides that an agency's initial regulatory flexibility analysis must consider alternatives to the proposed rule, including "an exemption from coverage of the rule, or any part thereof, for . . . small entities." *See* 5 U.S.C. § 603(c)(4). Nonetheless, the authority to grant "an exemption from coverage of the *rule*" does not allow the agency to altogether excuse a taxpayer from the statute.[7]

Standing requires plausible allegations of concrete injury, causation, and the likelihood of redress. And where Plaintiffs object to a (so-called) injury with no prospect of redress, because

---

[6] Although Plaintiffs' formal comments in response to the notice of proposed rulemaking are not entirely clear on this point, other communications with Treasury and IRS officials show that the change to the proposed regulations that Plaintiffs sought was, at bottom, to be exempt from the transition tax under section 965. (*See* Doc. 24-2 at 19-20; Ex. 1).

[7] After all, any alternative to the proposed rule still must "accomplish the stated objectives of applicable statutes," 5 U.S.C. § 603(c), and Section 965 provides no authority to the IRS to grant regulatory exemptions from the liability imposed under that section. Thus, Plaintiffs' requested exemption for individuals runs counter to the statute.

Legislative history confirms this. As the preamble to the final regulations notes, "[t]he statute applies to increase the subpart F income of all DFICs, *with no exception* to the extent that a DFIC has one or more United States shareholders that are individuals." TD 9846, Regulations Regarding the Transition Tax Under Section 965 and Related Provisions, 84 Fed. Reg. 1838, 1867 (Feb. 5, 2019) (citing 26 U.S.C. § 965(a)) (emphasis added). "Further, the legislative history expressly provides that *all* United States shareholders, *including individuals*, are subject to section 965." *Id*. (emphases added). The preamble also cites H.R. Rep. No. 115–446, at 606 (2017), which provides, "[i]n contrast to the participation exemption deduction [in section 245A] available only to domestic corporations that are U.S. shareholders under subpart F, the transition rule applies to *all* U.S. shareholders." (Emphasis added).

it results from a statute that they do not challenge, Plaintiffs cannot conceal this fundamental problem of standing by harping instead on regulatory procedure.

Indeed, far from likely redressing their alleged burden, Plaintiffs' requested relief — invalidation of the regulations — would likely exacerbate Plaintiffs' (claimed) difficulty in complying with the statute. After all, even if the regulations are struck, Plaintiffs remain subject to the transition tax and would have to determine their obligations under section 965. As discussed in support of the Motion to Dismiss (Dismiss Mem., Doc. 21-1, at 4-6), the regulations clarify how to calculate various amounts used in determining a taxpayer's tax liability under section 965 and provide rules regarding the taxpayer-favorable elections in section 965(h), (i), (m), and (n). As noted above, Plaintiffs never suggest that the statute would be easier to understand absent the regulations, or that they would not have hired tax professionals to determine their liabilities under section 965, absent the regulations. And without the guidance provided by the regulations, it stands to reason that complying with section 965 would only become more difficult.

**B.      This Court also lacks jurisdiction because the Anti-Injunction Act and the tax exception to the Declaratory Judgment Act bar this suit.**

In this case, the challenge to the regulations, if successful, would result in direct interference with the assessment and the collection of tax. As previously noted, the regulations at issue clarify how to calculate various amounts used in determining a taxpayer's tax liability under section 965. They also establish the manner for making various elections under section 965, which impact the timing and/or method of calculating and/or paying the tax. Plaintiffs' request that the Court remand the regulation and stay its enforcement is a request for pre-enforcement judicial interference with the assessment and collection of taxes. Plaintiffs'

arguments notwithstanding, that is precisely the type of relief that the Anti-Injunction Act and the tax exception to the Declaratory Judgment Act forbid.[8]

### 1. *The AIA applies without exception because Plaintiffs have alternative means to bring their regulatory challenges.*

As the D.C. Circuit has explained, when a complaint, such as the Amended Complaint here, seeks to invalidate a tax-related regulation, "the Anti–Injunction Act ordinarily applies because the suit, if successful, would invalidate the regulation and thereby directly prevent collection of the tax." *Florida Bankers Ass'n v. U.S. Dep't of Treasury,* 799 F.3d 1065, 1067 (D.C. Cir. 2015). Plaintiffs' attempt to distinguish *Florida Bankers* is unavailing. Plaintiffs allege without further explanation that their "ability to posture the issues in this case in the form of a deficiency or refund proceeding is far more speculative." (Doc. 23 at 17.) Yet there is no speculation that parties who have grounds to challenge tax regulations may do so in refund suits or in Tax Court deficiency proceedings. *See SIH Partners LLLP v. Comm'r of Internal Revenue*, 923 F.3d 296, 301 (3d Cir. 2019) (reviewing Tax Court case in which the plaintiffs challenged long-standing regulations promulgated under section 956); *Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, No. 16-70496, 2019 WL 2400999, at *8 (9th Cir. June 7, 2019) (reviewing Tax Court case in which the plaintiffs challenged amendments to the cost-sharing regulations promulgated under section 482).

---

[8] Those Acts are similar in operation, and if the Anti-Injunction Act bars relief, declaratory relief under the Declaratory Judgment Act also is unavailable. *See Florida Bankers Ass'n v. U.S. Dep't of Treasury,* 799 F.3d 1065, 1067 (D.C. Cir. 2015); *Cohen v. United States*, 650 F.3d 717, 727-31 (D.C. Cir. 2011) (en banc). For ease of reference, Defendants will refer to the Anti-Injunction Act to encompass both Acts.

Plaintiffs never challenge that proposition. Instead, it appears that Plaintiffs ground their assertion about the "speculative" nature of their ability to find relief through those other legal remedies on the fact that they do not currently owe a transition tax. Plaintiffs allege that they have prepared and filed their 2017 tax returns and determined that – so far – Plaintiffs do not owe a transition tax liability under section 965. (Doc. 23 at 9.) Plaintiffs' ability to challenge the regulations at issue through other legal remedies is no more speculative than it was in *Florida Bankers*. In *Florida Bankers*, two banking associations brought a pre-enforcement challenge to an IRS regulation that imposes a "penalty" on U.S. banks that fail to report interest paid to foreign account-holders. *Florida Bankers*, 799 F.3d at 1067. The D.C. Circuit found that the Anti-Injunction Act barred the suit because the "penalty" was treated as a tax under the Internal Revenue Code, and the pre-enforcement challenge to the regulation thus would restrain the assessment and collection of the tax paid if a bank failed to comply with the reporting requirement. *Id*. Like the Plaintiffs here, the plaintiffs in *Florida Bankers* did not yet owe the liability at issue. Indeed, the *Florida Bankers* plaintiffs never would owe the penalty at issue in that case, so long as they complied with the reporting requirements they wished to challenge. That did not prevent the D.C. Circuit from concluding that the Anti-Injunction Act applied to bar the banking associations' pre-enforcement regulatory challenge.

Similarly, Plaintiffs' invocation of the narrow exception to the Anti-Injunction Act embodied in *South Carolina v. Regan*, 465 U.S. 367 (1984), does not advance their argument. In that case, the Supreme Court created a limited exception to the Anti-Injunction Act when the plaintiff, the state of South Carolina, lacked *any* other means of litigating its claims. *See South Carolina*, 465 U.S. at 379-80. That was because South Carolina was not itself subject to the tax and thus never had the ability to challenge the statute through a refund suit or any other means.

11

*Id*. But that is not the situation in Plaintiffs' case. Plaintiffs admittedly are subject to the requirements of section 965 – they just apparently happen not to owe any transition tax yet. In *South Carolina*, the Supreme Court found that "the [Anti-Injunction] Act was intended to apply only when Congress has provided an alternative avenue for an aggrieved party to litigate its claims on its own behalf." *Id*. at 381. Because Congress has given Plaintiffs alternatives in the form of a refund suit (or a Tax Court petition if the IRS asserts a deficiency), the Anti-Injunction Act applies to bar their present suit.

Plaintiffs' reliance on *Cohen v. United States*, 650 F.3d 717 (D.C. Cir. 2011) (en banc), is equally unavailing. In *Cohen*, the IRS had assessed and collected an excise tax on long-distance telephone service. *Cohen*, 650 F.3d at 719-20. After several courts found that the tax was illegal, the IRS issued a notice indicating that it would: (a) no longer collect the tax; and (b) give a refund to anyone who requested it through a particular procedure. *Id*. at 720-21. A group of long-distance telephone customers brought suit under the APA, challenging the refund procedure described in the notice. *Id*. at 721. Because the excise tax at issue had already been collected and would not be collected again in the future, the D.C. Circuit concluded that the plaintiffs' suit did not interfere with the IRS's ability to collect and assess taxes. *Id*. at 725 ("This suit does not seek to restrain the assessment and collection of any tax. The IRS previously assessed and collected the excise tax at issue."). Thus, the suit was not barred by the Anti-Injunction Act. *Id*. at 731. The facts of *Cohen* are clearly distinguishable from the facts of the present case, where, as Plaintiffs admit, the IRS has not yet assessed or collected the section 965 transition tax at issue.

The outcome in *Z Street v. Koskinen*, 791 F.3d 24 (D.C. Cir. 2015), also does not aid Plaintiffs. The plaintiff in *Z Street*, a group seeking tax-exempt status, alleged that the IRS had

unconstitutionally delayed consideration of its application because of its viewpoints. *Z Street*, 791 F.3d at 31. Because the plaintiff only challenged the allegedly unconstitutional delay, the D.C. Circuit found that various statutory remedies, including refund suits and suits under Internal Revenue Code section 7428 for a determination of tax-exempt status, provided no remedy for the challenged delay. "Were it otherwise, the IRS would be free for at least 270 days – the period of time taxpayers must wait to invoke section 7428 – to process exemption applications pursuant to different standards and at different rates depending upon the viewpoint of the applicants – a blatant violation of the First Amendment." *Id*. at 32. *Z Street* is readily distinguishable from Plaintiffs' situation because Plaintiffs may seek the relief they want – relief from the challenged regulations – through the alternative remedies available to Plaintiffs and Plaintiffs have not alleged any type of viewpoint or other discrimination in the processing of their tax returns. As discussed above, refund suits and Tax Court deficiency proceedings are appropriate vehicles to seek and, if warranted, to obtain relief from tax regulations. *See SIH Partners*, 923 F.3d at 301; *Altera Corp.*, 2019 WL 2400999, at *8.

The more recent *Florida Bankers* decision cited above provides a better guide for the application of the Anti-Injunction Act in Plaintiffs' situation. Plaintiffs cannot escape the mandate of the Anti-Injunction Act when they have an available remedy, even though they must wait until they owe a transition tax under section 965 to challenge the regulations. Indeed, the point of the Anti-Injunction Act is to defer such actions until they may be presented in a refund suit or deficiency proceeding. *See Bob Jones Univ. v. Simon*, 416 U.S. 725, 736-37 (1974) (finding that the principal purpose of the Anti-Injunction Act is "the protection of the Government's need to assess and collect taxes as expeditiously as possible with a minimum of preenforcement judicial interference, 'and to require that the legal right to the disputed sums be

determined in a suit for refund.'") (quoting *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 7 (1962)). If Plaintiffs wish to argue that the Treasury Department abused its discretion by implementing regulations that did not exempt Plaintiffs from the transition tax under section 965, they can pursue that challenge in a refund suit or a deficiency proceeding in Tax Court, once section 965 is applied to them. And, as discussed next, the fact that Plaintiffs also raise procedural challenges under the Regulatory Flexibility Act does not interfere with the application of the Anti-Injunction Act.

### 2. *The Regulatory Flexibility Act in no way interferes with the application of the Anti-Injunction Act.*

The judicial review provisions in the Regulatory Flexibility Act do not override the Anti-Injunction Act's restrictions on injunctive relief, even assuming that other jurisdictional bars do not exist.[9] While the Regulatory Flexibility Act makes certain action reviewable, it expressly defers to other statutory schemes to determine the form and manner of review. The Regulatory Flexibility Act provides that judicial review of an agency's alleged violation of that Act shall be "in accordance with chapter 7." 5 U.S.C. § 611(a)(1). "Chapter 7" refers to 5 U.S.C. §§ 701-706, which are portions of the APA. The APA's waiver of sovereign immunity expressly provides that it is limited by restrictions imposed by other statutes. 5 U.S.C.

---

[9] As noted in the Motion to Dismiss (Doc. 21-1 at 10 n.10), judicial review under the RFA is limited to claims brought by "small entities," 5 U.S.C. § 611(a)(1). The RFA defines "small entities" as having the same meaning as "small business," "small organization," and "small governmental jurisdiction." *Id*. § 601(6). Each of those phrases is defined in the RFA, and none of them include individuals, like Plaintiff Monte Silver. *See id*. § 601(3), (4), (5). In their opposition to the Motion to Dismiss, Plaintiffs do not dispute that conclusion. But it is unclear whether Plaintiff Monte Silver, Ltd. has standing to challenge under the RFA. Because both Plaintiffs otherwise lack standing and the suit is barred by Anti-Injunction Act, we are not addressing that issue at this time, but do not waive it should the Court deny this motion to dismiss.

§§ 702(1)-(2) ("Nothing herein . . . affects other limitations on judicial review" or "confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought"). The D.C. Circuit has held that the restrictions of the Anti-Injunction Act limit the APA's waiver of sovereign immunity. *Cohen*, 650 F.3d at 724, 731 (citing H.R. Rep. No. 94-1656 at 12 (1976)); *We the People Found., Inc. v. United States*, 485 F.3d 140, 143 (D.C. Cir. 2007). The usual statutory scheme for judicial review of taxpayer challenges to IRS regulations applies to challenges based on the Regulatory Flexibility Act. In that vein, it is worth noting that *Florida Bankers* included a claim under the Regulatory Flexibility Act. *Florida Bankers*, 799 F.3d at 1065.

### 3. *The decision in* **Direct Marketing** *does not narrow the scope of the Anti-Injunction Act.*

The Supreme Court's decision in *Direct Marketing Ass'n v. Brohl*, 135 S. Ct. 1124 (2015), does not narrow the application of the Anti-Injunction Act, as Plaintiffs suggest (Doc. 23 at 18-19). In *Direct Marketing*, the Court considered the Tax Injunction Act ("TIA"), 28 U.S.C. § 1341, which restricts federal courts' ability to "enjoin, suspend or restrain the assessment, levy or collection of any tax under State law . . . ." It held that the TIA did not bar federal court consideration of a suit seeking to ban enforcement of Colorado's "penalty" on noncollecting out-of-state retailers who did not follow notice-and-reporting requirements for sales to Colorado residents – requirements designed to help Colorado collect use taxes from its residents. The Court found that the TIA's grouping of "restrain" with "enjoin" and "suspend" supported giving "restrain" a narrow, secondary meaning (equivalent to "enjoin") rather than its primary meaning of "to hold back" or "inhibit." *Direct Marketing*, 135 S. Ct. at 1132. Applying that narrow meaning, the Court concluded the TIA only prohibits enjoining actual acts of assessment, levy, or collection, and did not bar enjoining the penalty at issue. The TIA's tripartite grouping of the

verbs "restrain" with "enjoin" or "suspend," which prompted the Court in *Direct Marketing* to give "restrain" its narrow meaning, is not present in the Anti-Injunction Act. Rather, the Anti-Injunction Act refers only to "restraining" which, consistent with longstanding Anti-Injunction Act precedent, is more reasonable given its primary meaning as barring suits that inhibit assessment or collection.

The D.C. Circuit likewise has not viewed *Direct Marketing* as limiting the scope of the Anti-Injunction contrary to longstanding precedent. Writing for the majority in *Florida Bankers*, now-Justice Kavanaugh explained that the decision in *Direct Marketing* was inapposite because the Colorado provisions at issue did not impose a tax or a penalty which was treated as a tax.[10] Moreover, the Supreme Court in *Direct Marketing* did not cite, let alone repudiate or overrule, *Bob Jones* or any of the many other cases holding that the Anti-Injunction Act bars suits inhibiting assessment and collection. *Direct Marketing*, 135 S. Ct. at 1136 (Ginsburg, J., concurring) (finding that "[t]his suit does not implicate th[e] congressional objective" of "stop[ping] litigants from using federal courts to circumvent States' 'pay without delay, then sue for a refund' regimes"); *see also CIC Servs., LLC v. IRS*, 925 F.3d 247, 256 (6th Cir. 2019) (adopting *Florida Bankers*' distinction of *Direct Marketing*) (petition for rehearing en banc pending); *Alabama v. North Carolina*, 560 U.S. 330, 335-36 (2010) (declining to find a case was implicitly overruled by subsequent decisions that did not mention that case and did not directly address the issue it presented). Accordingly, *Bob Jones* and the other cases cited here and in the

---

[10] Contrary to Plaintiffs' contention (Doc. 23 at 18 n.11), *Florida Bankers* does not state that the Anti-Injunction Act *and the TIA* are "coterminous." *Florida Bankers* states that the Anti-Injunction Act *and the tax exception to the Declaratory Judgment Act* are "coterminous." *Florida Bankers*, 799 F.3d at 1067.

Motion to Dismiss remain valid authority. And even after the decision in *Direct Marketing*, the D.C. Circuit has noted, "we have recognized our need to engage in 'a careful inquiry into the remedy sought . . . and *any implication* the remedy may have on assessment and collection.'" *Maze v. IRS*, 862 F.3d 1087, 1092 (D.C. Cir. 2017) (quoting *Cohen*, 650 F.3d at 724 (emphasis added in *Maze*)).

As discussed above, Plaintiffs' regulatory challenge directly implicates the assessment and collection of any transition tax liability Plaintiffs may have under section 965. The regulations at issue clarify how to calculate various amounts used in determining a taxpayer's tax liability under Internal Revenue Code section 965. They also establish the manner for making various elections under section 965, which impact the timing and/or method of calculating and/or paying the tax. Plaintiffs seek to invalidate those regulations. That remedy certainly would interfere with the determination of the transition tax, including its assessment and collection. The Anti-Injunction Act forbids that result. As a result, Plaintiffs' claims should be dismissed for lack of jurisdiction.

## **CONCLUSION**

Plaintiffs raise a great deal of smoke to try to obscure the fact that the harms they are alleging are a direct result of the transition tax statute, and not of the regulations published in support of it. Plaintiffs fail to identify any concrete, particularized harm that is caused by the challenged regulations and that relief from the regulations would likely redress. As a result, Plaintiffs lack standing to bring their claims. And the Anti-Injunction Act compels dismissal on additional jurisdictional grounds. For either reason, or both, the Court should dismiss Plaintiffs' claims for lack of jurisdiction.

//

DATED:  August 1, 2019

        JESSIE K. LIU
        United States Attorney

        RICHARD E. ZUCKERMAN
        Principal Deputy Assistant Attorney General

        */s/ Nishant Kumar*
        JOSEPH A. SERGI (D.C. Bar No. 480837)
        Senior Litigation Counsel
        LAURA M. CONNER (VA Bar No. 40388)
        NISHANT KUMAR (D.C. Bar No. 1019053)
        Trial Attorneys
        Tax Division
        U.S. Department of Justice
        Post Office Box 227
        Washington, DC 20044
        Tel: (202) 514-2986
        Fax: (202) 514-6866
        Nishant.kumar@usdoj.gov
        Joseph.a.sergi@usdoj.gov
        Laura.m.conner@usdoj.gov