**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MONTE SILVER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-cv-247 (APM) |
| | ) | |
| INTERNAL REVENUE SERVICE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW OF *AMICUS CURIAE* THE CENTER FOR TAXPAYER
RIGHTS IN SUPPORT OF THE PLAINTIFFS**

Dana Montalto**,** D.C. Bar. No. MA0014
*Counsel for Amicus Curiae* The Center for Taxpayer Rights
Legal Services Center of Harvard Law School
122 Boylston Street
Jamaica Plain, Massachusetts 02130
(P) (617) 390-2737
(F) (617) 522-0715
(E) dmontalto@law.harvard.edu
*Prepared with assistance from law students*
*Abigail Fitts, Lauren Heron, and William Liang*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

DISCLOSURE ............................................................................................................1

STATEMENT OF INTEREST ....................................................................................2

SUMMARY OF ARGUMENT ...................................................................................4

ARGUMENT ..............................................................................................................6

    I.      The Regulatory Flexibility Act and Tax Regulations .............................................6

    II.     Regulatory Effects on Low-Income Taxpayers ...................................................10

CONCLUSION..........................................................................................................16

# TABLE OF AUTHORITIES

## CASES

*Alenco Communications Inc., v. Fed. Communications Comm'n,*
   201 F.3d 608 (5th Cir.2000) ........................................................................................... 4

*Associated Fisheries of Maine, Inc. v. Daley,*
   127 F.3d 104, 111 (1st Cir.1997) .................................................................................... 4

*Home Box Office, Inc. v. FCC,*
   567 F.2d 9, 35-36 (D.C. Cir. 1977) ............................................................................... 10

*Judulang v. Holder,* 565 U.S. 42 (2011) .............................................................................. 9

*Nat'l Women, Infants, & Children Grocers Ass'n v. Food & Nutrition Serv.,*
   416 F. Supp. 2d 92 (D.D.C. 2006) ................................................................................. 4

*United States Cellular Corp. v. Fed. Communications Comm'n,* 254 F.3d 78, 88
   (D.C.Cir. 2001) ............................................................................................................... 8

*W. Virginia Chamber of Commerce v. Browner,* 166 F.3d 336 (4th Cir. 1998) ............ 6

## STATUTES, LEGISLATIVE, AND REGULATORY MATERIALS

5 U.S.C.:

   § 601 .............................................................................................................................. 6,7,9

   § 603 .............................................................................................................................. 4,6,7

   § 604 .............................................................................................................................. 4,6,9

   § 604(a) ......................................................................................................................... 6

   § 605(b) ......................................................................................................................... 4,6,9

   § 607 .............................................................................................................................. 9

   § 608(b) ......................................................................................................................... 9

   § 609 .............................................................................................................................. 4,9

   § 609(a) ......................................................................................................................... 9

   § 610 .............................................................................................................................. 9

   § 611 .............................................................................................................................. 5,6,9

   § 611(a) ......................................................................................................................... 6,9

   § 611(a)(4) ..................................................................................................................... 9

   § 632 .............................................................................................................................. 7,8

26 U.S.C. (I.R.C.):

   § 274(d) ......................................................................................................................... 14

§ 965.................................................................................................................................. 2

§ 6050W............................................................................................................. 11, 12, 13

Administrative Procedure Act ("APA"):

Pub. L. No. 79-404................................................................................................... 6, 9

Federal Reserve Report on the Economic Well-Being of U.S. Households in 2018,
(2019), https://www.federalreserve.gov/publications/files/2018-report-economic-well-
being-us-households-201905.pdf........................................................................... 15

Internal Revenue Manual (IRM):

§ 32.1.5.4.7.4.5..................................................................................................... 7

Small Business Administration Office of Advocacy, *United States Small Business
Profile, 2018* ...................................................................................................... 8

Small Business Regulatory Enforcement Fairness Act of 1996 ("SBREFA"):

Pub. L. No. 104-121............................................................................................... 6

Treas. Reg. § 1.274-5A(f) ......................................................................................... 14

Treasury Inspector General for Tax Administration, Expansion of the Gig Economy
Warrants Focus on Improving Self-Employment Tax Compliance, (2019),
https://www.treasury.gov/tigta/auditreports/2019reports/201930016fr.pdf. ..................... 10, 13

Understanding the Latest Tax Gap Estimates and Overall Taxpayer Compliance (2019),
Publication 1415, https://www.irs.gov/pub/irs-pdf/p1415.pdf. ................................. 11

U.S. Government Accountability Office, GAO-16-720, Regulatory Guidance Processes:
*Treasury and OMB Need to Reevaluate Long-standing Exemptions of Tax Regulations
and Guidance* 22 (2016) ...................................................................................... 6

U.S. Government Accountability Office, GAO GGD 89-107, *Tax Administration:
Information Returns Can Be Used to Identify Employers Who Misclassify Workers*,
September 1989 .................................................................................................. 11

**OTHER AUTHORITIES**

2003 National Taxpayer Advocate Annual Report to Congress, Key Legislative
Recommendations: Tax Withholding on Nonwage Workers…………….................................. 12

Caroline Bruckner, Kogod Tax Policy Center, *Shortchanged: The Tax Compliance
Challenges of Small Business Operators Driving the On-Demand Platform Economy*
(2016).......................................................................................................... 11, 13, 15

Caroline Bruckner and Thomas L. Hungerford, *Failure to Contribute: An Estimate of the
Consequences of Non-and Underpayment of Self-Employment Taxes by Independent
Contractors, and On-Demand Workers on Social Security* (September 30, 2018).................. 11

CPA Practice Advisory, "32% of Self-Employed Workers Admit They Under Report
Taxable Income" (April 24, 2018)......................................................................... 11

Diana Farrell, Fiona Greig, JP Morgan Chase & Co. Inst., *Paychecks, Paydays, and the Online Platform Economy,* 7 (2016). ........................................................................................ 15

Haley Ford, *Giggin' in the 21st Century*, 80 Mont. L. Rev. 299 (2019) ..................................... 10

Erik Hurst, Geng Li, and Benjamin W. Pugsley, *Are Household Surveys Like Tax Forms: Evidence from Income Underreporting of the Self Employed* (November 2010) ........ 11

Marketplace-Edison Research Poll, December 2018, https://www.edisonresearch.com/wp-content/uploads/2019/01/Gig-Economy-2018-Marketplace-Edison-Research-Poll-FINAL.pdf ........................................................................ 10

Rosita Mindermann and Alexander Escobar, *Gig Economy Management Development Program Project*, State of California Franchise Tax Board (Sept. 21, 2018). ......................... 12

National Small Business Association, 2018 Small Business Taxation Survey .............................. 8

National Taxpayer Advocate 2019 Purple Book, Authorize Independent Contractors and Service Recipients to Enter into Voluntary Withholding Agreements without Risk that the Agreements will be used to Challenge Worker Classification Determinations .................. 12

Nina E. Olson, National Taxpayer Advocate Blog (2018), https://taxpayeradvocate.irs.gov/news/nta-blog-participants-in-the-sharing-economy-lack-adequate-guidance-from-the-irs. ........................................................................................ 15

Diane Ring and Shu-Yi Oei, "Tax Issues in the Sharing Economy: Implications for Workers," featured in THE CAMBRIDGE HANDBOOK OF THE LAW OF THE SHARING ECONOMY (Nestor M. Davidson, Michele Finck, and John J. Infranca, eds.), Cambridge University Press (2018) at 354 n.50 ............................................................... 12, 13

Kathleen Delaney Thomas, *Taxing the Gig Economy*, 166 Penn. L. Rev. (2018). ..................... 10

Shamik Trivedi, *Worker Misclassification Catches Attention of Congress, IRS*, Tax Notes, April 25, 2011 ................................................................................................................ 11

Tax Policy Center, Self-Employment Patterns for Men and Women and Implications for Tax Compliance, December 2019, https://www.taxpolicycenter.org/publications/self-employment-patterns-men-and-women-and-implications-tax-compliance/full ...................... 10

Testimony of National Taxpayer Advocate Nina Olson before the House Small Business Committee on May 26, 2016, in a hearing titled: The Sharing Economy: A Taxing Experience for New Entrepreneurs…………………………………………………................... 15

Donald T. Williamson, *Clarifying the Tax Classification of Workers*, Tax Notes, March 28, 2016 ................................................................................................................................... 11

**DISCLOSURE**

The Center for Taxpayer Rights is a 501(c)(3) not-for-profit corporation dedicated to advancing taxpayer rights and ensuring due process for taxpayers, with no parent corporation and no publicly traded stock.

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

The Center for Taxpayer Rights is an organization dedicated to furthering taxpayers' awareness of and access to taxpayer rights. A 501(c)(3) not-for-profit corporation dedicated to advancing taxpayer rights and ensuring due process for taxpayers, the Center accomplishes its mission, in part, by educating the public and government officials about the role taxpayer rights play in promoting compliance and trust in systems of taxation.  The Center, and its Executive Director, Nina Olson, the former National Taxpayer Advocate, have experience advocating on behalf of taxpayers whose voices might otherwise not receive attention.  The Center believes that regulations relating to small businesses have a significant impact on low-income taxpayers because of the number of low-income taxpayers who own small businesses impacted by the regulations and who work for small businesses.

## STATEMENT OF *THE CLINICS PREPARING THIS MEMORANDUM*

The Philip C. Cook Clinic and the Harvard Tax Clinic, founded in 1992 and 2015 respectively, were founded to represent low-income taxpayers before the Internal Revenue Service ("IRS") and in tax matters before the Courts. Clinic clients, or individuals seeking their advice, typically are not U.S. shareholders of the specified foreign corporations to whom I.R.C. § 965 would apply. However, in the instant case, the IRS violated the Regulatory Flexibility Act ("RFA"), among other administrative taxpayer protections, in imposing burdensome regulations under I.R.C. § 965, which sets a regulatory precedent that could indeed harm low-income taxpayers in the future. Were this Court to find that the IRS properly complied with the RFA, low-income taxpayers, particularly those who are self-employed and those with small businesses, could be disproportionately affected by similar regulatory action designed to increase information reporting in the sharing economy sector.

Timely notice was provided and consent to file this brief was requested and granted the parties. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. The only persons who contributed money that was intended to fund preparing or submitting this memorandum are Georgia State University College of Law and Harvard University, who paid the costs associated with preparing this brief.

## SUMMARY OF ARGUMENT

Congress enacted the Regulatory Flexibility Act ("RFA") "to encourage administrative agencies to consider the potential impact of nascent federal regulations on small businesses." *Associated Fisheries of Maine, Inc. v. Daley,* 127 F.3d 104, 111 (1st Cir. 1997). The agency must then allow affected small entities to participate in the rulemaking process, 5 U.S.C. § 609, issue an initial regulatory flexibility analysis, *Id.* § 603, and later issue a final regulatory flexibility analysis, *Id.* § 604, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." *Id.* § 605(b).

An agency needs to engage in a "reasonable" and "good faith effort" to carry out the mandate of the RFA. *Nat'l Women, Infants, & Children Grocers Ass'n v. Food & Nutrition Serv.*, 416 F. Supp. 2d 92, 108 (D.D.C. 2006) (quoting *Alenco Communications Inc., v. Fed. Communications Comm'n*, 201 F.3d 608 (5th Cir. 2000)). However, the Treasury Department ("Treasury") and the IRS have consistently sidestepped the regulatory flexibility analysis on small entities required by the RFA through the excessive use of the exemption certifications.

Several examples of regulations that could impact small businesses owned by low-income taxpayers are offered.  Low-income taxpayers engage in many aspects of the gig economy in ways that are treated for tax purposes as small businesses.  Treasury regulations regarding classification of individuals as businesses as well as regulations impacting those businesses routinely impact these taxpayers.  In adopting regulations, Treasury can adversely impact low-income taxpayers operating small businesses if it fails to give proper thought to the issues they face.  The examples seek to provide a small glimpse of the possible impact of the regulations on these businesses.

Judicial review of agency compliance with the RFA, including of the regulatory flexibility analysis itself and the agency certification exempting the regulatory flexibility analysis, is

available. 5 U.S.C. § 611. The Court should ensure that Treasury and the IRS fulfill their obligation under the RFA and complete regulatory flexibility analyses on small entities.

**ARGUMENT**

## I.     The Regulatory Flexibility Act and Tax Regulations

An agency must prepare and make available for public comment an initial regulatory flexibility analysis any time it is required to publish general notice of proposed rulemaking under the Administrative Procedure Act (APA) or any other law. 5 U.S.C. § 603(a).   The RFA also requires a final regulatory flexibility analysis when an agency promulgates a final rule. 5 U.S.C. § 604(a).   For each required regulatory flexibility analyses, the agency is generally required to describe the effect of the rule on small businesses, analyze alternatives that might minimize adverse economic consequences, and make their analyses available for public comment. 5 U.S.C. §§ 601–604.   Notably, however, a regulatory flexibility analysis is not required if the agency "certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b).

Legislative history of the Small Business Regulatory Enforcement Fairness Act of 1996 ("SBREFA"), a 1996 amendment to the RFA, reflects Congressional concerns regarding agencies "neglecting their duties under the RFA through casual agency certifications of non-applicability or insufficient analyses." *W. Virginia Chamber of Commerce v. Browner*, 166 F.3d 336 (4th Cir. 1998) (unpublished table disposition citing legislative history of SBREFA).   To address those concerns, Congress introduced judicial review for certain provisions of the RFA. 5 U.S.C. § 611(a).   It also required a new statement of factual basis supporting any certification that a rule will not have a significant impact on a substantial number of small entities. 5 U.S.C. § 605(b).

Contrary to the RFA's purpose, Treasury and the IRS rarely perform a regulatory flexibility analysis assessing a regulation's impact on small entities.   In a Government Accountability Office ("GAO") review of 200 tax regulations issued from 2013 to 2015, only two regulations' preambles

included a regulatory flexibility analysis. GAO-16-720, Regulatory Guidance Processes: *Treasury and OMB Need to Reevaluate Long-standing Exemptions of Tax Regulations and Guidance* 22 (2016).  According to the GAO review, approximately half of the regulations were issued with Treasury and the IRS claiming that the "RFA's requirements for a regulatory impact analysis did not apply because the regulation does not impose a collection of information requirement on small entities." *Id*. at 22.[1]  In the other half of the regulations reviewed that did not include a regulatory flexibility analysis, the preamble of the regulations claimed that the regulations would not have a significant economic impact on a substantial number of small entities. *Id.* at 23.

The RFA defines "small entities" to include small businesses, small organizations, and small governmental jurisdictions.[2]  The final regulations at issue in this case appear to define small entities as businesses with under $25 million in annual gross receipts. 84 Fed. Reg. 1838.  The RFA does not define "substantial number."  The IRS created the Internal Revenue Manual ("IRM"), to provide explanation and guidance to its staff.  Pursuant to the IRM all relevant facts and circumstances must be considered, but it notes that tax regulations with a broad effect on businesses or that target a specific industry and affect a large percentage of the small entities in that industry are likely to affect a substantial number of small entities. IRM § 32.1.5.4.7.4.5. Similarly, the RFA does not define "significant economic impact." The IRM simply provides that the estimations for the RFA are based on all relevant facts and circumstances and directs the IRS to collect statistics from within the agency, or externally with businesses, tax practitioners, or associations, or from other sources. *Id*.

---

[1] The RFA applies to interpretative rules involving internal revenue laws, but only to the extent that those tax regulations impose a collection of information requirement on small entities. 5 U.S.C. §§ 603, 604.

[2] Small businesses include businesses that satisfy the Small Business Administration's size standards.  5 U.S.C. § 601; *see* 15 U.S.C. § 632.  Most businesses likely will be classified as "small" under those standards.

The RFA "requires nothing more than that the agency file a final regulatory flexibility analysis demonstrating a reasonable, good-faith effort to carry out the RFA's mandate." *United States Cellular Corp. v. Fed. Communications Comm'n*, 254 F.3d 78, 88 (D.C. Cir. 2001). Yet, as the GAO review of 200 tax regulations demonstrates, Treasury and the IRS have almost entirely avoided regulatory flexibility analyses through the use of agency certification exempting the regulatory flexibility analysis. In the present case, per the IRS's own admission, around 20,000 multinational domestic corporations are subject to the regulations. 84 Fed. Reg. 1838. Many such businesses, especially smaller businesses that conduct business internationally, will be in a difficult position to comply with the paperwork requirements, or even to understand what is required of them. Yet, Treasury certified, without analysis, that the regulations would not have a significant economic impact on a substantial number of small entities.

The circumvention of the RFA impacts all small businesses in the United States, which similarly impacts a large percentage of our populace. According to the Small Business Administration, there are over 30 million small businesses in the United States,[3] employing close to 60 million individuals, or around half of all U.S. employment.[4] According to one survey, one in three small businesses spend over 40 hours each year dealing with federal taxes, spending up to $5,000 on *compliance* with federal tax laws in addition to lost time.[5] From Uber drivers to restaurant owners, many small businesses would benefit from a more regular use of the regulatory flexibility analysis on tax regulations, so as to not be burdened by paperwork designed with large business in mind. By not seriously considering the impact of regulations on small businesses, Treasury and the IRS consistently circumvent the stated will of Congress and impose heavy

---

[3] The criteria for small businesses can vary by sector, under 15 U.S.C. § 632, based on criteria such as gross receipts and number of employees, but here a uniform criteria based on number of employees was used.

[4] *See* Small Business Administration Office of Advocacy, *United States Small Business Profile, 2018*.

[5] *See* National Small Business Association, *2018 Small Business Taxation Survey*, 4-5.

financial costs on many businesses and American households, especially those who have the least resources to comply with massive IRS paperwork requirements, without first properly considering the true economic impact to those businesses and households.

The reason for non-compliance with the RFA by Treasury and the IRS remains unknown. Perhaps, like small-business taxpayers saddled with a regulatory burden, Treasury and the IRS find the RFA too burdensome to follow. While the motive for non-compliance is unknown, the consequence falls upon small businesses when the impact of new regulations occurs without consideration of the consequences. It appears that the government takes a narrow view of which entities its regulations impact, but we can only speculate as to the government's basis for exemption claims, because the government does not disclose its methodology or data used to determine the exemption applies to any particular regulation.

The applicable statute provides for judicial review of the agency's compliance with the RFA, including both the regulatory flexibility analysis and the agency certification exempting the regulatory flexibility analysis. 5 U.S.C. § 611. In § 611, the RFA permits judicial review of agency compliance with §§ 601, 604, 605(b), 607, 608(b), 609(a), and 610. *Id.* The RFA authorizes two types of judicial remedies, including among others: "remanding the rule to the agency", and "deferring the enforcement of the rule against small entities unless the court finds that continued enforcement of the rule is in the public interest." 5 U.S.C. § § 611(a)(4). A more robust enforcement of the RFA's procedural requirements incentivizes the IRS to consider sensible alternatives for small businesses and lessens the burden on many Americans, who simply do not understand how to navigate the labyrinth of the federal tax system.[6]

---

[6] Congress has long sought to protect the vulnerable taxpayer from onerous, ill-considered rules and regulations. Specifically, the APA was enacted in 1946, to "improve the administration of justice by prescribing fair administrative procedure." Administrative Procedure Act, Pub. L. No. 79-404 (1946). The APA ensures fair rule-making by requiring a notice-and-comment process prior to the issuance of substantive rules and guidance. The

## II.     Regulatory Effects on Low-Income Taxpayers

The required RFA analysis becomes particularly important when considered in the context of our current sharing or "gig" economy.  The gig economy represents "the fastest growing segment of the labor market."[7]  The emergence of the "gig economy" allows individuals to find work more easily through apps, work flexible hours, and utilize assets, such as their vehicles, to create revenue when they are not being put to personal use. However, it comes as a surprise to many gig workers that they are "business owners" under the tax law, which imposes quarterly tax filing and payment requirements as well as significant recordkeeping requirements that are poorly understood and consequently lead to a significant "gig economy tax gap".[8] Given this confusion, Treasury understandably has a strong incentive to find regulatory solutions to increase tax compliance in this business sector.[9]

---

notice-and-comment process must be meaningful, with agencies engaging in "reasoned decisionmaking" that is "based on a consideration of the relevant factors." *See Judulang v. Holder*, 565 U.S. 42 (2011), *quoting Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43, 103 (1983).  An "opportunity to comment is meaningless unless the agency responds to significant points raised by the public." *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35-36 (D.C. Cir. 1977).  Similarly, the RFA's requirement that the economic impact on small businesses be considered is meaningless if the IRS and Treasury can simply certify that such facts do not exist without a reasoned explanation accompanying such certification.

[7] Haley Ford, *Giggin' in the 21st Century*, 80 Mont. L. Rev. 299 (2019). In a December 2018 report, the Marketplace-Edison Research Poll found that almost one-quarter (24%) of Americans are employed in the gig economy, either as part-time or full-time gig workers. Marketplace-Edison Research Poll, December 2018, https://www.edisonresearch.com/wp-content/uploads/2019/01/Gig-Economy-2018-Marketplace-Edison-Research-Poll-FINAL.pdf. Additionally, a 2019 report found that the IRS's own tax form data shows that 17 million people filed a self-employment tax form. Tax Policy Center, Self-Employment Patterns for Men and Women and Implications for Tax Compliance, December 2019, https://www.taxpolicycenter.org/publications/self-employment-patterns-men-and-women-and-implications-tax-compliance/full.

[8] Professor Kathleen DeLaney Thomas argued in her research that many gig workers are quite different from traditional small business owners, but are nevertheless treated similarly for tax purposes.  Kathleen Delaney Thomas, *Taxing the Gig Economy*, 166 Penn. L. Rev. (2018).  She notes that subjecting potentially unsophisticated gig workers to the same tax reporting and compliance requirements of small-businesses and sole proprietors is burdensome and, in many cases, results in lower tax compliance.  *Id.* at 1417.

[9] In a 2019 report, the Treasury Inspector General for Tax Administration found that the growth of the gig economy requires that the IRS improve self-employment tax compliance. Treasury Inspector General for Tax Administration, Expansion of the Gig Economy Warrants Focus on Improving Self-Employment Tax Compliance, (2019), https://www.treasury.gov/tigta/auditreports/2019reports/201930016fr.pdf. The Inspector General reached this conclusion by analyzing the "tax gap", that is the difference between the amount of tax that taxpayers should report and owe and the amount that they actually report and pay. The report found that from 2008-2010, 15%, or $65 billion, of the overall tax gap was due to self-employment tax. *Id.* at 1. The IRS conducts periodic appraisals of the tax gap and uses this information in formulating tax administration strategies. Understanding the Latest Tax Gap

One can easily imagine Treasury attempting to improve gig economy tax compliance by enacting regulations imposing additional information reporting burdens on gig economy workers to attempt to close the gap between the amount of information the IRS typically receives about gig economy workers compared to the much larger amount of information the IRS receives about workers classified as employees.[10]

Consider, then, Treasury adopting a regulation designed to classify the vast majority of gig economy workers as employees rather than as independent contractors.[11]   Such a determination

---

Estimates and Overall Taxpayer Compliance (2019), Publication 1415, https://www.irs.gov/pub/irs-pdf/p1415.pdf. In 2019, the IRS released an analysis for years 2011, 2012, and 2013 and found that the gross average tax gap was estimated at $441 billion, with $353 billion stemming from underreporting.  Slightly over 10% ($45 billion) of the underreporting tax gap is attributable to self-employed taxpayers. *Id.* at 4.  However, these estimates are likely understated because the IRS makes those estimates based largely on third-party information reporting, including that from platform companies that employ gig-workers.  This information reporting does not exist where taxpayers receive cash for their work, and even in the limited situations in which it exists, it exists only because a taxpayer earns a specified amount. *See* Caroline Bruckner, Kogod Tax Policy Center, *Shortchanged: The Tax Compliance Challenges of Small Business Operators Driving the On-Demand Platform Economy* (2016) (payments made with a credit card or payment card must be reported on 1099-K *only* if more than 200 transactions were conducted or $20,000 was made); I.R.C. § 6050W.

[10] A recent study that analyzed the U.S. Census Bureau's redesigned Survey of Income and Program Participation (SIPP) estimated that 3.1 million independent contractors underreported self-employment income in 2014, resulting in as much as $2.51 billion in unpaid self-employment tax by gig workers.  Bruckner, Caroline and Hungerford, Thomas L., *Failure to Contribute: An Estimate of the Consequences of Non-and Underpayment of Self-Employment Taxes by Independent Contractors, and On-Demand Workers on Social Security* (September 30, 2018).  There is a large array of studies and literature that show self-employed workers consistently and substantially underreport their income to tax authorities.  Hurst, Erik and Li, Geng and Pugsley, Benjamin W., *Are Household Surveys Like Tax Forms: Evidence from Income Underreporting of the Self Employed* (November 2010).  Even more recently, a 2018 tax preparer industry survey reported 32% of self-employed workers admitted to underreporting on their tax returns, while 36% "don't do taxes at all." CPA Practice Advisory, "32% of Self-Employed Workers Admit They Under Report Taxable Income." (April 24, 2018).  Not all of the self-employment tax gap results from gig-economy workers. These workers make up only a subset of the self-employed.  The fact that the bulk of gig-economy workers are classified as self-employed suggests that these larger trends in self-employed tax compliance are exacerbated by the growth of gig-economy workers that increase the overall size of this group of taxpayers.

[11] Admittedly, such a regulation would first require Congressional action to repeal section 530 of the Revenue Act of 1978's ban on the Treasury Department enacting regulations on classifying employees and independent contractors.  Such a repeal is certainly conceivable, however, as both the IRS and the GAO have advocated for it since 1989, and repeal of this ban has been the subject of legislative efforts and recommendations over the past decade.  See Shamik Trivedi, *Worker Misclassification Catches Attention of Congress, IRS*, TAX NOTES, April 25, 2011; Donald T. Williamson, *Clarifying the Tax Classification of Workers*, TAX NOTES, March 28, 2016; GAO GGD 89-107, *Tax Administration: Information Returns Can Be Used to Identify Employers Who Misclassify Workers*, September 1989, at 10.  See also, 2003 National Taxpayer Advocate Annual Report to Congress, Key Legislative Recommendations: Tax Withholding on Nonwage Workers, p.256 (providing an in depth discussion of section 530) and National Taxpayer Advocate 2019 Purple Book, Authorize Independent Contractors and Service

could have considerable appeal in potentially reducing the failure to report income by gig economy workers.  It might be further justified as helping gig economy workers by reducing the compliance burdens associated with classifying them as independent contractors, such as eliminating the need to pay estimated taxes because of the presence of employee withholding.[12]

However, as in the instant case, the enactment of such a regulation could have the effect of increasing their tax burden at the expense of easing their compliance obligations.  Professors Diane Ring and Shu-Yi Oei aptly point out that such a solution could have unintended negative consequences, particularly for low-income taxpayers currently operating effectively as small businesses.  Professors Ring and Oei describe these potentially negative consequences as follows:

> Imagine a worker who earns $10,000 in gross income from sharing economy work and $45,000 from other employment, and spends $2,000 on qualified business expenses in the conduct of the sharing economy work. If the worker is classified as an independent contractor with respect to the sharing economy work, the $2,000 of expenses will be considered "above-the-line" expenses under Section 62. Such above-the-line expenses may be fully deducted in arriving at the taxpayer's "adjusted gross income," which would be $53,000, and will accordingly reduce the taxpayer's taxable income by a full $2,000. In contrast, if the worker is classified as an employee with respect to the sharing economy work, the $2,000 of employee expenses will be miscellaneous itemized deductions under Section 67 (because Section 62 excludes employee expenses), and will be disallowed to the extent they do not exceed 2 percent of the taxpayer's adjusted gross income. In this case, the worker's adjusted gross income remains at $55,000. Two percent of adjusted gross income is $1,100. Thus, the taxpayer will only be permitted to deduct $900 out of

Recipients to Enter into Voluntary Withholding Agreements without Risk that the Agreements will be used to Challenge Worker Classification Determinations, page 103.

[12] Under the current tax reporting rules for gig platform companies, self-employed workers should receive a Form 1099-MISC for payments by businesses for more than $600 for goods or services they provide. However, if a worker receives payment from customers via an On-Demand Platform, the IRS generally considers the platform to be a third-party settlement organization (TPSO) for tax reporting purposes. TPSOs need not distribute Forms 1099 to their contractors unless the aggregate number of transactions of a service provider exceeds 200 and the amount reported exceeds $20,000.  I.R.C. § 6050W.   A 2018 study found that, of the Top 100 On-Demand Platforms in 2016, only 12% issued Form 1099-Ks to gig workers, and of the 12% that did, only half issued them to more than 55 workers.  Rosita Mindermann, Alexander Escobar, *Gig Economy Management Development Program Project*, State of California Franchise Tax Board (Sept. 21, 2018).  Rather than preparing a tax return once each year like most working individuals, gig workers, as "business owners," must prepare Form 1040ES and pay estimated taxes four times each year to avoid potential penalties.  These burdens for both the government in the form of lost tax revenue from unreported income and for taxpayers in terms of compliance costs could be eliminated if gig economy workers were classified as employees.

the $2,000 expenses incurred from her $55,000 of adjusted gross income. The taxpayer will not be able to deduct anywhere on her tax return the remaining $1,100 spent.[13]

As the above example illustrates, a regulatory solution designed to close the gig-economy tax gap and even to provide some compliance simplification for low-income taxpayers could nevertheless have a negative consequence of increasing the tax burden on a vast majority of low-income taxpayers.  If the Secretary is permitted to simply "certify" that such regulation will not harm small businesses, rather than providing the requisite impact analysis, an overly broad regulation directed at small businesses could have a devastating impact on gig workers without first meaningfully considering the impact.[14]

While the above example finds its roots in ongoing tax policy discussions with respect to this business sector, it admittedly would require legislative action before regulatory action could take place.  However, other examples exist that do not require additional legislative authorization.

For example, assume  Treasury issued regulations that significantly expand requirements to issue a 1099-K.[15]  This might result in an RFA certification that this would not impose a burden on small businesses and in fact the government would argue that such guidance would help these workers in regards to tracking their income for compliance purposes.

---

[13] Diane Ring and Shu-Yi Oei, "Tax Issues in the Sharing Economy: Implications for Workers," featured in THE CAMBRIDGE HANDBOOK OF THE LAW OF THE SHARING ECONOMY (Nestor M. Davidson, Michele Finck, and John J. Infranca, eds.), Cambridge University Press (2018) at 354 n.50.  Professors Ring and Oei also note that in this example the taxpayer now classified as an employee would lose the benefit of the lower tax rate available through I.R.C. § 199A.  *Id.* at 354.

[14] Further, there are concerns that self-employed gig workers still fly "under the radar" when it comes to IRS small business data. This could create the unfortunate consequence of gig workers failing to be considered at all in the enactment of regulations intended to enhance small business compliance. Bruckner, *supra,* note 9.

[15] They could realistically determine that gig economy platforms do not fall within the definition of a TPSO under I.R.C. § 6050W, and accompany such a determination with a reduction in the 1099 threshold to effectively require that these platforms provide 1099s for any income that was earned on their platforms. *See* Treasury Inspector General for Tax Administration Report 2019-30-016, *Expansion of the Gig Economy Warrants Focus on Improving Self-Employment Tax Compliance*, February 24, 2019, at 33-37 (describing generally the need for regulatory clarification of information reporting requirements under I.R.C. § 6050W).

However, such an action might indeed be unduly burdensome on small businesses because it might effectively lock some of them out of the employment market. Not wanting to be overwhelmed by increased 1099 issuance costs, platforms could determine in response to such a regulation that they might not want workers who do not generate a certain level of income, determining that workers using their platforms for smaller amounts of income generated compliance costs that were not worthwhile. In addition, it could stifle competition in the gig economy arena by imposing additional compliance costs on new entrants into the sharing economy that might initially rely on involving a larger pool of workers, each of whom might initially generate small amounts of income but who would impose significant 1099-K issuance costs on a new small business that does not have the infrastructure in place to issue a large number of 1099-Ks. As a result, low-income taxpayers who rely on a small amount of gig-economy work might find that they do not have as many opportunities for employment as they currently exist.

Other possible regulatory action could take place in the context of either reducing improper business deductions or simplifying recordkeeping requirements in the hopes of enhancing compliance. Treasury could attempt to close the gig-economy tax gap by tightening the substantiation requirements for certain business expenses under I.R.C. § 274(d). This could occur in the form of reducing or even eliminating the per diem and mileage allowances for travel, currently allowed under Treas. Reg. § 1.274-5A(f), in favor of requiring taxpayers to substantiate actual costs, with an RFA certification that such a reduction would not overly burden small businesses. While this might impose an additional burden on large businesses in terms of increased recordkeeping requirements, such a burden would likely be much more manageable than it would be for a small business or self-employed taxpayer. Large businesses could more easily develop company-wide processes and procedures and invest in sophisticated software solutions to track

actual costs and provide guidance to their employees about how such costs should be substantiated.

The smaller, self-employed gig economy worker, however, may not have the resources to address

the additional compliance requirements and thus find themselves uncompetitive with the larger

platforms and essentially locked out of the market.  While the additional compliance concerns may

in fact be of higher public worth than the loss of smaller gig economy workers from the market,

the RFA requires the analysis of the impact on such workers so that a meaningful decision on such

a point can be made.

The increased tax cost imposed by these example regulatory actions could have devastating

consequences for low-income taxpayers.[16]  Gig workers tend to be younger and less financially

sound than the typical business owner, "gigging" fewer hours each week oftentimes as a

supplement to their primary source of income.[17]  While a traditional sole proprietor may earn

$100,000 annually, working 40-hour weeks, the average Uber driver will earn less than $10,000

per year working less than 15 hours a week.[18]  The Federal Reserve reported in 2018 that gig

workers in particular experience financial fragility.[19]   Therefore, IRS rules and regulations

designed to enhance compliance for independent contractors and small businesses and to simplify

compliance obligations at the cost of increased tax liability could create a disparate burden on low-

---

[16] See, e.g., Testimony of National Taxpayer Advocate Nina Olson before the House Small Business Committee on May 26, 2016, in a hearing titled: The Sharing Economy: A Taxing Experience for New Entrepreneurs (beginning at page 10 or the testimony the discussion focuses on the general burden placed on unsophisticated gig workers)

[17] See Bruckner, supra note 9

[18] Id. A recent study showed average annual earnings of just over $6,396 for gig workers providing services, and only $3,768 for those leasing assets or selling goods.  Diana Farrell, Fiona Greig, JP Morgan Chase & Co. Inst., Paychecks, Paydays, and the Online Platform Economy, 7 (2016).  Eighty-five percent of gig workers earn less than $500/month from their gigs.  Nina E. Olson, National Taxpayer Advocate Blog (2018), https://taxpayeradvocate.irs.gov/news/nta-blog-participants-in-the-sharing-economy-lack-adequate-guidance-from-the-irs.

[19] The report based this on the finding that they would have difficulty handling a $400 unexpected expense.  Federal Reserve Report on the Economic Well-Being of U.S. Households in 2018, (2019), https://www.federalreserve.gov/publications/files/2018-report-economic-well-being-us-households-201905.pdf.  For those who use gig work as their primary source of income, 58% said they would have trouble handling this unexpected expense, and that number only decreases to 44% for those who engage in gig work part-time.  Id. at 20.

income taxpayers who engage in gig work.  This is precisely the type of harm that the RFA is designed to prevent and why ensuring Treasury's use of "certification" procedures does not all but nullify the RFA.

## CONCLUSION

Small-business owners not only represent a substantial part of the economy but low-income small-business owners comprise a significant share of the group.  When Treasury and the IRS fail to consider the impact of regulations on this group as required by the RFA, they put pressure on these vulnerable taxpayers to comply with increased complexity that may not be necessary to achieve Congressional goals.  For many of these taxpayers having to contest a regulation in the context of litigation concerning the merits of the liability on a tax return could be difficult or impossible from a financial perspective.  These small business owners play a large role in our economy.  They already face significant challenges in commenting on regulations that large businesses do not face.  These small businesses deserve to have Treasury and the IRS consider their circumstances when promulgating regulations as Congress intended.

Respectfully submitted,

 /s/ Dana Montalto
Dana Montalto, D.C. Bar. No. MA0014
*Counsel for Amicus Curiae* The Center for Taxpayer Rights
Legal Services Center of Harvard Law School
122 Boylston Street
Jamaica Plain, Massachusetts 02130
(T) (617) 390-2737
(F) (617) 522-0715
(E) dmontalto@law.harvard.edu
*Prepared with assistance from law students*
*Abigail Fitts, Lauren Heron, and William Liang*

Dated: May 18, 2020

## <u>CERTIFICATE OF SERVICE</u>

I, Dana Montalto, hereby certify that the foregoing documents filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

/s/ Dana Montalto
Dana Montalto

Dated: May 18, 2020