## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SILVER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-247-APM |
| | ) | |
| INTERNAL REVENUE SERVICE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
## SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION

**Table of Contents**

INTRODUCTION

BACKGROUND

    A.   Statutory framework of section 965. .......................................................................... 2

    B.   Regulations under section 965. ................................................................................. 3

    C.   Regulatory Flexibility Act Analysis .......................................................................... 6

    D.   Plaintiffs' business and Silver's tax return preparation ............................................. 9

ARGUMENT

I.     The summary judgment standard in Administrative Procedure Act cases is highly
      deferential to the agency. .......................................................................................... 9

II.    Plaintiffs lack standing to seek injunctive relief because neither faces any ongoing burden
      from the regulations at issue. .................................................................................. 11

III.   The Court lacks jurisdiction to entertain Plaintiffs' claims under the Regulatory
      Flexibility Act and the Paperwork Reduction Act. ..................................................... 14

    A.   Congress has not authorized entities like Plaintiffs to bring actions for judicial
         review under the RFA. ......................................................................................... 15

    B.   It is unclear whether Plaintiffs are making a claim under the Paperwork Reduction
         Act, but in any event Congress has barred that sort of claim. ................................... 19

IV.   Treasury complied with the Paperwork Reduction Act. .................................................. 20

V.    Treasury complied with the Regulatory Flexibility Act. ................................................. 22

    A.   Plaintiffs provide no evidence sufficient to call into question Treasury's conclusion
         regarding economic impact under the Court's "highly deferential" review. ............. 23

    B.   Plaintiffs point to no "foundational error" undermining Treasury's analysis. .......... 27

VI.   The Anti-Injunction Act proscribes the Plaintiffs' requested relief................................. 29

VII.  Plaintiffs' requested remedies are inappropriate............................................................ 31

    A.   Remand is sufficient to correct any deficiencies that the Court finds. ...................... 32

    B.   Deferring enforcement of the regulation against Plaintiffs and small entities is not in
         the public interest................................................................................................. 34

    C.   Plaintiffs' request for compliance with section 212 of Public Law 104-121 is both
         beyond the scope of their amended complaint and premature. ................................. 37

CONCLUSION

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ad Hoc Metals Coal. v. Johnson*,
    2006 WL 8445386 (D.D.C. Jan. 20, 2006)............................................................27

*Aeronautical Repair Station Ass'n, Inc. v. FAA*,
    494 F.3d 161 (D.D.C. 2007) ......................................................................28, 33

*Air Transp. Ass'n of America, Inc. v. Nat'l Mediation Bd.*,
    719 F. Supp.2d 26 (D.D.C. 2010) ...........................................................................11

*Alegent Health-Immanuel Med. Ctr. v. Sebelius*,
    34 F. Supp. 3d 160 (D.D.C. 2014) ...........................................................................19

*Am. Fed. of Labor v. Chertoff*,
    552 F.Supp. 2d 999 (N.D. Cal. 2007) ......................................................................28

*Arpaio v. Obama*,
    797 F.3d 11 (D.C. Cir. 2015) ...................................................................................11

*Bloch v. Powell*,
    227 F.Supp.2d 25 (D.D.C. 2002) .............................................................................10

*C & W Fish Co., Inc. v. Fox*,
    931 F.2d 1556 (D.C. Cir. 1991) ...............................................................................10

*Chamber of Commerce of U.S. v. Napolitano*,
    648 F. Supp. 2d 726 (D. Md. 2009) .........................................................................34

*Cohen v. United States*,
    650 F.3d 717 (D.C. Cir. 2011) (en banc). Dkt. 29 ..................................................30

*Consumer Elecs. Ass'n v. F.C.C.*,
    347 F.3d 291 (D.C. Cir. 2003)..................................................................................10

*Council for Urological Interests v. Burwell*,
    790 F.3d 212 (D.C. Cir. 2015) .........................................................................23, 27

*Debt Buyers' Ass'n v. Snow*,
    481 F. Supp. 2d 1 (D.D.C. 2006) ............................................................................31

*Dickens v. United States*,
    671 F.2d 969 (6th Cir.1982) ................................................................31

*Ellis v. Commissioner*,
    67 F. Supp. 3d 325 (D.D.C. 2014), *aff'd*, 622 Fed. App'x 2 (2015).......................31

*Florida Bankers Ass'n v. U.S. Dep't of Treasury*,
    799 F.3d 1065 (D.C. Cir. 2015) .....................................................25, 31

*G.M. Leasing Corp. v. United States*,
    429 U.S. 338 (1977)..................................................................34

*Harlan Land Co. v. U.S. Dep't of Agr.*,
    186 F. Supp. 2d 1076 (E.D. Cal. 2001)...................................................33

*Helicopter Ass'n Int'l, Inc. v. F.A.A.*,
    722 F.3d 430 (D.C. Cir. 2013) ......................................................26, 27

*Judicial Watch, Inc. v. Rossotti*,
    317 F.3d 401 (4th Cir. 2003) ..........................................................31

*Lake Carriers' Ass'n v. E.P.A*,
    652 F.3d 1 (D.C. Cir. 2011) ...........................................................23

*Lehman v. Nakshian*,
    453 U.S. 156 (1981)..................................................................14

*Lowrie v. United States*,
    824 F.2d 827 (10th Cir.1987) .........................................................31

*Mackinac Tribe v. Jewell*,
    87 F. Supp. 3d 127 (D.D.C. 2015), *aff'd*, 829 F.3d 754 (D.C. Cir. 2016).............................18

*Michigan v. U.S. E.P.A.*,
    213 F.3d 663 (D.C. Cir. 2000) .........................................................23

*Mid-Tex Elec. Co-op., Inc. v. F.E.R.C.*,
    773 F.2d 327 (D.C. Cir. 1985) .........................................................23

*Motor & Equip. Mfrs. Ass'n v. Nichols*,
    142 F.3d 449 (D.C. Cir. 1998) .........................................................24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)................................................................10, 11

*Muttitt v. Dep't of State*,
    926 F. Supp. 2d 284 (D.D.C. 2013) ....................................................38

*Nat'l Ass'n for Home Care v. Shalala*,
    135 F. Supp. 2d 161 (D.D.C. 2001) ..................................................................32

*North Carolina Fisheries Association, Inc. v. Daley*
    16 F. Supp. 2d 647, 652-53 (E.D. Va. Oct. 10, 1997) ...........................................28

*Northport Health Servs. of Arkansas, LLC v. United States Dep't of Health &*
    *Human Servs.*,
    No., 2020 WL 1696009 (W.D. Ark. Apr. 7, 2020)..................................................27

*Nw. Min. Ass'n v. Babbitt*,
    5 F. Supp. 2d 9 (D.D.C. 1998) .............................................................................28

*Owner-Operator Indep. Drivers Ass'n, Inc. v. United States Dep't of*
    *Transportation*,
    879 F.3d 339 (D.C. Cir. 2018) .......................................................................12, 13

*Safari Club Int'l v. Salazar*,
    709 F.3d 1 (D.C. Cir. 2013) ...................................................................................29

*Seven-Sky v. Holder*,
    661 F.3d 1 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ......................................30

*Sierra Club v. Mainella*,
    459 F.Supp.2d 76 (D.D.C.2006) .......................................................................9, 10

*Southern Offshore Fishing Ass'n v. Daley*,
    995 F. Supp. 1411 (M.D. Fla. 1998)........................................................27, 28, 33

*States Telecom Ass'n v. FCC*,
    400 F.3d 29 (D.C. Cir. 2009) ................................................................................33

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998)................................................................................................29

*Swanson Grp. Mfg. LLC v. Jewell*,
    790 F.3d 235 (D.C. Cir. 2015) .....................................................................11, 12, 13

*Tozzi v. E.P.A.*,
    148 F. Supp. 2d 35 (D.D.C. 2001) ..................................................................19, 20

*Transmission Access Policy Study Group v. FERC*,
    225 F.3d 667 (D.C. Cir. 2000) ..............................................................................26

*United States v. Mead Corp.*,
    533 U.S. 218 (2001)..............................................................................................10

*United States v. Testan,*
    424 U.S. 392 (1976)...........................................................................................14

**Statutes**

5 U.S.C. § 601.................................................................................................7, 15, 16, 23

5 U.S.C. §§ 603......................................................................................................................22

5 U.S.C. § 604........................................................................................................................22

5 U.S.C. § 605........................................................................................................................22

5 U.S.C. § 611...........................................................................................................15, 23, 32, 34

5 U.S.C. § 701(a)(1)..............................................................................................................20

5 U.S.C. § 706(2)(A).............................................................................................................10

15 U.S.C. § 632.........................................................................................................16, 18, 23

26 U.S.C. § 965....................................................................................................... *passim*

26 U.S.C. § 7421(a)...............................................................................................................29

26 U.S.C. § 7805(f)..................................................................................................................6

31 U.S.C § 3514.....................................................................................................................12

44 U.S.C. § 3507...........................................................................................................19, 20, 21

44 U.S.C. § 3512(a)...............................................................................................................21

Public Law 104-121 section 212..............................................................................32, 38, 39

Tax Cuts and Jobs Act. Pub. L. No. 115-97, 131 Stat. 2054 (2017)....................................2

**Other Authorities**

13 C.F.R. § 121.105.......................................................................................16, 17, 18, 23

64 FR 42222-01.....................................................................................................................27

73 FR 48434-01.....................................................................................................................27

77 FR 39919...........................................................................................................................27

81 FR 688688-01....................................................................................................................27

83 FR 39514 *et seq.* ..............................................................................................................3

Federal Rule of Civil Procedure 12(b)(1) ..................................................................................20

Federal Rule of Civil Procedure 56 ............................................................................................9

H.R. Rep. No. 115-446 (2017)....................................................................................................8

Revenue Procedure 2018-17 .......................................................................................................4

Treas. Reg. § 1.965-2(f)(2) .........................................................................................................4

Treas. Reg. § 1.965-7(f)..............................................................................................................4

**INTRODUCTION**

Before the 2017 Tax Cuts and Jobs Act ("TCJA"), U.S. citizens and most other U.S.

taxpayers were typically subject to tax on income they earned anywhere in the world.  The TCJA

replaced this worldwide system with a quasi-territorial one.  As part of this effort, the TCJA

amended section 965 of the Internal Revenue Code to impose a "transition tax" on U.S.

shareholders of certain foreign entities, based on the earnings accumulated abroad by those

entities since 1986, whether or not the earnings were distributed back to the U.S.

Treasury and the IRS (collectively, "Treasury" or "the agency") issued regulations

relating to reporting and payment of the transition tax.  In the process, and in accordance with the

Regulatory Flexibility Act, Treasury determined and certified that the regulations would not have

a significant economic impact on a substantial number of directly regulated and statutorily-

defined "small entities."  This certification rendered unnecessary a fuller analysis of economic

impact on those small entities.

Plaintiffs, Monte Silver ("Silver") and his business Monte Silver, Ltd. ("Silver Limited"),

claim to be small entities unduly burdened by the regulations.  In the comment phase leading up

to the final regulations, Silver repeatedly pressed for individual owners of small businesses to be

exempt from the transition tax.  Treasury could not agree to this, because the requested

exemption would run afoul of the statute.  So, in this suit, Plaintiffs have challenged the agency's

certification about economic impact, claiming — wrongly — that it was made without "an iota

of evidence" in violation of the Regulatory Flexibility Act ("RFA").

Plaintiffs lack standing to bring this suit.  For most taxpayers, the transition tax is a one-

time obligation, though they can choose to pay the tax in installments.  Plaintiffs owe no

transition tax, and therefore have no future reporting obligations under section 965 or the

associated regulations.  Besides that, neither Plaintiff qualifies as a "small entity" afforded

1

protection under the RFA.  And though Plaintiffs leave us all guessing, still, whether they are asserting a claim under the Paperwork Reduction Act (PRA) — by turns, disavowing the claim and then citing anyway to the PRA's requirements — there is no judicial review of alleged violations of that law.

In any case, the agency complied with the PRA.  It also complied with the RFA by making a reasonable and evidence-based certification on economic impact.  Plaintiffs fail to controvert the agency's findings and present nothing else to overcome the high degree of deference this Court owes the agency when reviewing its certification.

The Anti-Injunction Act bars this suit, and not just the particular remedies Plaintiffs seek. But even if the Court pressed past all the threshold problems with Plaintiffs' claims, and then also decided the merits in Plaintiffs' favor, the only appropriate remedy would be to remand the matter to the Treasury and the IRS to address whatever procedural violation this Court finds was committed in issuing the regulations.

**BACKGROUND**

A.     **Statutory framework of section 965.**

Internal Revenue Code section 965 was amended in 2017 as part of the Tax Cuts and Jobs Act.  Pub. L. No. 115-97, 131 Stat. 2054 (2017).  Section 965 applies to U.S. shareholders in a specified foreign corporation and to U.S. persons who hold an interest in a pass-through entity that is itself a U.S. shareholder in a specified foreign corporation.  In other words, it applies to U.S. persons that have an ownership stake, direct or indirect, in a specified foreign corporation.  The law mandates a "deemed repatriation" of certain earnings held abroad in a subset of foreign corporate entities, called "deferred foreign income corporations," (DFICs) and

generally requires the U.S. shareholders to pay a one-time transition tax on the untaxed foreign earnings accumulated in these DFICs since 1986.  26 U.S.C. § 965(a).

In addition, the statute at subsections 965(h), (i), (m), and (n) provides for favorable elections that may be made by certain taxpayers required to now include these "deemed repatriated" foreign earnings in their income.  An election under subsection 965(h) allows a taxpayer that has a transition tax liability to pay it, interest free, in eight annual installments unless a specified "acceleration" event occurs.  *See* ADMIN_03524.  Subsection 965(i) allows a shareholder of an S corporation that is a shareholder in a DFIC to elect to indefinitely defer its transition tax liability with respect to the S corporation until a specified "triggering" event occurs.  *See* ADMIN_03525.  Subsection 965(m) allows real estate investment trusts to elect to defer the foreign income inclusion over eight years.  Subsection 965(n) generally allows a taxpayer to elect not to take section 965 (and the inclusion of accumulated foreign income) into account in determining its net operating loss for the inclusion year or in carrying that loss backward or forward to other tax years.

Finally, subsection 965(o) directs that the Secretary "shall prescribe such regulations or other guidance as may be necessary or appropriate to carry out the provisions of this section."

### B.    Regulations under section 965.

On August 9, 2018, Treasury published in the Federal Register a notice of proposed rulemaking under section 965 (as well as related proposed regulations under sections 962 and 986).  ADMIN_03554 to _03615 (83 FR 39514 *et seq.*).   Before publishing the notice of proposed rulemaking, Treasury issued three other notices addressing the upcoming regulations and related issues:  Notice 2018-07, Notice 2018-13, and Notice 2018-26.  *See* ADMIN_00627, _00639, _00651.  A fourth notice, Notice 2018-78, was published after the notice of proposed

rulemaking.  *See* ADMIN_00670.  Prior to the notice of proposed rulemaking, Treasury also published Revenue Procedure 2018-17, which relates to changes in accounting periods potentially relevant to section 965.  ADMIN_00623.  The IRS published a series of Questions and Answers to provide further guidance regarding filing and payment obligations under the new rules.  ADMIN_00674.[1]

On February 5, 2019, Treasury published final regulations in the Federal Register.  *See* ADMIN_03136 to _03213.  The proposed and final regulations answered a number of technical questions relating to section 965.  For instance, because the statute allows taxpayers to make favorable elections in the manner prescribed by the Secretary, the regulations set forth how to make each election.  26 U.S.C. §§ 965(h)(5), (i)(8)(B), (m)(2)(A), and (n)(3); ADMIN_03158 to _03164 and _03200 to _03210.  The regulations also establish the terms and conditions for curing an acceleration or triggering event that might otherwise obligate the taxpayer to immediately pay the full amount of a deferred or staggered transition tax liability.  *See* ADMIN_03158 to _03160, _03532.

The regulations recognize two additional elections.  First, Treas. Reg. § 1.965-7(f) allows taxpayers to elect to calculate the post-1986 earnings and profits as of October 31, 2017, and prorate that amount to November 2, 2017, rather than having to determine the amount as of November 2, 2017, which might force an interim "closing of the books" at the beginning of a new financial year.  ADMIN_03575 to _03576; ADMIN_03208 to _03209.  Second, Treas. Reg. § 1.965-2(f)(2) allows taxpayers to elect to make certain basis adjustments with respect to their DFIC stock or applicable property to facilitate future tax-free access to earnings and profits that have been taxed under section 965.  ADMIN_03566.

---

[1] Also available at: https://perma.cc/A5PG-FEB4.

The regulations therefore provide taxpayer-favorable rules that, to the extent permitted by the statute, ameliorate potential difficulties that taxpayers could have in calculating, reporting, and paying tax resulting from section 965.  *See* ADMIN_03554 (referring to information collection requirements associated with "taxpayer-favorable rules" or taxpayer elections).

Although Treasury and the IRS received a flood of comments from taxpayers in response to the proposed rulemaking, relatively few dealt with the contents of the regulations.  Instead, the majority of the comments complained of the transition tax.  The record contains over two hundred form letters that start "My name _____[NAME]. I am an American living in _____[COUNTRY] and I vote in _____ [STATE]" and then state that "Americans overseas with interests in foreign corporation should be exempt from the Repatriation Tax and from the GILTI regime[2] . . . ."  *See, e.g.*, ADMIN_01551-1552, _01557-01558, _01600-_01601, _01613-_01614, -01690-_02277, _02494-_02495.  Another cluster of similar letters starts "I am a U.S. Person with an interest in a small business" and ends with a request that small businesses be exempt from the tax.  ADMIN_01340 to _01427.  Only three comments addressed the Regulatory Flexibility Act analysis.  *See* ADMIN_01187-_0193, ADMIN_02445-_02458, and ADMIN _-02459-_02492.

As explained in the preamble to the final regulations, Treasury could not adopt the repeated requests for an exemption from the tax, as that would run contrary to the clear language and legislative history of section 965.  *See* ADMIN _03165 ("Numerous comments were received requesting guidance exempting individuals from the application of section 965. The statute is clear that section 965 applies to all United States shareholders.  . . . . Because the statute

---

[2] GILTI stands for "global intangible low taxed income."  The so-called GILTI regime is not at issue in this suit.

and legislative history are clear that section 965 was intended to apply to all United States shareholders, including individuals, the Treasury Department and the IRS have determined that providing the requested relief is not appropriate").

### C.    Regulatory Flexibility Act Analysis

When the proposed regulations were released, Treasury determined that the economic impact of the regulations (apart from the statute) on small entities stemmed from collection of information obligations, and those obligations only came into play if taxpayers sought to rely on favorable rules or elections and needed to demonstrate they were entitled to that treatment.  *See* ADMIN_03580; ADMIN_03172.  As a result, Treasury certified that the regulations did not impose collection of information requirements having a significant economic impact on a substantial number of small entities and thus an initial Regulatory Flexibility Act (RFA) analysis was not required.  *Id.*

This certification was based on several facts.  First, the average burden is five hours, which is minimal, particularly in comparison to other regulatory requirements related to owning stock in a specified foreign corporation.  ADMIN_03581.  Second, the collection of information requirements apply only if a taxpayer chooses to make an election or rely on a favorable rule.  *Id.* Third, the collections of information apply to the owners of specified foreign corporations, *id.*, but the specified foreign corporation (whatever its size) is not itself subject to the reporting requirements and, meanwhile, a U.S. shareholder with sufficient stock in such a corporation (that is, a taxpayer that *is* subject to the reporting requirements) is unlikely to be a small entity.  *Id.*

Regardless, as required by law, Treasury sent a copy of the proposed regulations to the Chief Counsel for Advocacy of the Small Business Administration ("SBA") for comment on its impact on small businesses.  *See* ADMIN_03581; ADMIN_03172; 26 U.S.C. § 7805(f).

Silver also contacted the SBA about these proposed regulations, repeatedly.  For one, Silver copied the Acting Chief Counsel (Major Clark) and a Senior Counsel (Claudia Rodgers) at the SBA's Office of Advocacy on the majority of his correspondence with the IRS.  *See* Statement of Select Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment (hereinafter just "Fact"), at para. 1.  In addition, on August 9, 2018, Silver sent an email entitled "Secretary Mnuchin's bad faith certification under the Regulatory Flexibility Act regarding the proposed 965 rule" to Acting Chief Counsel Clark at the SBA (copying, among others, Senior Counsel Rodgers).  Fact 2.  On August 14, Silver sent another email to Clark and Rodgers at the SBA requesting a call "to discuss the recent proposed 965 regulation with regard to  . . . (ii) their compliance with section 605© [sic] of the Regulatory Flexibility Act, and (iii) SBA duties under FRA [sic] 612."  Fact 3.  On September 12, 2018, Silver forwarded his submitted comments as part of an email sent to "Treasury, OMB, OIRA & SBA Officials" that again discussed his concerns about Treasury's compliance with the Regulatory Flexibility Act.  Fact 4.  Finally, Plaintiff Monte Silver wrote to "Linda, Michael and Pradeep" at the SBA multiple times to discuss the proposed regulations.  Fact 5.

The SBA did not issue any public comments to the regulations, ADMIN_03172, although they received the proposed rules for review, *see id.*, along with repeated emails from Silver pointing the SBA to (alleged) burdens on small business and flaws in Treasury's approach to the RFA (*see* Facts 1-5).

After reviewing the comments, Treasury determined and certified that the final regulations would not have a significant economic impact on a substantial number of small entities within the meaning of section 601(6) of the Regulatory Flexibility Act.  ADMIN_03171. In setting forth this conclusion, the final regulations cite to published information from the

Conference Report accompanying the Act (H.R. Rep. No. 115-446, at 688 (2017)), and Bureau of Economic Analysis aggregate data. *Id.* As before, Treasury determined that the economic impact of the final regulations when considered alone (that is, above the impact "baseline" of the statute itself) would be minimal. ADMIN_03172. This was because any economic impact of the final regulations would stem from the collection of information requirements they established, and those would not be extensive. *Id.* Specifically, Treasury concluded (confirming what was stated in the proposed regulations) that the average burden associated with these collection of information requirements would be 5 hours, which is negligible when compared to the other regulatory requirements related to owning stock in a specified foreign corporation. *Id.* What is more, these reporting requirements would only apply if a taxpayer chose to make an election or rely on a favorable rule. *Id.*

Treasury addressed comments about specific language within the regulations, at length. *See* ADMIN_03136 through _03164 (addressing comments throughout). As to the general comments from Silver and like-minded individuals about the economic impact of the rules, Treasury wrote, "The comments received regarding the economic impact of the proposed regulations principally focus on burdens imposed by the statute (i.e., the tax due as a result of section 965) rather than any additional burdens resulting from the proposed regulations." ADMIN_03172.

Having determined that the regulations did not impose a significant economic impact on a substantial number of small entities, Treasury concluded that a regulatory flexibility analysis under the RFA was not required. ADMIN_03172.

### D.      Plaintiffs' business and Silver's tax return preparation

Plaintiff Monte Silver is a U.S. citizen residing in Israel.  Fact 6.  Silver Limited is a

corporation located in and organized under the laws of Israel.  Fact 7.  Silver Limited does not

have a place of business in the United States.  Fact 8.  Silver is the sole shareholder and sole

employee of Silver Limited.  Fact 9.  The records of the California Secretary of State show no

California business registration for Silver Limited.  Fact 10.  A search of 20 other major

corporate databases show no connection between Silver Limited and the State of California.

Fact 11.  Silver Limited does not have a U.S. employer identification number and does not report

or pay U.S. taxes.  Fact 12.

Silver has amended his 2017 individual income tax return twice.  Fact 13.  As he explained

on the amended returns, he first amended his 2017 return to report foreign bank accounts he or

his wife owned or controlled.  Fact 14.   He amended his return a second time to file a statement

that he forgot to include earlier.  Fact 15. The "Transition Tax Statement" Silver included with

his original return for 2017 was never amended.  Fact 16.

## ARGUMENT

### I.      The summary judgment standard in Administrative Procedure Act cases is highly deferential to the agency.

Plaintiffs claim a violation of the Regulatory Flexibility Act and seek review under the

Administrative Procedure Act, which they claim provides the waiver of sovereign immunity

empowering this Court to review the agency action at issue here.  *See* dkt. no. 47-1 (hereinafter

"Plaintiffs' Brief," abbreviated as "Pls. Br.") at 5.  While the parties have now filed Rule 56

cross-motions for summary judgment, the limited role federal courts play in reviewing agency

action under the APA means that the typical Rule 56 summary judgment standard does not

apply.  *See Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89–90 (D.D.C. 2006) (internal citation

omitted).  In APA cases like this one, "the function of the district court is to determine whether or not . . . the evidence in the administrative record permitted the agency to make the decision it did."  *Id.* (internal citations omitted).[3]  Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and otherwise consistent with the APA standard of review.  *See Bloch v. Powell*, 227 F. Supp. 2d 25, 31 (D.D.C. 2002) (citation omitted).

In reviewing agency action under the APA, a court asks only whether the action was "arbitrary and capricious."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983); 5 U.S.C. § 706(2)(A).  Under this standard, a court "may not set aside an agency rule that is rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency."  *Id.*; *see also United States v. Mead Corp.*, 533 U.S. 218, 227 (2001) (citations omitted); *Consumer Elecs. Ass'n v. F.C.C.*, 347 F.3d 291, 300 (D.C. Cir. 2003) (review of agency action is "necessarily deferential").  The scope of review is "narrow and a court is not to substitute its judgment for that of the agency."  *Id.* at 43;

---

[3] Plaintiffs renew their attempt to add documents to the administrative record.  *See* Pls. Br. at 16, fn 4.  To that end they attach an appendix of documents directly to the back of their brief.  These documents appear to be a subset of the same ones they earlier moved (at dkt. no. 39) to include in the administrative record.  Though, to add to the confusion, the same documents now bear a different bates prefix from the one Plaintiffs used in their earlier motion ("PR" instead of "MS Admin").  The Court did not grant the Plaintiffs' earlier motion to supplement, deferring its consideration until summary judgment briefing.  Defendants, responding to that motion, pointed out that Plaintiffs, for the most part, sought to supplement the administrative record with documents *already in it*.  *See* dkt. no. 42.  Defendants also explained why any non-duplicative documents proffered by Plaintiffs were not properly part of the record.  *See id.*  While Plaintiffs again urge the same documents on the Court as part of the administrative record, they still do not adequately explain why the Court should allow it.

*C & W Fish Co., Inc. v. Fox*, 931 F.2d 1556, 1565 (D.C. Cir. 1991) (citations omitted) ("this court will not second guess an agency decision or question whether the decision made was the best one").

Because the court is asked only "to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did," *Air Transp. Ass'n of America, Inc. v. Nat'l Mediation Bd.*, 719 F. Supp. 2d 26, 32 (D.D.C. 2010) (citation and internal quotation omitted), so long as the administrative record shows that an agency "engaged substantively with the question" at issue and adequately explained the reasoning supporting its conclusion, "[n]o more is required under the APA," *id.* at 40-41 (citations omitted), and a court must grant summary judgment in favor of the agency.  A court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *State Farm*, 463 U.S. at 43 (citations and internal quotations omitted).

## II.   Plaintiffs lack standing to seek injunctive relief because neither faces any ongoing burden from the regulations at issue.

The "irreducible constitutional minimum of standing contains three elements":  injury in fact, causation, and redressability.  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (internal citation omitted). The plaintiff bears the burden of establishing these elements of standing in the same manner as otherwise required at a given stage of a litigation.  *Id.* (*citing Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992)).  Here, at summary judgment, Plaintiffs "can no longer rest on mere allegations" and must produce concrete evidence of ongoing or imminent future injury to support their claim for injunctive relief.  *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 239–40 (D.C. Cir. 2015) (citations omitted).  This creates a "significantly more rigorous burden to establish standing" than if Plaintiffs had sought redress for past injuries.  *Id.*  Where the prospect of future injury is only "speculative," a suit for injunctive relief cannot stand.

*Owner-Operator Indep. Drivers Ass'n, Inc. v. United States Dep't of Transportation*, 879 F.3d 339, 347 (D.C. Cir. 2018).

Having reached the summary judgment stage, Plaintiffs detonate their own case.  In their brief, Plaintiffs, relying on Silver's sworn declaration, assert, "At no time did Plaintiffs owe any Transition Tax, nor do they have any reason to believe they ever will."  Pls. Br. at 7; dkt. no 47-2 ("Silver Decl."), ¶ 18.  Whatever unspecified cost Silver already incurred in reporting that he owed no transition tax is irrelevant to Plaintiffs' request for injunctive relief.  *Swanson*, 790 F.3d at 239–40.[4]  What is relevant is any ongoing or future reporting obligation.  But given Silver's declaration that neither Plaintiff owes a transition tax, they have no further reporting obligation. Not only do Plaintiffs fail to demonstrate ongoing injury or a prospect of future injury that is more than "speculative," they demonstrate the very opposite:  that they have *no* ongoing injury or prospect of future injury.  As a result, Plaintiffs lack standing to maintain this suit.  *See*

---

[4] On top of that, Silver misleads the Court about any past burden he has faced.  He laments that, because of the complexity of the statute and the regulations, he has been forced to twice amend his 2017 tax return, following "hours of painstaking study and analysis of the otherwise inscrutable rules."  *See* Pls. Br. at 7; Silver Decl. ¶ 18.  ***Not true***.  He first amended his 2017 return  to comply with an unrelated requirement, stemming from the Bank Secrecy Act (*see* 31 U.S.C § 3514 et *seq.*), to report foreign bank accounts he or his wife owned or controlled.  Fact 14.  The second time he amended his return, it was to attach a statement that he forgot to include earlier. Fact 15.  In contrast, the "Transition Tax Statement" he included with his original return was never amended.  Fact 16.

And even without all this evidence giving lie to Silver's assertion, Plaintiffs' statement on its face is illogical.  Silver determined in his original return that he owed no transition tax, and his position on that has never changed (Pls. Br. at 7).  Thus, there would be no reason to repeatedly amend his return to report again and again that he still did not owe a transition tax. Commonsense in this situation dictates that, whatever prompted the repeated amendments to Silver's 2017 return, it was not the "inscrutable rules" relating to the transition tax. The evidence confirms this.

*Owner-Operator Indep. Drivers Ass'n, Inc.*, 879 F.3d 339 at 347; *Swanson Grp. Mfg. LLC*, 790 F.3d 235 at 240.

They try to avoid this conclusion by asserting that they will continue to incur "significant" "compliance costs" even if they owe no transition tax. They do not offer an explanation for how this could possibly be the case. In fact, it cannot. Silver Limited is a foreign corporation and is not itself subject to the transition tax. After all, that tax applies only to United States shareholders that have a stake, direct or via a domestic pass through entity, in a DFIC, and Silver Limited is not a U.S. shareholder at all. *See* 26 U.S.C. § 965; ADMIN_03522.[5] And because Silver does not owe any transition tax, no further calculations or compliance efforts are required from him after submitting his 2017 income tax return (aside from the mechanical act of restating Silver Limited's 2017 income inclusion again on his 2018 forms).

The reporting required under the regulations is largely a "one-time paperwork burden." ADMIN_03169 ("The Treasury Department and the IRS anticipate substantially all paperwork burdens related to the final regulations to be incurred only with respect to the inclusion year."). True, additional reporting —although "negligible" —is required for those that have a transition tax liability *and* elect to defer or pay it in installments. *See id.* ("Any subsequent reporting (such as in connection with a transfer of a section 965(h) net tax liability or a section 965(i) net tax liability) would be negligible burdens that implement elections made and payments calculated in the inclusion year."); ADMIN_03544 ("Information is collected for the purposes of determining the amount of the tax liability as well as tracking the payment of the tax liability."); ADMIN_03549 ("The information collected . . . will be used to allow taxpayers to make

---

[5] Silver Limited does not have a U.S. tax identification number and does not report or pay *any* U.S. taxes, transition or otherwise. Fact 12.

elections or file agreements to continue deferring the payment of the section 965 tax liability. The information collected will enable taxpayers and the IRS to keep track of the deferred payments/liabilities until fully paid."). But this is not Plaintiffs' situation. They have no transition tax liability and thus nothing to defer, pay in installments, track, or report in the future.

As a final attempt to skirt the problem of no standing, Plaintiffs try to argue that Defendants have conceded the point. Plaintiffs assert in error that Defendants have already *agreed* that Plaintiffs' "compliance obligations extend for years into the future." *See* Pls. Br. at 7. Defendants have never suggested this, and Plaintiffs mischaracterize Defendants' Answer in their brief. In answering Plaintiffs' allegation that "the Final Regulations create collection of information obligations that extend far beyond three years," Defendants stated, "Defendants admit that certain of the collection of information obligations could extend beyond three years, *but deny that this obligation applied to Plaintiffs*." Dkt. no. 34 (Answer to Am. Compl.), ¶ 54 (emphasis added). And Defendants' position is the same today, to wit: if Plaintiffs do not owe a transition tax, they have no further reporting obligation under the regulations.

By now swearing that they owe no transition tax, Plaintiffs have conclusively refuted their own standing.

## III.   The Court lacks jurisdiction to entertain Plaintiffs' claims under the Regulatory Flexibility Act and the Paperwork Reduction Act.

Standing is not the only jurisdictional hurdle Plaintiffs cannot clear. "It long has been established, of course, that the United States, as sovereign, 'is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *United States v. Testan*, 424 U.S. 392, 399 (1976) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)); *see also Lehman v. Nakshian*, 453 U.S. 156, 160 (1981). While Congress has authorized suits for judicial review under the RFA, the

extent of its consent is limited to actions brought by "small entities."  Neither Monte Silver – an individual – nor Silver Limited – a foreign entity – qualifies as a "small entity" within the scope of Congress's allowance of suits for judicial review under the RFA.  And as for the PRA, Congress has authorized no private right of action at all.  Indeed, Congress has expressly barred suits claiming alleged violations of the PRA.

### A.     Congress has not authorized entities like Plaintiffs to bring actions for judicial review under the RFA.

Congress has limited judicial review under the RFA to claims brought by "small entities." 5 U.S.C. § 611(a)(1).  The RFA defines "small entities" as having the same meaning as "small business," "small organization," and "small governmental jurisdiction."  *Id*. § 601(6).  Each of those phrases is defined in the RFA, and neither Silver, who is an individual, nor his law firm, which is a foreign entity, qualifies as small entity within the meaning of the RFA.

By no stretch of the imagination does Silver or Silver Limited qualify as a "small governmental jurisdiction," which "means governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand," *id*. § 601(5).  Likewise, neither plaintiff is a "small organization," because neither is a "not-for-profit enterprise which is independently owned and operated and is not dominant in its field," *id*. § 601(4).  Certainly Silver, an individual, is not a "not-for-profit enterprise." Neither is his business, which, as Plaintiffs acknowledge, "is an Israeli *corporation*."  Fact 7; Pls. Br. at 6. (emphasis added).  Indeed, Plaintiffs do not assert that either of them qualifies as a small entity under those terms.  Instead, they assert that each of them qualifies as a "small business" within the meaning of the RFA.  Pls. Br. at 12-13.  But they are wrong.

With an exception not relevant here, "small business", as used in the RFA, "has the same meaning as the term 'small business concern' under section 3 of the Small Business Act."

5 U.S.C. § 601(3).  Section 3 of the Small Business Act clarifies that such a concern is "one which is independently owned and operated and which is not dominant in its field of operation." 15 U.S.C. § 632(a)(1).  That statute further provides that the Small Business Administration "may specify detailed definitions or standards by which a business concern may be determined to be a small business concern for the purposes of this chapter or any other Act."  15 U.S.C. § 632(a)(2).  Plaintiffs acknowledge as much, and go on to assert that they meet size qualifications that the SBA has established.  Pls. Br. at 13.  But that does not end the inquiry, as the SBA has implemented regulations providing additional standards that define the parameters of a "small business concern."

In a regulation titled, "How does the SBA define 'business concerns or concern,'" the SBA explains that a

> small business is a business entity organized for profit, with a place of business located in the United States, and which operates primarily within the United States or which makes a significant contribution to the U.S. economy through payment of taxes or use of American products, materials or labor.

13 C.F.R. § 121.105.  Silver, as an individual, is not "a business entity organized for profit," 13 C.F.R. § 121.105, nor is he a small business concern that "is independently owned and operated," *see* 15 U.S.C. § 632(a)(1).  And while Defendants do not contest that Silver's law firm is organized for profit, the firm does not meet the other criteria described immediately above.

By Plaintiffs' own admission, Silver Limited does not have a place of business in the United States.  Silver Limited is an lsraeli corporation.  Fact 7.  In addition, the Form 5471, Information Return of U.S. Persons With Respect to Certain Foreign Corporations, that Silver prepares regarding his law firm asks for the "[n]ame, address, and identifying number of branch

office or agent [of the foreign corporation] (*if any*) in the United States." *See* Ex. 1 at 1 (emphasis added).)  Silver left that space on his Form 5471 for 2017 conspicuously blank. *Id.*[6]

Lacking a place of business in the United States is enough to disqualify Silver Limited as a small business concern.[7]  Besides that, Silver Limited does not meet either prong of the final requirement.  There is no evidence that it operates primarily within the United States, or that it makes a significant contribution to the U.S. economy through payment of taxes or use of American products, materials or labor.  As a business incorporated and located in Israel and with no U.S. presence, it does not appear that Silver Limited operates in the United States at all, much less primarily.  As for contributing significantly to the economy, Silver Limited can hardly contribute significantly through use of American products, materials or labor, as the firm is located in Israel and has Silver, who lives in Israel, as its sole shareholder and employee.[8]  And while Silver acknowledges that he is subject to U.S. income taxes, Silver Limited does not file U.S. tax returns and does not even have a U.S. employer identification number.  Fact 12.

---

[6] Although Plaintiffs alleged in their amended complaint that Silver "has maintained a place of business in both Israel and California" since 2010 and that Silver Limited "has maintained a place of business in both locations" since 2012, *see* dkt. no. 5 at ¶ 3, Plaintiffs now allege merely that Silver "is a member of the California and Israel bars" and that Silver "practiced law in the United States before moving to Israel in 1997," Pls. Br. at 6.  Plaintiffs' abandonment of their prior, unsupported claim is no surprise given that the records of the California Secretary of State show no California business registration for Silver Limited.  *See* Fact 10.

[7] As noted above, to qualify as a "small business concern" under the applicable SBA regulation, the business entity must (1) be organized for profit; (2) have a place of business located in the United States; **and** (3) operate primarily within the United States **or** make a significant contribution to the U.S. economy through payment of taxes or use of American products, materials or labor.  *See* 13 C.F.R. § 121.105.

[8] As Plaintiffs admit, Silver has always been the sole shareholder and sole employee of Silver Limited.  Fact 9; Pls. Br. at 6.

In light of all those circumstances, it is hardly surprising that Plaintiffs make no effort in their motion for summary judgment to try to establish that Silver Limited operates primarily within the United States, or that it makes a significant contribution to the U.S. economy. Although Plaintiffs alleged in their amended complaint that Silver Limited contributes significantly to the U.S. economy, *see* dkt. no. 5 at ¶ 4, they make no similar allegations in their motion for summary judgment, much less any attempt to support them with evidence.[9]

"A plaintiff who files an action against the United States must demonstrate that there has been a waiver of sovereign immunity that is applicable to the claims plaintiff has brought in order to satisfy the plaintiff's burden of establishing that the court has jurisdiction over the complaint." *Mackinac Tribe v. Jewell*, 87 F. Supp. 3d 127, 136 (D.D.C. 2015), *aff'd*, 829 F.3d 754 (D.C. Cir. 2016).  Instead of meeting this burden, the facts that Plaintiffs allege in their motion for summary judgment, along with the documentation introduced by Defendants, establish that Plaintiffs cannot meet the requirements for a waiver of sovereign immunity to bring suit under the RFA.  As neither Plaintiff qualifies as a "small business concern" under SBA regulations, and thus cannot qualify as a "small entity" under the RFA, the Court thus lacks jurisdiction to hear their RFA claim.

---

[9] Plaintiffs also allege in their amended complaint that Silver himself contributes significantly to the U.S. economy.  Dkt. no. 5 at ¶ 4.  Even assuming that allegation were true, it is irrelevant as Silver, an individual, does not meet the fundamental qualification of being a small business concern that "is independently owned and operated," *see* 15 U.S.C. § 632(a)(1), nor is he "a business entity organized for profit," 13 C.F.R. § 121.105.  Silver's alleged investment in U.S. commercial real estate also is irrelevant to whether his law firm makes a significant contribution to the U.S. economy because Silver acknowledges that he invests "individually, unrelated to [Silver] Limited."  Silver Decl., ¶ 3.

**B.      It is unclear whether Plaintiffs are making a claim under the Paperwork Reduction Act, but in any event Congress has barred that sort of claim.**

Plaintiffs clearly state, "This lawsuit does not state a cause of action under the PRA." Pls. Br. at 2.  Still, they go on at length about alleged violations of the PRA, and so we explain why a PRA claim, had they presented one, is not justiciable and is without merit.

This Court does not have jurisdiction to review any alleged violations of the Paperwork Reduction Act.  The PRA addresses various procedures that an agency must meet when it proposes to "conduct or sponsor the collection of information."  *See* 44 U.S.C. § 3507(a).  When an agency proposes a rule that contains a collection of information requirement, the agency must submit its proposed rule to the Director of the Office of Management and Budget ("OMB"), who decides whether the agency's submission meets the requirements of the PRA and whether the information collection will be approved.  *See id.* § 3507(d).  But "[t]he decision by the Director to approve or not act upon a collection of information contained in an agency rule shall not be subject to judicial review."  *Id.* § 3507(d)(6).  As a result, courts do not have jurisdiction to hear standalone challenges to agency action based on the PRA.  *See Alegent Health-Immanuel Med. Ctr. v. Sebelius*, 34 F. Supp. 3d 160, 170 (D.D.C. 2014) (noting that the PRA "does not create a private cause of action"); *Tozzi v. E.P.A.*, 148 F. Supp. 2d 35, 48 (D.D.C. 2001) (finding that "§ 3507(d)(6) is nothing less than an explicit statement of clear Congressional intent that, under the PRA, OMB [information collection request] approval decisions are unequivocally not subject to judicial review").

Plaintiffs agree that the PRA does not give them an avenue to seek judicial review of the regulations here.  *See* dkt. no. 23 at 7 n. 4.  Indeed, when Plaintiffs amended their complaint, they no longer asserted a claim under the PRA.  *Compare* Dkt. no. 1 at ¶ 1 *with* Dkt. no 5 at ¶ 1.  Yet Plaintiffs still ask the Court to order Defendants to correct alleged violations of the PRA.

Plaintiffs are wrong when they suggest that the APA provides a vehicle for review of PRA procedures.  *See* Pls. Br. at 6.  Judicial review under the APA is not available when another statute, such as the PRA, precludes judicial review.  *See* 5 U.S.C. § 701(a)(1).  As previously observed, "no amount of statutory parsing or backdoor foray invoking the private suit provision of the APA can overcome such statutory clarity and command" as found in the PRA's bar to judicial review.  *Tozzi*, 148 F. Supp. 2d at 48.  Plaintiffs' claims asking the Court to order correction of alleged violations of the PRA —whether they seek relief directly under the PRA, or under the APA— must be dismissed.  *See id.* (dismissing claim for alleged violations of the PRA pursuant to Federal Rule of Civil Procedure 12(b)(1)).

## IV.     Treasury complied with the Paperwork Reduction Act.

Setting aside Congress's express jurisdictional bar to any claim Plaintiffs might make under the PRA, Treasury complied with their obligations under the PRA.  As noted above, an agency must submit a proposed rule to the Director of the OMB when the agency proposes a rule that contains a collection of information.  44 U.S.C. § 3507(d).  The Director then reviews the agency's submission and determines whether the agency's submission meets the requirements of the PRA and whether the information collection will be approved.  *See id.*

That is the process that occurred with the regulations under section 965.  As Treasury explained in the preambles to both the notice of proposed rulemaking and the final regulation, the regulation required the collection of information regarding certain limited topics, namely elections that a taxpayer who owed transition tax might choose to make, certain transfer agreements, and positions that a taxpayer might take with respect to the regulation's anti-abuse rules.  ADMIN_03554, _03169.  As required by the PRA, *see* 44 U.S.C. § 3507(d)(1), Treasury forwarded its notice of proposed rulemaking, ADMIN_03554-03615, to OMB, along with its

required submission form, ADMIN_03544-_03552.  In response, OMB issued a control number

for the information collection request, ADMIN_03169, _03133, thus approving the request.[10]

     As required by the PRA, *see* 44 U.S.C. § 3507(a), (b), Treasury published notice of its

proposed collection of information in the Federal Register, stating that it was seeking approval

from the Director of OMB, soliciting comments from the public, and addressing the collection of

information requirements and burdens imposed by the regulations, ADMIN_03554.  In the final

regulation, Treasury reported OMB's approval and control number, addressed the public

comments, and again addressed the burdens imposed by the regulations.  ADMIN_03169.  As

for the public comments, Treasury noted that "[c]omments suggested that the burden reported in

connection with the collection of information requirements under the proposed regulations did

not appropriately take into account the time necessary for determining net tax liability under

section 965 and performing other computations related to the determination of such net tax

liability."  ADMIN_03169.  Treasury responded that the collections of information under the

regulations do not relate to those tax computations but instead "relate solely to the making of

elections, filing of transfer agreements, and reporting of positions concerning the application of

anti-abuse rules."  ADMIN_03169.  As Treasury observed, "[l]imited information" is required

for those purposes, and the time estimates to comply with those limited information requests was

reasonable.  *Id.*  As a result, Treasury complied with its obligations under the PRA.  Regardless,

even if Treasury did not met all its obligations under the PRA, Congress has barred judicial

review, as discussed above.

---

[10] Absent a valid OMB control number on the document requesting the information, a respondent is not required to provide the requested information and cannot be subject to a penalty for failing to provide the requested information.  *See* 44 U.S.C. § 3512(a).

**V.      Treasury complied with the Regulatory Flexibility Act.**

Plaintiffs lack Article III standing and neither Plaintiff is a "small entity" entitled to seek judicial review of agency action under the RFA.  But even if the Court were to conclude that Plaintiffs have standing and qualify as small entities under the RFA, and go on to consider the merits of their claim under the RFA, Plaintiffs would lose.

The RFA requires an agency to analyze how its proposed rules would affect small businesses.  If it determines and certifies that those rules will not have a "significant economic impact on a substantial number of small entities," no further analysis is needed.  5 U.S.C. §§ 603-604, 605(b).  Here, Treasury estimated the number of small entities that would fall directly within its regulation, estimated the likely economic impact on them, and made the 605(b) certification obviating further analysis.  The Plaintiffs assert the certification was inadequate.  However, they present no evidence that undercuts the agency's decision, especially given the high degree of deference this Court owes that decision.[11]

So, were it to even reach this question, this Court should rule that the 605(b) certification was proper.  The agency certification here is similar to 605(b) certifications that courts have upheld, and stands miles apart from the starkly flawed 605(b) certifications that courts have found inadequate.

---

[11] Plaintiffs suggest that the Treasury and the IRS habitually "circumvent" RFA requirements through making 605(b) certifications, *see* Pls.' Br. at fn. 6, but their broadside makes no sense. The certification procedure is, after all, part of the RFA itself and not a circumvention. Compliance with the RFA requires, as much as anything else, that the agency "[avoid] duplicative or unnecessary analyses."  5 U.S.C. § 605.

**A.**    **Plaintiffs provide no evidence sufficient to call into question Treasury's conclusion regarding economic impact under the Court's "highly deferential" review.**

Agency determinations under the RFA are reviewed "in accordance with" the APA. 5 U.S.C. § 611(a)(2); *Lake Carriers' Ass'n v. E.P.A*, 652 F.3d 1, 5 (D.C. Cir. 2011). Thus, while an agency's 605(b) certification is subject to judicial review, such review is "'highly deferential' as to the substance of the analysis" grounding the certification, "particularly where an agency is predicting the likely economic effects of a rule." *Council for Urological Interests v. Burwell*, 790 F.3d 212, 227 (D.C. Cir. 2015) (citing *Helicopter Ass'n Int'l, Inc. v. F.A.A.*, 722 F.3d 430, 438 (D.C. Cir. 2013)). To prevail against Plaintiffs' claim on the merits, Treasury need only demonstrate a "reasonable, good-faith effort to comply" with the RFA. *Id.* (quoting *U.S. Cellular Corp. v. F.C.C.*, 254 F.3d 78, 88 (D.C. Cir. 2001) (internal quotation marks omitted)).

First, Treasury adequately estimated the number of "small entities" that would be subject to the proposed regulations at 20,000. The agency's estimates were properly limited to "small entities" as defined under the Small Business Act and incorporated into the RFA. *See* 5 U.S.C. § 601(3); 15 U.S.C. § 632; 13 C.F.R. § 121.105. Beyond that, the agency needed only to consider those small entities it regulates directly. *Michigan v. U.S. E.P.A.*, 213 F.3d 663, 689 (D.C. Cir. 2000) (internal citation omitted); *Mid-Tex Elec. Co-op., Inc. v. F.E.R.C.*, 773 F.2d 327, 342 (D.C. Cir. 1985). In reaching its estimate, the agency expressly (and properly) disregarded the larger number of U.S. citizens living abroad (like Silver) that owned foreign corporations directly (like Silver Limited) or indirectly through other foreign entities, because they are simply not "small entities" granted consideration under the RFA. ADMIN_03171. Instead, the agency focused on small "multinational domestic corporations," that is, U.S.-based businesses with at least a 10% interest in a foreign corporation. *Id.*

23

Plaintiffs do not properly challenge the agency's estimate.  They do not identify a larger number of "small entities" beyond 20,000 that Treasury should have included in its estimate but did not.  Instead, their brief just references a "large number of small businesses," and points to comments submitted by U.S. citizens abroad that own businesses in their countries of residence.  Pls. Br. at 14.  In earlier comments on the regulations, American Citizens Abroad made a similar allegation about the large number of U.S. citizens abroad that own foreign businesses.  *See* ADMIN_01187-_01193.  But as Treasury already explained in its RFA certification, it disregarded many, if not all, of these businesses as not being "small entities" for purposes of the RFA.  *See* ADMIN_03171 ("Although the Treasury Department and the IRS received a number of comments asserting that a substantial number of small entities would be affected by the proposed regulations, those comments were principally concerned with U.S. citizens living abroad that owned foreign corporations directly or indirectly through other foreign entities.  No small entity is affected in this scenario.")

The *amicus* brief by Republicans Overseas, Inc. is unilluminating for the same reason:  its estimates are not limited to "small entities" as defined in the RFA.  It estimates at least 71,000 foreign businesses owned or managed by U.S. citizens, but then concedes that the regulations "may not apply" to some or all of these types of businesses.  Dkt. no. 56 at 10, 13.  That concession gives away the game, because "[t]he [D.C. Circuit] has consistently held that the RFA imposes 'no obligation to conduct a small entity impact analysis of effects on entities which it does not regulate.'"  *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 467 (D.C. Cir. 1998).  Thus, Treasury's estimate, which was properly limited to statutorily-defined "small entities" directly regulated by the proposed rules, remains all but uncontroverted.

Second, even if the Plaintiffs *could* demonstrate the agency substantially undercounted "small entities," it would still not undermine the agency's RFA analysis.  After all, the agency already acknowledged that its estimate did not capture *all* small entities subject to the regulations, but then explained why a more exact count was not needed once one turned to the question of "significant economic impact."  ADMIN_03171.  That is because, "regardless of the number of small entities" potentially affected, *see id.*, each affected entity would only bear a small per-year additional tax burden (3% to 5% of total sales receipts) as the result of section 965.  *Id.*  More to the point, these entities would face an even slighter, "minimal" cost *due to the regulations themselves*, in the form of the time and effort involved in filling out the paperwork required to take advantage of certain pro-taxpayer elections that the regulations established.  *Id.*; *compare Fla. Bankers Ass'n*, 19 F. Supp. 3d at 122, 125 (explaining why imprecise estimates of the number of regulated entities did not call into question the correctness of agency's RFA certification) *vacated sub nom. Fla. Bankers Ass'n v. U.S. Dep't of the Treasury*, 799 F.3d 1065 (D.C. Cir. 2015). [12]

---

[12] Case law suggests that in determining the "economic impact" of regulations, the agency can discount any impact inherent in the law preexisting the regulations.  *In Carpenter, Chartered v. Secretary of Veterans Affairs*, the court upheld an agency's certification under the RFA because the regulations at issue, governing legal fees in veterans benefit cases, "provid[ed] a means of enforcing a statutory prohibition that was already in place."  343 F.3d 1347, 1357 (Fed. Cir. 2003).  As the court put it, because "the effect of the amendments would be to prevent fee arrangements that were already unlawful under current statutory standards, they would not have a substantial effect on the legitimate activities of any small entities."  *Id.*  Similarly, existing law required small entities to engage in the type of reporting requirements that regulations at issue in *Florida Bankers Association v. United States Department of Treasury* required, which meant it was reasonable for Treasury to assume that the additional cost of complying with the regulations would not be "significant."  19 F. Supp. 3d at 125.  In this instance, Plaintiffs concede that the TCJA imposed the transition tax (and associated burdens) before the regulations came into existence, *see* Pls. Mot. at 8, but consistently fail to disaggregate any burden from the statute from any alleged burden from the regulations.

Plaintiffs do not present a concrete dispute as to the per entity "economic impact" estimates of the agency.  Plaintiffs' brief states only that Silver has spent "hours" and will continue to spend "significant" time and cost to comply with the "statute and the Final Regulations" in the coming years.  Pls. Br. at 7.[13]  Even setting aside Plaintiffs' continued conflation of the burdens inherent to the statute versus the regulations, this generalized complaint is insufficient to call into question Treasury's determination of economic impact.  *See Helicopter Ass'n. Int'l, Inc.*, 722 F.3d 430, 438 (D.C. Cir. 2013) ("An unsubstantiated estimate is insufficient to call the FAA's figure into question."); *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 738 (D.C. Cir. 2000) (under "highly deferential standard of review," petitioners' self-serving "views to the contrary" provided "no basis for questioning" the agency's judgment).

The *amicus* brief submitted in support of Plaintiff also fails to move the dial.  Besides the bare assertion that an expatriate taxpayer would have to "expend substantial time and resources over and above her or his ordinary U.S. tax compliance efforts" as a result of "the regulation *or the statute*," dkt. no. 56 at 7 (emphasis added), the *amicus* brief presents only one anecdote with an actual time estimate.  It quotes a taxpayer stating, "[E]ach year, I incur substantial accounting expenses and spend in excess of 100 hours of my own time in order to comply with my IRS tax obligations."  *Id.* at 14.  There is no way to tell what portion of the 100 hours relates to the

_____

[13] In section II, above, we explain that Plaintiffs lack standing given that they owe no transition tax (and Silver Limited is not even subject to the tax) and thus have no ongoing compliance burden.  Silver's vague assertion of continuing burden is problematic for him here (in the merits of his RFA claim) for a different reason:  even assuming he did somehow have a continued burden under the regulations, he fails to estimate it or to posit the time and effort imposed by the regulation over and above the baseline created by the preexisting statute, and therefore does not counter the Treasury's conclusion that any reporting burden imposed by the regulations is "minimal."

transition tax statute, much less the regulations.   Nothing in this anecdote or the rest of the *amicus* brief adds heft to Plaintiffs' case.

**B.  Plaintiffs point to no "foundational error" undermining Treasury's analysis.**

On top of that, a comparison to section 605(b) certifications examined in other cases further confirms that the certification here should easily clear this Court's "highly deferential" review.  Treasury's assumptions regarding economic impact were no less reasonable than the assumptions made in the certification upheld in *Council for Urological Interests*, 790 F.3d 212, 226–27 (D.C. Cir. 2015) (examining RFA certification at 73 FR 48434-01).  Treasury's certification here resembles in scope and method the one upheld in *Ad Hoc Metals Coal. v. Johnson*, 2006 WL 8445386, at *4–5 (D.D.C. Jan. 20, 2006) (examining RFA certification at 64 FR 42222-01) and in *Helicopter Ass'n Int'l, Inc.*, 722 F.3d at 438 (examining RFA certification at 77 FR 39919).   And Treasury's certification is more substantial than the two-paragraph-long certification upheld in *Northport Health Servs. of Arkansas, LLC v. United States Dep't of Health & Human Servs.,* No., 2020 WL 1696009, at *16 (W.D. Ark. Apr. 7, 2020) (examining RFA certification at 81 FR 688688-01).

Meanwhile, it is simple to see what sets this case apart from the cases, including the two cited by Plaintiffs, in which an RFA certification failed to clear a court's deferential review. In *Southern Offshore Fishing Association v. Daley*, the SBA stated it was "perplexed and bewildered by the illogical certification" at issue there.  995 F. Supp. 1411, 1435 (M.D. Fla.

1998).  Here, in contrast, the SBA made no public comments when the proposed regulations were submitted for its review.[14]

In *North Carolina Fisheries Association, Inc. v. Daley*, the court faulted the agency's "no significant impact" certification for turning on a single assertion that, besides having no factual basis, bore no apparent connection to economic impact.  16 F. Supp. 2d 647, 652-53 (E.D. Va. Oct. 10, 1997).  Here, in contrast, Treasury used published data to reasonably estimate the economic impact on directly regulated small entities.  *See, e.g.*, ADMIN_03171 at n. 1.

Turn to cases not cited by Plaintiffs and the contrast gets even sharper.  In one case, the court struck an RFA certification where it concluded that the agency made a categorical error about what entities were, or were not, directly regulated by its proposed rule.  *See Aeronautical Repair Station Ass'n, Inc. v. FAA*, 494 F.3d 161, 176-178 (D.D.C. 2007).  In another case, the court struck an RFA certification predicated on a definition of "small entity" that diverged from the governing definition in the Small Business Act.  *Nw. Min. Ass'n v. Babbitt*, 5 F. Supp. 2d 9, 14–15 (D.D.C. 1998).  And in yet another case, the court struck an RFA certification that turned on the misconception that costs "voluntarily" incurred by the subject entities to fall into a "safe harbor rule" were not to be considered within economic impact.  *Am. Fed. of Labor v. Chertoff*, 552 F. Supp. 2d 999, 1013 (N.D. Cal. 2007).

---

[14] The proposed regulations were submitted to the SBA for comment.  The submission included Treasury's explanation for its conclusion that the collection of information requirements detailed in the regulations would "not have a significant economic impact on a substantial number of small entities."  ADMIN_03581.  Meanwhile, Silver also contacted the SBA several times with his concerns about the regulations.  Facts 1-5.  Nonetheless, despite the SBA's role as the "RFA watch-dog" agency, *Southern Offshore Fishing Ass'n v. Daley*, 995 F. Supp. 1411, 1435 (M.D. Fla. 1998), it did not provide any public comments voicing concerns about the regulations' "impact on small business."  *See* ADMIN_03172.

In all these cases, an obvious foundational error on the part of the agency led the Court to question the RFA certification in spite of the deferential standard of review.  Here, in contrast, Plaintiffs point to no foundational error committed by Treasury.  *See Safari Club Int'l v. Salazar*, 709 F.3d 1, 9 (D.C. Cir. 2013) ("Where, as here, the foundational premises on which the agency relies are adequately explained and uncontested," the court is "bound to uphold the agency's determination.").

## VI.      The Anti-Injunction Act proscribes the Plaintiffs' requested relief.

The Court suggested it would revisit the application of the AIA at this stage in the litigation.  If Plaintiffs' lack of standing, failure to state a claim, and failure on the merits of their RFA and PRA claims do not obviate a discussion of remedies, the AIA should preempt it.

In footnote 1 to its earlier opinion on the motion to dismiss (dkt. no. 29), the Court stated that it could postpone a decision on the application of the AIA until it determined whether "Plaintiffs prevail on the merits."  But the AIA is a *jurisdictional* bar, and the Court should not proceed to evaluate the merits of a case only to *then* decide that it never had jurisdiction, anyway.  Doing so would place the Court "beyond the bounds of authorized judicial action and thus offends fundamental separation-of-powers principles."  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 84 (1998) (admonishing against the exercise of "hypothetical jurisdiction" whereby courts proceeded to the merits despite jurisdictional objections).

Carrying things to the merits would also flatly contravene the express language of the AIA.  The statute directs that "no suits *for the purpose* of restraining the assessment or collection of any tax *shall be maintained* in any court[.]"  26 U.S.C. § 7421(a) (emphases added).  The *purpose* of a suit can be gleaned well before ruling on its merits, and where a court proceeds anyway to the merits of such a suit, it has *already* violated the AIA by allowing the suit to "be maintained."

29

This Court's earlier opinion on the motion to dismiss cites heavily from *Cohen v. United States*, 650 F.3d 717, 730–31 (D.C. Cir. 2011) (en banc). Dkt. 29 at 5. But that case dealt with an IRS rule governing *refunds of amounts already paid*. And for that reason, the D.C. Circuit concluded in *Cohen* that the taxpayer's challenge to the rule did not "seek to restrain the assessment or collection of any tax" and that, if the taxpayers prevailed and the rule was suspended, it would not impede assessment or collection. *Id.* at 725-726 ("The IRS previously assessed and collected the excise tax at issue. The money is in the U.S. treasury; the legal right to it has been previously determined. . . This suit is strictly about the procedures under which the IRS will return taxpayers' money. In any event, whether the IRS's procedures are upheld or the Appellants succeed in forcing a different set of procedures, those procedures are not retroactive; they do not and cannot affect the assessment or collection of taxes after the fact.")

In contrast, the regulations challenged here govern the self-reporting of the transition tax. Self-reporting *per se* culminates in assessment of tax. Indeed, it is the foundation of our system of taxation. *Seven-Sky v. Holder*, 661 F.3d 1, 32–33 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("keep in mind that the individual tax return is absolutely central to the IRS's assessment and collection of taxes. Tax returns are the means by which most taxpayers self-assess and pay their taxes, and the means by which much of the Government's tax revenue is collected. The tax return thus forms the foundation of the IRS's assessment and collection process.") (footnote omitted); *abrogated by Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, (2012).

Thus, in seeking to enjoin enforcement of these regulations, Plaintiffs' requested relief, as a matter of logic, will impede or restrain assessment. And so this suit is barred. *See Judicial Watch, Inc. v. Rossotti*, 317 F.3d 401, 405 (4th Cir. 2003) ("it is clear that the Anti–Injunction

Act extends beyond the mere assessment and collection of taxes to embrace other activities, such as an audit to determine tax liability, that may culminate in the assessment or collection of taxes); *Lowrie v. United States,* 824 F.2d 827, 830 (10th Cir.1987) ("The statute applies not only to the actual assessment or collection of a tax, but is equally applicable to activities leading up to, and culminating in, such assessment and collection."); *Dickens v. United States,* 671 F.2d 969, 971 (6th Cir.1982) (the Act "is equally applicable to activities which are intended to or may culminate in the assessment or collection of taxes"); *Ellis v. Commissioner*, 67 F. Supp. 3d 325, 332 (D.D.C. 2014), *aff'd*, 622 Fed. App'x 2 (2015) (noting that "… circuit courts have adopted a broad interpretation of… [the prohibition in the AIA], finding that 'it is applicable to not only the assessment and collection of taxes, but to activities which are intended to or may culminate in the assessment or collection of taxes as well'"); *Debt Buyers' Ass'n v. Snow*, 481 F. Supp. 2d 1, 9 (D.D.C. 2006) (stating that "[e]ven Plaintiff admits that the AIA 'has been interpreted to apply also to activities which are intended to or may culminate in the assessment or collection of taxes'").

The fact that Plaintiffs' suit involves a procedural challenge under the RFA does not change that result.  Indeed, the D.C. Circuit previously has invoked the AIA in dismissing a pre-enforcement regulatory challenge that included an RFA claim.  *See Florida Bankers Ass'n v. U.S. Dep't of Treasury,* 799 F.3d 1065, 1065 (D.C. Cir. 2015).

## VII.    Plaintiffs' requested remedies are inappropriate.

Plaintiffs' requested remedies are inappropriate.  As noted above, the Court lacks jurisdiction to fashion any remedy for Plaintiffs' claims under the PRA and the RFA, even assuming there was any technical violation of those statutes.  And, as discussed above, Treasury complied with the PRA and the RFA.  Treasury followed the correct procedures under the PRA

31

in obtaining the OMB Director's approval for the information collection included in the regulations at issue, and Treasury's certification that the regulations would not have a significant economic impact on a substantial number of small entities satisfied Treasury's obligation under the RFA.  As a result, no remedy is appropriate here.  If, however, the Court finds that it has jurisdiction to entertain Plaintiffs' PRA and RFA claims and that Treasury committed some procedural error under either of those statutes, then the Court should limit its remedy to remanding to the agency to address the procedural deficiency.

Plaintiffs ask the Court to remand the regulations to the IRS for compliance with the PRA, the RFA and section 212 of Public Law 104-121, but they also ask the Court to defer enforcement of the regulations against Plaintiffs and other small entities.  Pls. Br. at 21-22.  Remand alone is sufficient to correct any deficiencies that the Court finds.  And even deferring enforcement of the regulations against just Plaintiffs (who have no further reporting obligation) and small entities would not be in the public interest.  Finally, Plaintiffs' request for compliance with section 212 is both beyond the scope of their amended complaint and premature.

### A.      Remand is sufficient to correct any deficiencies that the Court finds.

The purpose of the RFA is to protect small entities from undue administrative burden.  *Nat'l Ass'n for Home Care v. Shalala*, 135 F. Supp. 2d 161, 163 (D.D.C. 2001) (citation omitted).  Consistent with that purpose, the RFA provides that courts need not vacate a rule in its entirety to remedy an RFA violation;[15] instead, courts may simply remand the rule to the agency for correction of any deficiencies.  5 U.S.C. § 611(a)(4)(A).  Courts also may defer the rule's enforcement with respect to small entities only.  5 U.S.C. § 611(a)(4)(A); *United*

---

[15]  Indeed, Plaintiffs do not ask the Court to vacate the regulations.  *See* Pls. Br. at 20 n. 7 ("Plaintiffs do not seek to 'strike' any regulations.  Rather they seek merely to remand them to Defendants for compliance with the RFA and PRA.")

*States Telecom Ass'n v. FCC*, 400 F.3d 29, 43 (D.C. Cir. 2009).  Courts embrace the RFA's

deference with respect to fashioning a remedy, opting to remand, defer enforcement or employ a

combination of these, as the situation warrants.  *See U.S. Telecom Ass'n v. F.C.C.*, 400 F.3d 29,

43 (D.C. Cir. 2005); *S. Offshore Fishing Ass'n v. Daley*, 995 F. Supp. 1411, 1437 (M.D. Fla.

1998) ("The RFA affords considerable discretion in formulating an appropriate remedy for the

Secretary's failure to comply with the statute.").

  As described above, the IRS gave its certification and factual basis for making its

certification that the regulations does not have a significant economic impact on a substantial

number of small entities.  If the Court, however, finds a deficiency in that certification, remand

to the IRS is all that is needed to correct it.  When, as here, the agency has conducted analysis of

some kind, remand is the appropriate remedy to allow the agency to correct any defect or flaw in

its certification or reasoning.  *See Harlan Land Co. v. U.S. Dep't of Agr.*, 186 F. Supp. 2d 1076,

1097 (E.D. Cal. 2001) (remanding where an agency rested its certification on reasoning that the

court believed to be "flawed"); *see also Aeronautical Repair Station Ass'n, Inc. v. F.A.A.*,

494 F.3d 161, 178 (D.C. Cir. 2007) (holding in context of RFA analysis that failed to address

other alternatives considered, a requirement under the RFA when certification is not applicable,

that the appropriate remedy was to remand "for the limited purpose of conducting the analysis

required," and not to disrupt the "substance" of the rule); *Chamber of Commerce of U.S. v.

Napolitano*, 648 F. Supp. 2d 726, 742 (D. Md. 2009).

The same applies if the Court finds a deficiency in Treasury's PRA procedures. Although, unlike the RFA, the PRA does not discuss potential remedies, there is no reason that Treasury could not correct any procedural flaws on remand.[16]

**B.    Deferring enforcement of the regulation against Plaintiffs and small entities is not in the public interest**.

Not only is remand alone sufficient to cure any deficiencies, but deferring enforcement of the regulations against Plaintiffs and small entities would be inappropriate here, regardless, because it is not in the public interest.  The RFA expressly contemplates continued enforcement of the rule with respect to all entities if a court finds that such enforcement is in the public interest.  5 U.S.C. § 611(a)(4)(B) (a court may "defer[] the enforcement of the rule against small entities *unless the court finds that continued enforcement of the rule is in the public interest*") (emphasis added).  Courts have found that it is in the public interest to enforce the tax laws. *See, e.g., G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350 (1977) (noting the vital nature of taxes and importance of tax enforcement).

Here, the public interest favors continued enforcement of rules that assist taxpayers in meeting their transition tax obligations.  The regulations at issue clarify how to calculate various amounts used in determining a taxpayer's tax liability under Internal Revenue Code section 965. The regulations also establish the manner for making various elections under section 965, which impact the timing and/or method of calculating and/or paying the tax.  Because the statute allows the taxpayer to make certain favorable elections in the manner prescribed by the Secretary, the regulations establish the manner for making each election.  26 U.S.C. §§ 965(h)(5), (i)(8)(B),

---

[16] As Congress has expressly forbidden judicial review of the OMB Director's approval of information collection contained in a regulation, it can come as no surprise that the PRA would not address potential remedies for any procedural deficiencies in that situation.

(m)(2)(A), and (n)(3); ADMIN_03158 to _03164 and _03200 to _03210.  If application of the regulations were deferred as to any taxpayers, those taxpayers would face uncertainty in meeting their obligations under Internal Revenue Code section 965.  Absent the regulations, taxpayers' obligation to pay the transition tax would still exist, but they would have to proceed without the guidance and assistance of the regulations.

For example, section 965(h) allows a taxpayer that has a liability based on application of section 965 to elect to pay the liability in eight annual installments unless a specified "acceleration" event occurs.  In other words, the election relieves a taxpayer from the obligation to otherwise pay the liability in a lump sum all at once.  The statutory language in paragraph (h) provides that each election "shall be made in such manner as the Secretary shall" prescribe. 26 U.S.C. §§ 965(h)(5).  Accordingly, the regulations establish the manner for making that (and other) statutory elections.  The absence of the regulations could lead to the following consequences:

1.  Small, indirect owners.  The statute provides that United States shareholders of a DFIC can make the election.  The regulations allow all taxpayers with a section 965(h) net tax liability to make the election.  Without the regulations, certain U.S. persons who own less than 10% of a DFIC through a domestic pass-through entity (e.g., USP owns 1% of a partnership that owns 10% of a DFIC) would not be able to make the section 965(h) election and thus their section 965(h) net tax liabilities would be immediately due.

2.  Delayed elections.  The statute provides only that the election must be made by the due date for the return for the inclusion year.  The regulations specify that the election may be made by the extended due date, regardless of whether an

35

extension was requested.  Without the regulations, a large number of taxpayers who filed elections after the unextended due date for their inclusion year returns (whether or not an extension was requested) would be treated as not having made a valid election, and their section 965(h) net tax liabilities would be immediately due.

3. <u>Manner of making election</u>.  The statute directs the Secretary to provide the manner in which the election is made.  The regulations prescribe how to make the election and what information to provide.  Without the regulations, it is arguable that taxpayers would not be able to make the election, in which case the entire section 965(h) net tax liabilities for all taxpayers who made the section 965(h) election would be immediately due.

4. <u>Acceleration events</u>.  The statute provides that acceleration events include: an addition to tax for failure to timely pay an installment, a liquidation or sale of substantially all of the assets of the taxpayer, a cessation of business by the taxpayer, or any similar circumstance.  The regulations expand upon "any similar circumstance" and include exchanges of substantially all of the assets and also death of an individual.  The regulations provide certainty as to what events constitute acceleration events, thus allowing taxpayers to better understand the tax costs of their proposed transactions.  And without the regulations, taxpayers would be able to argue that some of these events should not constitute acceleration events, and if they were not, then taxpayers who had one of those events would be able to continue deferring their payments, thus thwarting the application of section 965.

5. <u>Transfer Agreements</u>.  The statute provides that certain acceleration events will not be treated as such provided that, if substantially all of the assets of the taxpayer are acquired by another taxpayer, the second taxpayer enters into an agreement with the Secretary to be liable for the remaining installment payments. The statute limits the circumstances for transfer agreements to sales of substantially all of the assets, but the regulations expand this to include other transfers and exchanges.  The regulations also provide the method of obtaining an agreement with the Secretary.  Without the regulations, there would be no method to enter into an agreement with the Secretary, and taxpayers who have these acceleration events occur would not be able to enter into an agreement, and the remaining installment payment would be due in their entirety (i.e., no more deferral).

Uncertainty about whether taxpayers still could take advantage of the election to pay in installments could present staggering consequences to taxpayers who might suddenly owe the entirety of their transition tax liability, absent the regulation that governs details about the application of the election.  And, as described above in paragraph 4, deferring application of the regulations could jeopardize tax enforcement by thwarting the intended application of section 965.  Public interest favors the continued application of the regulations to all taxpayers subject to section 965, while any procedural deficiencies in finalizing the regulation are corrected on remand.

**C.   Plaintiffs' request for compliance with section 212 of Public Law 104-121 is both beyond the scope of their amended complaint and premature.**

For the first time in this litigation, Plaintiffs ask the Court in their motion for summary judgment to order the IRS to comply with section 212 of the Contract with America

Advancement Act Of 1996, Pub. L. 104–121, March 29, 1996, 110 Stat 847, which requires an "agency [to] publish one or more guides to assist small entities in complying with[a] rule" the agency publishes, but only when the "agency is required to prepare a final regulatory flexibility analysis under section 604 of title 5, United States Code."  Plaintiffs did not seek that relief in their original or amended complaint, and they have not sought to amend their complaint yet again so that they may pursue this additional claim.  Plaintiffs cannot seek this relief now on summary judgment.  *See Muttitt v. Dep't of State*, 926 F. Supp. 2d 284, 294-95 (D.D.C. 2013) ("A plaintiff cannot ensconce claims between the lines of an otherwise garden-variety Prayer for Relief, only to embellish those obscurities into new causes of action for the first time at summary judgment.").

In any event, Plaintiffs are not entitled to injunctive relief ordering the IRS to comply with section 212.  That provision only applies when a final regulatory flexibility analysis is done.  Here, the IRS has complied with the RFA's requirements by certifying that the regulations will not impose a significant economic impact on a substantial number of small entities.  So, no final regulatory flexibility analysis is required.  *See* Argument, Part V, above.   And even if the Court finds that the IRS's certification is insufficient, that does not mean the IRS should be required to engage in a regulatory flexibility analysis.  Instead, the IRS should have the opportunity to correct any deficiencies by further supporting and explaining its certification.  Any present order to comply with section 212 is thus premature.

## CONCLUSION

Because Plaintiffs lack standing to bring this suit, the Court should dismiss it with prejudice.  In the alternative, their RFA and PRA claims should be dismissed for lack of jurisdiction.  In the event that the Court proceeds to the merits of either claim, it should grant

summary judgment in favor of the Treasury based on its compliance with the requirements of

those Acts.  And if, notwithstanding everything above, the Court finds Plaintiffs' claims

justiciable and meritorious, then the only appropriate remedy would be to remand to Treasury to

address any procedural violations it made in the process of issuing the section 965 regulations.


DATED: July 20, 2020                          RICHARD E. ZUCKERMAN
                                              Principal Deputy Assistant Attorney General

                                              */s/ Nishant Kumar*
                                              JOSEPH A. SERGI (D.C. Bar No. 480837)
                                              Senior Litigation Counsel
                                              LAURA M. CONNER (VA Bar No. 40388)
                                              NISHANT KUMAR (D.C. Bar No. 1019053)
                                              Trial Attorneys
                                              Tax Division
                                              U.S. Department of Justice
                                              Post Office Box 227
                                              Washington, DC 20044
                                              Tel: (202) 514-2986
                                              Fax: (202) 514-6866
                                              Nishant.kumar@usdoj.gov
                                              Joseph.a.sergi@usdoj.gov
                                              Laura.m.conner@usdoj.gov