## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MONTE SILVER** and
**MONTE SILVER, LTD**.,
an Israel corporation

*Plaintiffs*

*v.*

**INTERNAL REVENUE SERVICE;**
**UNITED STATES DEPARTMENT**
**OF THE TREASURY; CHARLES RETTIG,**
in his official capacity as Commissioner of the
Internal Revenue; and **STEVEN MNUCHIN**, in
his official capacity as United States Secretary
of the Treasury

*Defendants*

Civil Action No. 19-cv-0247-APM

Judge Amit P. Mehta

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND
## IN REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS'
## <u>MOTION FOR SUMMARY JUDGMENT</u>

## Table of Contents

INTRODUCTION ................................................................................................................ 1

STANDARD OF REVIEW ................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

 I. The RFA 605(b) certifications are arbitrary and capricious.  Defendants are not entitled to any further deference. ................................................................................ 2

 II. Plaintiffs have established standing. .................................................................... 2

 III. The Court has subject-matter jurisdiction to adjudicate Plaintiffs' claims under the RFA and PRA. ................................................................................................. 6

 IV. On the merits, Defendants have failed to comply with the Paperwork Reduction Act. ..... 14

 V. On the merits, Treasury has failed to comply with the RFA ............................. 15

 VI. The Anti-Injunction Act does not bar the Plaintiffs' requested relief. .............. 17

 VII. Plaintiffs' requested remedies are appropriate. ................................................. 17

CONCLUSION ................................................................................................................. 21

## **Table of Authorities**

**Cases**

*Aeronautical Repair Station Ass'n, Inc. v. F.A.A.*, 494 F.3d 161 (D.C. Cir. 2007) ........................... 22

*Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d. 23 (D.D.C. 2017) ................................................................ 5

*Am. Biosci., Inc. v. Thompson*, 269 F.3d 1077 (D.C. Cir. 2001) ........................................................... 5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................................... 4

*Chamber of Commerce of U.S. v. Napolitano*, 648 F. Supp. 2d 726 (D. Md. 2009) ........................ 22

*Harlan Land Co. v. U.S. Dep't of Agr.,* 186 F. Supp. 2d 1076 (E.D. Cal. 2001) ............................... 22

*Lujan vs. Defenders of Wildlife*, 504 U.S. 555 (1992) .......................................................................... 6

*North Carolina Fisheries Ass'n Inc. v. Daley,* 27 F. Supp. 2d. 650 (E.D. VA 1998) ............Exhibit D

*Northwest Min. Ass'n v. Babbit,* 5 F. Supp 2d. 9 (D.D.C. 1998)..........................................Exhibit D

*Sierra Club vs. EPA*, 292 F.3d 895 (D.C. Cir. 2002) ........................................................................... 6

**Statutes**

15 U.S.C. §632(a)(1) ............................................................................................................................... 10

15 U.S.C. §632(a)(2) ............................................................................................................................... 10

5 U.S.C §611(a)(4)(B) .............................................................................................................................. 22

5 U.S.C. §601(3) ...................................................................................................................................... 10

**Rules**

13 C.F.R. §121.105(a) ............................................................................................................................... 9

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 56(a). ............................................................................................................................... 4

**SBA Cases**

*Mexican Intermodal Equipment*, SBA No. 4182 (1996) ...................................................................... 12

*Size Appeal of B&A and Yutan Construction* No. 105 (1964), *aff'd*, 44 COMP. GEN. 253, B-154756
      (November 2, 1964) ......................................................................................................................... 12

*Size Appeal of Com-Tech Services,* Inc., No. 4119 (1995) ................................................................ 13

*Size Appeal of Torgreen, Inc.,* SBA No. SIZ-4213 (1996) .................................................... 11, 12, 13

## INTRODUCTION

In their Cross-Motion for Summary Judgment and Response to Plaintiffs' Motion for Summary Judgment (ECF 57-1) ("Defendants' Brief"), Defendants ask the Court to rule in their favor on six independent grounds. Two arguments have already been rejected by this court - standing and the Anti-Injunction Act ("AIA). Three arguments are based on the administrative record and must fail as Plaintiffs' have clearly established, and Defendants' Brief does not and cannot rebut, that Defendants' RFA 605(c) certifications were arbitrary and capricious. The sixth argument which claims that the court lacks jurisdiction to hear the case is without merit as a matter of law and fact. A seventh argument goes to issues of remedies in the event that Plaintiffs prevail on the merits.

## STANDARD OF REVIEW

As discussed in greater detail in the moving papers,[1] a motion for summary judgment must be granted when there is no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The non-moving party may not rely solely on allegations or conclusory statements and to defeat a summary judgment motion. It must establish more than 'the mere existence of a scintilla of evidence' in support of its position." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986).

In cases involving judicial review of agency action – such as this case – the summary judgment rules operate somewhat differently. "[T]he district judge sits as an appellate tribunal" and "[t]he entire case on review is a question of law." *Am. Biosci., Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation marks omitted). In this posture, the court must decide "whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23, 30 (D.D.C. 2017) [per Mehta, J.]

---

[1] See moving papers for detailed analysis of the APA standard of review. ECF 47-1 pages 11-12.

## ARGUMENT

Plaintiffs address each of Defendants' seven arguments.

I.   **The RFA 605(b) certifications are arbitrary and capricious.  Defendants are not entitled to any further deference.**

Plaintiffs do not dispute Defendants' discussion of the standard of review.  However, Defendants' Brief does not cite a single reference in the administrative record that supports their certifications.  Nor can they.  As set forth in detail in Plaintiffs' moving papers, there is not a single document or iota of evidence in the administrative record that supports the certifications.  Quite the opposite.  There is overwhelming evidence in the administrative record supporting the fact that the regulations had and continue to have a significant impact on a substantial number of businesses.

The administrative record establishes that the certifications are arbitrary and capricious for several reasons

A. Defendants entirely failed to consider the impact of the statute and regulations on small businesses. Rather they issued certifications that ran counter to the vast amount of evidence before them.  The certifications were so implausible that they could not be ascribed to a reasonable difference in view.

B. Defendants' certifications were not based on any relevant data and were not accompanied by a satisfactory explanation which demonstrates a "rational connection between the facts found and the choice made."

C. The certifications not only lacked substantial evidence, but lacked any evidence whatsoever.

Thus, in this case Defendants are entitled to no deference and this argument must fail.

II.   **Plaintiffs have established standing.**

As the Court has previously ruled in denying Defendants' motion to dismiss, Plaintiffs have established procedural standing.  To establish procedural standing, Plaintiffs "need only establish that

the agency violated a procedural right designed to protect her interests, and that it is plausible "that the procedural breach will cause the essential injury to the plaintiff's own interest."   ECF 29 at page 2. To establish injury, "a procedural injury claim therefore must be tethered to some concrete interest adversely affected by the procedural deprivation." *Id.*, at 3.

> In many if not most cases the petitioner's standing to seek review of administrative action is self-evident; no evidence outside the administrative record is necessary for the court to be sure of it. In particular, if the complainant is an object of the action (or forgone action) at issue— as is the case usually in review of a rulemaking and nearly always in review of an adjudication — there should be "little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.
>
> *Sierra Club vs. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002), citing *Lujan vs. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (internal quotations omitted).

In two prior declarations Plaintiffs have established that they incurred compliance costs as a direct result of the Transition Tax and the regulations which are the subject of this lawsuit.  In fact, as a direct result of the complex law and regulations, Plaintiffs have had to amend their 2017 return at additional expense. (ECN 47-2, Silver Dec. para 18).

Defendants admit that Plaintiffs filed their 2017 tax returns, which included their Transition Tax related filings.  ECN 57-5 fact 9.  Defendants admit that Plaintiffs amended their 2017 tax returns. ECN 57-4 fact 15.  Significantly, Defendants do not dispute that Plaintiffs' incurred compliance costs in filing their initial or amended tax returns. They simply state that "whatever unspecified cost Silver already incurred in reporting that he owed no transition tax is irrelevant in Plaintiffs' request for injunctive relief." ECF 57-1, page 12.

In so stating, Defendants disregard the courts' ruling on the issue of procedural standing and injury as if it did not exist. In addition, there appears to be significant holes in Defendants' understanding of administrative law and the Transition Tax.[2]

---

[2] While the former is baffling, the latter is understandable, given the complexity of the law.

3

### Administrative law

Defendants position as to injury is quite clear.  "What is relevant is any ongoing or future reporting obligation.  Not only do Plaintiffs fail to demonstrate any ongoing injury or a prospect of future injury that is more than "speculative," they demonstrate the very opposite: that they have no ongoing injury or prospect of future injury." ECN 57-1, page 12.

As the Court made clear, standing in an RFA procedural case does not require future injury. Plaintiffs have established that they have been adversely affected by Defendants' failure to comply with the RFA and have incurred a concrete and particular injury in the form of the compliance costs they have expended.  Plaintiffs, therefore, have Article III standing to challenge the regulations here under the RFA and APA.

### Tax Law

While future injury is not required, Defendants' statement that Plaintiffs will have no future compliance costs because they owe no Transition Tax liability demonstrates a lack of understanding of the Transition Tax.  A short description of the law is sufficient to establish that Plaintiffs will have compliance costs long into the future, even though they owned no Transition Tax.

### The 962 election

The Transition Tax is paid by the shareholder of the foreign corporation, never by the foreign corporation itself.  Under the statute, the US parent corporate shareholder (*e.g.* Google U.S. and Apple U.S.) can automatically offset their Transition Tax liability by using 10 years of foreign tax credits for taxes paid by the foreign subsidiary.  The only way that Silver (an individual shareholder) could have enjoyed the same benefit of 10 years credits for Israeli corporate taxes paid by Silver Ltd was by making an IRC 962 election.  Accordingly, Monte Silver made a 962 election.[3] The 962 election was

---

[3] The IRC 962 election is an archaic provision that was rarely used before the introduction of the Transition tax.  In all his years of practice, until December 2017, Silver had never heard of this election. To the best of his knowledge, no client of his ever make that election prior to December 2017. (Silver Decl. ¶ 5.)
*See* https://www.alston.com/en/insights/publications/2020/02/the-section-962-election ("Before the enactment of the Tax Cuts and Jobs Act of 2017 (TCJA), most tax practitioners were not familiar with Section 962, and very few had ever utilized it in planning.")

not some unique decision of Silver.  In fact, realizing the predicament that individual shareholders were in, Defendants discussed the 962 election in great detail in the proposed and final regulations. Indeed, the proposed and final regulations ended up expanding the circumstances in which the election could be used in the context of the Transition Tax.[4]

The election involves many complications. One such complication is set forth in 962(d) and states as follows:

> Special rule for actual distributions.
>
> <u>The earnings and profits of a foreign corporation</u> attributable to amounts which were included in the gross income of a United States shareholder under section 951(a) and with respect <u>to which an election under this section applied shall, when such earnings and profits are distributed,</u> notwithstanding the provisions of section 959(a)(1), <u>be included in gross income to the extent that such earnings and profits so distributed exceed the amount of tax paid under this chapter on the amounts to which such election applied.</u>

(Emphasis added)

Simply put, this section states that an individual shareholder who makes a 962 election is subject to special US tax rules when that individual receives a dividend from the foreign company.  As a result, each time that Silver receives a dividend from Silver Ltd., Silver must comply with a wide variety of the most complex tax laws in the IRC, such as foreign tax credit accounting, allocation between dividends tainted and not tainted by the 962 election, a bilateral tax treaty, qualified/non-qualified dividends, etc.  Silver has been asked by a large number of US tax professionals of small business owners how to comply with this provision.[5]  Given the complexity of the matter, Silver has been and remains unable to provide an answer. (Silver Decl. ¶ 4).  What is certain is that complex and costly compliance will be required whether dividends are distributed tomorrow or in 20 years, and regardless of whether Plaintiffs owed Transition Tax.  This is not speculative. This is a certainty.

Furthermore, making the 962 election correctly is a highly technical matter.  Failing to make it

---

[4]  The 962 election was cited 54 times in the proposed and final regulations. The actual amendment to prior 962 regulations covered three pages in the final regulations.  AR 3360-3362,
[5]  Such "tax professionals" are often CPAs and enrolled against who operate one-person firms.

correctly may result in a taxpayer's inability to claim the tax credits, while mega-corporations like Google and Apple enjoy it automatically.  In this case, in 2017, Silver made the 962 election based on his best understanding of the law.  Subsequently, Silver learned that his 962 election was not made correctly.  Accordingly, Plaintiffs amended their 2017 to correct the initial 962 election.   The amendment was not simply "a form that he forgot to include earlier," as Defendants claim.   ECF 57-4, Fact 15.  The amendment was the sole result of the extreme complexity of the subject matter. (Silver Decl. ¶ 5).

In sum, plaintiffs have established the required "injury" for an RFA procedural case. Though not required to do so, they have also established concrete future injury.

### III.   The Court has subject-matter jurisdiction to adjudicate Plaintiffs' claims under the RFA and PRA.

#### A.    The RFA & Jurisdiction

Defendants argue for the first time that the Court lacks subject matter jurisdiction over Plaintiffs' claims under the RFA.  This argument is premised principally on a single regulation promulgated by the Small Business Administration - 13 C.F.R. §121.105(a) - which Defendants suggest erroneously is controlling for purposes of the RFA.  Defendants' reliance on this regulation is misplaced for two reasons.

*First*, the RFA is not limited by the SBA regulation.  The RFA clearly states that the term "small business" has the same meaning as the term "small business concern" under section 3 of the Small Business Act.  5 U.S.C. §601(3).  The Small Business Act defines "small business concern" as a business that (A) is independently owned and not dominant in its field (15 U.S.C. §632(a)(1), and (B) meets certain size requirements (15 U.S.C. §632(a)(2)).  The Small Business Administration has established highly detailed size standards based on the North American Industry Classification System (NAICS).[6]

---

[6] The SBA's "size standards" are set forth in 13 C.F.R. § 121.201. See Electronic Code of Federal Regulations, Part 121-

Under the SBA, the Small Business Administration has very limited authority to limit what constitutes a small business.  15 U.S.C. 632(a)(2) specifically limits this authority to issues of business size.

> (2) Establishment of size standards
> (A) In general: The Administrator may specify **detailed definitions or standards** by which a business concern may be determined to be a small business concern for the purposes of this chapter or any other Act.
> (B) Additional criteria: The standards described in paragraph (1) may utilize number of employees, dollar volume of business, net worth, net income, a combination thereof, or other appropriate factors.

(Emphasis Added).

First, regulation §121.105(a) which Defendants rely on is unrelated to size.  Second, the entire paragraph is one sentence long, clearly not arising to the level of the requisite "detailed definition or standard."

The RFA cannot be read so narrowly such that a one sentence SBA regulation unrelated to size has the impact of preventing a vast large number of small businesses from seeking relief under the RFA.  Such narrow interpretation would allow the Small Business Administration (possibly under pressure from Defendants) to issue regulations which drastically narrow the term "small business," thus rendering the entire RFA ineffective and frustrating an important public policy established by Congress.

*Second*, by its clear terms, this regulation only deals with businesses who seek to enjoy certain SBA assistance, a fact which Defendants' Brief conveniently failed to state.

> (1) Except for small agricultural cooperatives, <u>a business concern eligible for assistance from SBA</u> as a small business is a business entity organized for profit, with a place of business located in the United States, and which operates primarily within the United States or which makes a significant contribution to the U.S. economy through payment of taxes or use of American products, materials or labor.

(Emphasis added).

Very few cases have dealt with this regulation.  Those that do all arise in the context of eligibility

---

Small Business Size Regulations, (August 19, 2019). https://www.sba.gov/document/support--table-size-standards

of small businesses for set aside tenders.[7]

"It is clear the regulatory requirement is intended to prevent foreign-based firms, which do not contribute to the U.S. economy, from taking advantage of the U.S. government's small business programs." *Size Appeal of Torgreen, Inc.,* SBA No. SIZ-4213, at 3 (1996).

The congressional goal of the RFA and PRA is to protect small businesses from burdensome laws and regulations.  The limited goal of the SBA regulation is to prevent foreign businesses who do not contribute to the U.S. economy from enjoying SBA set-aside programs.   For the two reasons set forth above, the SBA regulation is not relevant to RFA analysis.

Not surprisingly, Defendants propose a different interpretation to the one sentence SBA regulation. "Although the Treasury Department and the IRS received a number of comments asserting that a substantial number of small entities would be affected by the proposed regulations, those comments were principally concerned with U.S. citizens living abroad that owned foreign corporations directly or indirectly through other foreign entities. No small entity is affected in this scenario."[8]

Such an interpretation has led Defendants to callously ignore the pleas of a vast number of small businesses.  Now, Defendants seek to rob them of standing under the RFA.  First, Defendants' interpretation utterly frustrates the RFA.  Second, it runs counter to express congressional history that "any doubt as to whether a regulatory flexibility analysis should be performed must be resolved in favor of performing the analysis." [9]  Third, it results in an unreasonable outcome whereby one medium size U.S.-based business would have standing, while 100,000 tiny businesses of American citizens and taxpayers living abroad who are harmed by Defendants' RFA violation would not.

Here, Plaintiffs seek no economic benefit or assistance from the SBA.  Silver is a U.S. citizen and taxpayer who simply seeks to be protected under the RFA.  Thus, Plaintiffs request that the court

---

[7] These cases were all heard by the United States Small Business Administration, Office of Hearings and Appeals (SBA).
[8] AR 3371; Exhibit D.  The certification of the final regulation even goes one step further: <u>Regardless of the number of small entities potentially affected by section 965 or the final regulations,</u> the Treasury Department and the IRS have concluded that there is no significant economic impact on such entities as a result of the final regulations." [emphasis added].
[9] House Rept. 104-49, part 1 page 7 (1995).

specifically find that 13 CFR 121.05 is not relevant in this case.

For argument sake, the following discussion assumes that the SBA regulation does apply to this case.  Even then, the regulation is of not avail to Defendants.

1.   Can a foreign company qualify as a small business under this regulation?

The answer is unequivocally yes.  Regulation § 121.105 (b) states that "a business concern may be in the legal form of an individual proprietorship, partnership, limited liability company, corporation, joint venture, association, trust or cooperative, except that where the form is a joint venture there can be no more than 49 percent participation by foreign business entities in the joint venture."

The SBA has long recognized that § 121.105 does not bar foreign businesses from being a small business under the SBA.  *Mexican Intermodal Equipment*, SBA No. 4182 (1996) (Mexican company); *Size Appeal of B&A and Yutan Construction* No. 105 (1964), *aff'd*, 44 COMP. GEN. 253, B-154756 (November 2, 1964) (Canadian company); *Torgreen, supra*.

2.   "Place of business" and "contribution" requirements.

These issues have been addressed by the SBA very seldomly, and always in the context of a challenge to a set-aside tender. And even then, the SBA has liberally interpreted the terms "Place of Business" and "Contribution," so that they impose virtually no requirements at all.

As to place of business requirement, the few SBA cases addressing this issue have required only that the place of business be one be where "a firm either offers for sale or performs the services which it sells, and which the public knows as the firm's place of business." *Torgreen, supra* at 2, *citing Size Appeal of Com-Tech Services,* Inc., No. 4119 (1995).

In essence, to fulfill this requirement all that is required is that a business offer to sell services at the location, and that the public know the location to be the firm's place of business.  The actual sale or performance of services is not even required.

The contribution element is discussed in *Torgreen* which involved a company that had been in existence for three years but had never entered into a contract and had no revenue.  "It also is clear that

9

Congress intended small business set asides to benefit small businesses, including foreign owned small businesses with places in the U.S. which also <u>contribute</u> to the U.S. economy." *Torgreen* at 3. (Emphasis added).   As a result, the SBA ruled that "its intention to contribute to the U.S. economy" was sufficient to qualify under the regulation. *id.*

3.   Can an individual qualify as a small business under this regulation?

As set forth above, an individual can be a "small business". 13. C.F.R.105(b). Applying the above to this case, it is clear that both Plaintiffs are small businesses under the RFA.

   A. Monte Silver

Defendants admit that Silver invests in U.S. real estate.  ECF 57-5 Fact 8.  These investments, which started in 2010, were and continue to be made solely for profit.  Each separate investment involves the purchase, ownership, operation, maintenance and ultimate sale of a distinct commercial real estate -  all of which take place solely in the United States.  By definition, each investment has a place of business in the United States, and operates primarily and exclusively within the U.S.  This meets the "place of business" and "operates primarily" criteria of SBA regulation 121.105(a).  No further analysis is required.[10]

Accordingly, Silver meets all the requirements under SBA Regulation 121.105 and is a small business for purposes of the RFA.  For purposes of issue preclusion, Plaintiffs ask the Court to make a finding to this effect.

   B.  Silver, Ltd.

As set forth in Silver's supporting declaration (Silver Decl., ¶¶ 7-16), starting in 2010, Silver opened a law firm in Israel and operated it as a sole proprietorship.  *Id.* at ¶7.  Seeking to leverage his personal and business ties in Los Angeles, in early 2010 Silver entered into a cooperation agreement

---

[10] Of course, each such investment contributes to the U.S. economy in many ways, including but not limited to the payment of federal and state taxes when the property is sold for a profit, and the use of American-based products, material and labor in managing and operating the properties. (Silver Decl. ¶ 6)

with a Los Angeles-based law firm in which Steve Wasserman (Wasserman), was and remains a senior partner. *Id.* Silver and Wasserman had enjoyed a close relationship since 1994. *Id.* Under the terms of a 2010 written cooperation agreement, both sides agreed to invest time, effort and money to generate (i) mutually beneficial domestic and international legal business and, (ii) Israeli investors in both locations for US real estate investments in which Wasserman had been involved in for many years. *Id.*

This relationship made business sense to Silver for several reasons.  First, Silver was well connected to prominent Los Angeles-based Israeli businesspeople and civic leaders, an audience both he and Wasserman sought to cultivate for business reasons.  *Id.* at ¶8.  Second, both sides were interested in generating US legal business from large Israel-based companies, something that neither side could do without the other.  *Id.*  Third, two years after the real estate crash of 2008, many Israelis Silver knew sought to invest in U.S. real estate.[11] *Id.*

As business grew, in 2012 Silver established Silver Ltd. The agreement with Wasserman was assigned to the Silver Ltd. at that time. *Id.* at ¶9.

From the outset, Silver undertook (and continues to undertake) a wide variety of actions to market his law firm as unique in that it had (and has) an active presence in both Los Angeles and Israel. Silver's actions have taken on many dimensions.

<u>Basic marketing aspects</u>

 These activities have included things such as (i) having his firm's business card include contact details of the Los Angeles location, (ii) having a Wasserman law firm business card, (ii) appearing on the Wasserman website, with a profile that highlighted his offices in both locations, (iii) having his U.S.-based location appear on Plaintiffs' firm's website, (iv) appearing on the Wasserman letterhead as of-counsel, (iv) having email accounts of the Wasserman firm and his own firm, and (iv) advertising

---

[11] Without a credible U.S.-based office, Silver would be unable to generate significant U.S. legal work from large Israel-based business would retain Silver for significant U.S. legal matters.  In addition, no Israel-based real estate investor would invest with Silver without Silver having a solid reputable U.S.-based partner.

the fact that Silver was connected to the Wasserman firm. (Silver Decl., ¶11 and Exhibit B).

<u>Presence in Los Angeles</u>

From the outset it was vital that Silver frequently travel to Los Angles to firmly establish his Los-Angeles office and presence.  Accordingly, for several years Silver flew two Los Angeles very frequently.   Trips would generally last one week or two.  Each trip involved a hectic often seven-day work-week of back to back meetings, lectures and social events.  (Silver Decl., ¶12).

In his Los Angeles office, Silver has (i) performed legal services for existing clients, (ii) met potential clients, and (iii) hosted seminars for the target audience.  These events were well advertised in the local Israeli-newspaper and would be attended by dozens of people. (*Id.*; Exhibit B).

To strengthen the awareness of his Los Angeles office, Silver regularly published business articles for the largest Hebrew-language weekly magazine in the city. In an effort to generate legal business, he would meet Los Angeles-based branches of large Israeli businesses and banks, as well as relevant businesspeople and civic leaders.  Also, for years, Silver and the Wasserman firm placed large advertisements in Hebrew-language magazines in Los Angeles.  *Id.*, at 13. Exhibit B. These advertisements highlighted Silver, his Los Angeles office, and the fact that the Wasserman firm had a Hebrew speaker in the office, and a presence in Israel.  *Id.*

When required or at the request of Israel-based clients, Silver has flown to Los Angeles to perform legal services in the Los Angeles office. *Id.*

<u>Activities in Israel</u>

In Israel, Silver marketed and continues to market himself as having a U.S. office, an essential prerequisite in order to generate both legal business from large Israel-based businesses, and investors interested in U.S. real estate.  *Id.* at ¶14. At countless meetings with businesses and investors big and small, he held and holds himself out as someone who has a U.S. office and who spent and spends a significant time in the United States.  *Id.*

In addition, over the years, Silver has organized a very large number of seminars in Israel, most

often in cooperation with highly reputable Israel-based companies and associations. *Id.* at ¶15. Some events have been attended by hundreds of business people, and many of the events have been covered by leading Israeli media. *Id.* In order to leverage these events to establish his U.S. presence and Los Angeles office, Silver would have the Wasserman firm sponsor the events. *Id.* Indeed, senior partners of the Wasserman firm flew to Israel to attend the more important events. (*Id.*; Exhibit. B). At other times, and in an effort to close a sizeable deal, a senior partner of the Wasserman firm flew (and continue to fly) to Israel to attend meetings with senior officers of the country's largest companies. *Id.*

Silver's effort to establish himself and Silver Ltd, as a firm with offices in both Los Angeles and Israel has been, and remains, successful. *Id.* at ¶16. Silver and/or the Wasserman firm have been able to secure very large Israel-based clients for U.S.-based legal work. *Id.* This work as generated very significant fees and income for both sides and other U.S.-based third parties. *Id.*

<u>Real estate</u>

Silver Ltd has also invested in one US commercial real estate investment. Silver Decl., ¶6. As set forth in the discussion related to Silver's real estate investments, Silver Ltd.'s investment in and of itself qualifies Silver Ltd. as a small business.

Defendants are aware of none of this activity, as they failed to conduct any discovery. Instead, they rely on false and baseless representations to seek to disprove that which is an indisputable fact.

1. Defendant's contend that Plaintiffs concede that Silver Limited does not have a place of business in the United States." Brief page 16. ECF 57-4, Fact 7. Of course, Plaintiffs have made no such concession.

2. Defendants content Silver Ltd. does not file US tax returns and does not even have a U.S. employer identification number. ECF 57-5, Fact 12. First, as required by law, Silver and Silver Ltd. file form 5471. [12] Second, Silver Ltd. has a US Employer Identification Number ("EIN"). (Exhibit

---

[12] "Information Return of U.S. Persons with Respect to Certain Foreign Corporations."

C).  In fact, the EIN was mailed by Defendants to Silver's Los Angeles place of business where Silver receives his US-based mail to this day.

The only statement made by Defendants that may be true is that Plaintiffs did not fill out a certain box in Form 5471 correctly.  ECF 57-4, Fact 8.  If this is so, it is solely due to the fact that this form is very complex, has many highly detailed schedules, and is wholly unsuitable for a small business owner.

As a result of the above, Silver Ltd. is a small business under the SBA and RFA.  For purposes of issue preclusion, Plaintiffs ask the court to indeed make a finding to this effect.

The Court therefore has subject matter jurisdiction to adjudicate Plaintiffs' claims under the RFA and APA.

B. **The PRA & Jurisdiction**

As Plaintiffs have repeatedly made clear in its pleadings, they we do not state a cause of action under the PRA.[13]  However, there is nothing in the PRA that prevents the court from providing relief requiring Defendants' to comply with the provisions of the PRA designed to protect Plaintiffs and other small businesses.  This is especially so when Defendants so blatantly violated the law, and even failed to provide the statutorily required certification.

IV.    **On the merits, Defendants have failed to comply with the Paperwork Reduction Act.**

Defendants' Brief, like the entire administrative record, fails to set forth a single document or iota of evidence that Defendants complied with the PRA, or even attempted to comply with it.  In fact, the administrative record does not even display that any certification was made under PRA 3506(c)

In their brief, Defendants mischaracterize the content of a few items in the administrative record to support their compliance with the PRA.  These records have nothing to do at all with PRA

---

[13] Defendants wrongly state that "Congress had barred this sort of action." The actions explicitly barred by Congress are limited to those brought against the OMB for the approval or disapproval of agency requests to conduct collection of information. 44 U.S.C. §3507(d)(6). See Hyatt v. Office of Management and Budget, No. 17-17101 (9th Cir. 2018)

compliance.  Rather they are simply parts of the proposed and final regulations.[14]

Accordingly, Defendants' did not comply with the PRA and never attempted to do so.

V.   **On the merits, Treasury has failed to comply with the RFA**

A.   Defendants fail to provide a single document or iota of evidence to support their RFA 605 certification.

i.   Certification of the proposed regulation.

As to the certification of the proposed regulation, the issue is not one of deference.  As set forth in Plaintiff's moving papers, the certification is invalid as a clear matter of law.

ii.   Certification of the final regulation.

The question is not one of deference.  As both parties agree, as to the merits, the sole question before the Court is whether the administrative record supports the Section 605(b) certification as a matter of law.  Clearly, it does not.  In their Brief, as in the administrative record, Defendants fail to set forth a single document or iota of evidence that establishes that the certification meets the RFA/PRA standards.  Even worse, neither Defendants' Brief nor the administrative record suggest that Defendants even attempted to comply with the RFA.

Indeed, the only document cited by the Defendants to support their compliance with the RFA is AR 3171, which is simply the certification itself issued under the final regulations.  A simple analysis of this document makes clear that to state that it supports a certification makes a mockery of common sense.

Defendants' sole argument that they even considered the RFA and PRA relies on (i) one single paragraph in the final certification related to the number of small businesses impacted by the regulation (ECN 52-1 pages 23-24); (AR 3171), and (ii) one paragraph and one small table in the final certification which mention the term "economic impact". (ECN 52-1 page 25); (AR 3171-3172).

---

[14] AR 03554 – 3615 are simply the proposed regulations.  AR 03169 is simply the PRA provisions in the final reg. 03133 is the first page of the final regulations

First, none of the above even appeared in the certification of the proposed regulation.   The certification in the proposed regulation is invalid on its face.   As to the final regulation certification, Defendants cynically added these two paragraphs to quash the uproar that they encountered from small businesses.   Indeed, Silver predicted that Defendants would so behave.   (PR135).

As to the merits, these two paragraphs and table in the final regulations cannot even remotely be considered sufficient to justify a certification, especially given (i) the facts that Defendants knew and chose to ignore, and (ii) that this regulation was designated a "significant regulatory action." [15]   First, the paragraph mentioning the number of small businesses is based on explicitly self-contradicting guess work.   Second, the paragraph and table referring to the "economic impact" is based on unidentifiable, unrelated, high-level, economy-wide, aggregate data.  This data explicitly states that (i) it does not apply to small businesses as defined by the RFA.  (AR 3172), and (ii) it only deals with the economic burden imposed on businesses that have Transition Tax liability, totally ignoring the fact that most small businesses owe no tax, but are subject to significant compliance costs.   See Schedule D for a detailed analysis of these two paragraphs and table.

As a final point, Defendants claim that they submitted the proposed regulation to the SBA for comment. ECF 57-1 page 28, footnote 14.   Indeed, Defendants are required by law to submit either the RFA 603 Regulatory Flexibility Analysis or the RFA 605(b) certification with the supporting factual statement to the Chief Counsel for Advocacy of the Small Business Administration. 5 U.S.C. §603(a) & 604(a)(3).   However, there is nothing in the administrative record, not an email or other document, that establishes that Defendants did even this.[16]   Indeed, a Freedom of Information Act

---

[15] "Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. The OIRA has designated this rule as an economically significant regulatory action under section 3(f) of Executive Order 12866 and the Memorandum of Agreement (MOA), Review of Tax Regulations under Executive Order 12866 (April 11, 2018)" AR 3721-3722 (proposed regulation) and AR 3339 (final regulation')

[16] AR 03581 and AR 3172, cited by Defendants, are simply copies of the certifications that were included in the proposed and final regulations, respectfully.   Defendants' failed to comply with even this requirement.  This is not surprising. In the entire administrative record there are only five emails which originated from within Defendants or any Federal agency for that matter.  (Exhibit F).  Defendants claim "the record includes approximately 600 pages of emails."  ECF 42-1 at 8. After extensive review of the record, Plaintiffs have been unable to locate them. Plaintiffs assume that as part of the 600 emails, Defendants counted 595 emails from small business owners.

request to the SBA indicated that they had not a single document relevant to these regulations.  (Exhibit E).

B.  The "foundational error" is Defendants' arbitrary and capricious conduct.

Defendants spent pages avoiding the issue.  The foundational error is clear.  The certifications issued by Defendants in both the proposed and final regulations are arbitrary and capricious.  Not only are the certifications not backed by a single document or iota of evidence, but a vast amount of evidence in the administrative record directly contradicts the certifications.

VI.  **The Anti-Injunction Act does not bar the Plaintiffs' requested relief.**

The court has already ruled on this issue.  Until the remedy stage, this action does not implicate the AIA.  "The court need not decide at this stage whether the greater relief Plaintiffs seek—staying enforcement of the regulations until such time as Defendants comply with their statutory duties would run afoul of the Anti-Injunction Act. The court need address that issue only if Plaintiffs prevail on the merits." ECN 29, page 6 Footnote 1.

Accordingly, the judge may address the AIA issue in the remedy stage, should Plaintiffs prevail on the merits.

VII.  **Plaintiffs' requested remedies are appropriate.**

Defendants' final argument concerns the appropriate remedy to be invoked in the event the Court finds, as it should, that Defendants have failed to comply with the RFA and PRA in issuing the Regulations

As a preliminary matter, Defendants' preferred remedy is quite clear and repeatedly stated in Defendants' Brief. "If the Court, however, finds a deficiency in that certification, remand to the IRS is all that is needed to correct it. When, as here, the agency has conducted analysis of some kind, remand is the appropriate remedy to allow the agency to correct any defect or flaw in its certification or reasoning." [emphasis added] ECF 57-1, at 33.  "And even if the Court finds that the IRS's certification is insufficient, that does not mean the IRS should be required to engage in a regulatory

flexibility analysis. Instead, the IRS should have the opportunity to <u>correct any deficiencies by further supporting and explaining its certification</u>." (emphasis added). *Id.* at 38.

The GAO report found that Defendants circumvent the RFA in 99.5% of the cases.  And in this case, their disregard for the RFA and PRA is blatant.  Despite this, Defendants would have the Court simply order recertification under 605(b).  Words cannot express the outrage that small businesses should and would feel if that was the final result of this litigation.

A. <u>Remand is expressly required under the RFA.</u>

As to the remedy, the RFA is very clear:  "In granting any relief in an action under this section, the court shall order the agency to take corrective action consistent with this chapter and chapter 7, including, but not limited to— (A) remanding the rule to the agency, and (B) deferring the enforcement of the rule against small entities unless the court finds that continued enforcement of the rule is in the public interest."  5 U.S.C §611(a)(4)(B).

Defendants' attempt to quote the law as saying that "a court <u>may</u> 'defer the enforcement of the rule'" is not only wrong, but again puts the accuracy of Defendants' representations into question.

As stated above, what Defendants mean by remand is clear: remand to allow them to recertify. Not only is this position outrageous on its face, but the cases that Defendants cite do not stand for the proposition at all.  *Harlan Land Co. v. U.S. Dep't of Agr.,* 186 F. Supp. 2d 1076, 1097 (E.D. Cal. 2001) involved a case where a federal agency and the government of Argentina conducted extensive analysis on the impact of importing citrus fruit from Argentina.  The court's opinion dedicated several pages to describe the analysis that the parties performed.  Despite this, the court found that the RFA analysis was flawed and "remand[ed] the final rule to defendants for consideration of the economic impact that the importation of Argentine citrus will have on small businesses." *Harlan* at 1097.

*Aeronautical Repair Station Ass'n, Inc. v. F.A.A.*, 494 F.3d 161 (D.C. Cir. 2007) stands for the exact opposite of what Defendants cite it for.  "For the foregoing reasons, we uphold the substance of the FAA's 2006 Final Rule and remand for the limited purpose of conducting the analysis required

under the Regulatory Flexibility Act." *id.* at 178

*Chamber of Commerce of U.S. v. Napolitano*, 648 F. Supp. 2d 726 (D. Md. 2009) also fails to support Defendants' position.  "Even if the Plaintiffs were correct, the proper remedy would not be to vacate the Rule promulgated by the agency. … If the Regulatory Flexibility Act was not followed, the proper remedy appears to be to remand to the agency and order that a regulatory flexibility analysis be prepared."  *id.* at 742

B. <u>Deferring enforcement of the regulation against Plaintiffs and small entities is in the public interest</u>

The public interest is clear:   Defendants must comply with their statutory obligations under the RFA and PRA.

Defendants' claim that "the public interest favors continued enforcement of rules that <u>assist taxpayers in meeting their transition tax obligations</u>." [emphasis added] ECF 57-1 page 34.

This argument makes no sense whatsoever.  A main reason Plaintiffs filed this action is that Silver, a tax attorney, has no idea what the Transition Tax regulations say.  Neither do small business owners or tax professional of small businesses.  These regulations are impenetrable and do not assist small business owners in meeting their obligations.   Quite the opposite. They impose legal obligations on small businesses which neither they nor their tax professionals can even begin to understand.

> The regulations at issue clarify how to calculate various amounts used in determining a taxpayer's tax liability under Internal Revenue Code section 965. The regulations also establish the manner for making various elections under section 965, which impact the timing and/or method of calculating and/or paying the tax. Because the statute allows the taxpayer to make certain favorable elections in the manner prescribed by the Secretary, the regulations establish the manner for making each election.

ECF 57-1 at 34.

As repeatedly set forth in Silver's declarations, he has no idea whatsoever what the regulations mean.  The Regulations might as well be written in hieroglyphics.  One thing is clear: the regulations do not assist small businesses in any way.

Furthermore, as set forth in Plaintiffs' motion for summary judgment, deferring the

enforcement of the Regulations will have no impact on Defendants' ability to collect taxes.

First, small business owners are independently liable for the tax under the statute.  Second, Defendants' own data proves that small businesses do not even owe Transition Tax.  AR 3171.  Indeed, over 95% of the taxes raised by the Transition Tax were generated by companies with more than $2.5 billion in assets.  (Exhibit G).

C.  <u>Plaintiffs' request for compliance with section 212 of Public Law 104-121 is within the scope of their amended complaint.</u>

In one sentence Defendants argue that the Regulations are important to assist small businesses to comply with the law.  And in the very next sentence they contend that they should not be required to publish guidelines to assist small entities in complying with the rule.

Section 212 was enacted as part of the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREF).  The SBREF amended and strengthened the RFA by (i) providing small businesses with a private cause of action on which this action is based, (ii) including Treasury rules within its scope, and (iii) adding Section 212.   Section 212 is, thus, an integral part of the RFA and falls squarely within the scope of this action as filed.

The Defendants' give two reasons why they should not be required to comply with Section 212.

(i)    "That provision only applies when a final regulatory flexibility analysis is done." ECF 57-1, at 38.   So, in essence, by circumventing the RFA requirements by issuing baseless certifications, Defendants suggests that they should be rewarded by being released from having to publish Section 212 guidelines.

(ii)   "And even if the Court finds that the IRS's certification is insufficient, that does not mean the IRS should be required to engage in a regulatory flexibility analysis. Instead, the IRS should have the opportunity to correct any deficiencies by further supporting and explaining its certification."  ECF 57-1 at 38.  More need not be said.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request the Court to grant Plaintiffs' Motion for Summary Judgment, deny Defendants' Cross-Motion for Summary Judgment and enter an order as requested in the moving papers (ECF 47-3).

<u>Date</u>: August 19, 2020

Respectfully submitted,

/s/ *Lawrence Marc Zell*

_____
Lawrence Marc Zell (DC Bar # 959437)
**ZELL & ASSOCIATES INTERNATIONAL ADVOCATES LLC**
14 Penn Plaza
225 West 34th Street, 9th Floor
New York, New York 10122
E-mail: mzell@fandz.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2020, a copy of the foregoing document was served electronically through the Court's ECF system on all counsel of record.

/s/ *Lawrence Marc Zell*

_____

Lawrence Marc Zell (DC Bar # 959437)
**ZELL & ASSOCIATES INTERNATIONAL ADVOCATES LLC**
14 Penn Plaza
225 West 34th Street, 9th Floor
New York, New York 10122
E-mail: mzell@fandz.com

*Counsel for Plaintiffs*