# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**MONTE SILVER** and
**MONTE SILVER, LTD**.,
an Israel corporation

       *Plaintiffs*

*v.*

**INTERNAL REVENUE SERVICE;**
**UNITED STATES DEPARTMENT**
**OF THE TREASURY; CHARLES RETTIG**,
in his official capacity as Commissioner of the
Internal Revenue; and **JANET YELLEN**[1], in
her official capacity as United States Secretary
of the Treasury

       *Defendants*

Civil Action No. 19-cv-0247-APM

Judge Amit P. Mehta

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR RECONSIDERATION AND FOR LEAVE TO AMEND THE <u>COMPLAINT</u>

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Jannet Yellen, in her official capacity as Secretary of Treasury, has been substituted as a defendant in place of former Secretary of Treasury, Steven Mnuchin.

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   LEGAL STANDARD FOR RECONSIDERATION ............................................ 1

III.   ARGUMENT .................................................................................................... 5

  A.  PLAINTIFFS HAVE ARTICLE III STANDING TO MAINTAIN THIS LAWSUIT ...... 5

  1. THE COURT MISINTERPRETED THE RFA .................................................... 5

  2. FUTURE INJURY IS NOT A PREREQUISITE FOR RELIEF UNDER 5 U.S.C. §611…………………………………………………………………………...……..6

  3.   BOTH PLAINTIFFS HAVE ARTICLE III STANDING WITH RESPECT TO PROSPECTIVE RELIEF BECAUSE THEY WILL HAVE FUTURE REPORTING REQUIREMENTS AND COMPLIANCE COSTS .................................................. 9

  4.   PLAINTIFFS' INJURIES CAN BE REDRESSED BY GRANTING THEM NOMINAL DAMAGES ...................................................................................... 14

  B.  PLAINTIFFS ARE REGULATED ENTITIES FOR THE PURPOSES OF THE RFA ... 19

  1.   PLAINTIFFS FALL WITHIN THE ZONE OF INTERESTS OF THE RFA .............. 19

  2.   IN THE CASE OF SUBPART F STATUTES AND REGULATIONS, WHERE TAX LAW DISREGARDS THE CORPORATE ENTITY, PLAINTIFFS ARE ONE-IN-THE-SAME FOR RFA PURPOSES ............................................................................ 24

IV.   CONCLUSION ................................................................................................ 26

i

# I.     **INTRODUCTION**

Pursuant to Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure ("FRCP")[2] Plaintiffs respectfully submit this Memorandum of Points and Authorities in support of their Motion for Reconsideration (ECF 70) of this Court's March 28, 2021 Memorandum Opinion (ECF 67) (the "Opinion") – _Silver, et al. v. IRS, et al._, 2021 WL 1180081 (D.D.C. Mar. 28, 2021) – and Order (ECF 68) (the "Order") denying their motion for Summary Judgment (ECF 47) and granting Defendants' Cross-Motion for Summary Judgment (ECF 57). Plaintiffs also seek leave to file an amended complaint with respect to the remedy in accordance with FRCP 15. Specifically, Plaintiffs ask that the Court reconsider its rulings that (i) Plaintiffs lack Article III standing because the complained-of past injury cannot be redressed by a ruling in their favor (Opinion, at 17-20); (ii) Plaintiffs lack Article III standing for so-called "prospective relief" (interpreted by the Court to  mean "injunctive relief") due to a failure to demonstrate future injury (Opinion, at 20-24); and (iii) that neither Plaintiffs Silver Limited or Silver in his individual capacity are "subject to" the Final Regulations for purposes of the RFA[3] (Opinion, at 25-30).

# II.     **LEGAL STANDARD FOR RECONSIDERATION**

A motion for reconsideration under FRCP 59(e) should be granted when there is an "intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." _See Nat'l Sec. Archive v. C.I.A._, 584 F.Supp.2d 144, 146 (D.D.C. 2008), _quoting Firestone v. Firestone_, 76 F.3d 1205, 1208 (D.C. Cir. 1996).  In addition, FRCP 60(b) provides that, "[o]n motion and just terms, the court may relieve a party or its legal

---

[2] It is generally understood that Rules 59(e), and 60(b) of the Federal Rules of Civil Procedure encompass motions for reconsideration. 11 Charles Alan Wright et al., FEDERAL PRACTICE & PROCEDURE § 2810.1 (3d ed. 2017).
[3] All abbreviations, unless otherwise indicated, are the same as those used in Plaintiffs' Motion for Summary Judgment and related submissions.

representative from a final judgment, order, or proceeding" for reasons including "any other reason justifying relief."

There are three grounds why the Court should reconsider its Opinion and Order with regard to Article III standing.

*First*, the Court expressly declined to consider Plaintiffs' argument that future injury is not a prerequisite for relief under 5 U.S.C. §611(a)(4) on the grounds that it was raised for the first time during oral argument. *See* <u>Opinion</u>, at fn. 5; *see also* Hearing Transcript ("Hr'g Tr."), at 41–42. The Court itself acknowledged that redressability was never thoroughly briefed by the parties or considered by the Court on motion to dismiss or on summary judgment prior to oral argument. Plaintiffs' argument was advanced in response to the Court's own inquiry about redressability. Plaintiffs have consistently maintained that RFA-mandated relief is not injunctive relief and is not conditioned upon future injury.

*Second*, even assuming for argument's sake that Article III required Plaintiffs to demonstrate future injury in order to have judicial review on the merits of the Government's failure to comply with the certification requirements of 5 U.S.C. §605(b), Plaintiffs have established such injury. As the Court noted, "the record is less clear on this point" and found that Plaintiffs' explanation was both "lengthy" and "impenetrable." Notably, the Court appropriately classified the issue of future injury as a factual one (<u>Opinion</u>, at *12). Reconsideration is proper here because Plaintiffs will now clarify whatever misunderstanding existed concerning Plaintiffs' future injury. *Cf.* <u>Lovely-Coley v. D.C.</u>, 255 F. Supp. 3d 1, 9 (D.D.C. 2017) (granting motion for reconsideration when it seeks to clarify "errors of [...] fact that need correction.").

*Third*, recent Supreme Court authority concerning Article III standing not addressed by the parties or the Court justifies revisiting the Court's ruling that Plaintiffs' *past injury* cannot be redressed.  In <u>Uzuegbunam v. Preczewski</u>, 141 S. Ct. 792 (March 8, 2021), the Supreme Court ruled that Article III's redressability requirement will be met by a prayer for nominal damages where a procedural right has been abridged. Reconsideration is appropriate because the landmark ruling in <u>Uzuegbunam</u> can directly affect the outcome of this case and therefore would prevent manifest injustice, if the Court grants Plaintiffs' motion for leave to amend their complaint to include a prayer for nominal damages under FRCP 15.

Reconsideration of the Opinion and Order is also proper in connection with the Court's conclusion relating to "statutory standing" under the RFA.  The Court's analysis is erroneous in two regards: (1) as demonstrated below and as argued during summary judgment, CFCs like Silver Limited are clearly deep within the "zone of interests" when it raises RFA challenges to the Transition Tax Final Regulations. This is evident both from the statute, the Final Regulations and the legislative history; (2) regardless of whether the Plaintiffs are seen as separate entities or a unitary enterprise, the Court overlooked the way the IRC and the Government disregard corporateness in the context of CFCs and their U.S. stockholders under Subpart F of the Code, the TCJA and the Final Regulations.  The Court's apparent misunderstanding of these core concepts, if not reconsidered and addressed, will result in "manifest injustice." Reconsideration will serve "to correct a clear error" for purposes of Rule 59(e).

Finally, given the strong possibility that the Opinion and Order will be appealed, reconsideration is also appropriate to ensure that the record before the appellate court is complete thus enable full consideration of all legal argument on appeal. *See* <u>City of New York v. Nat'l R.R. Passenger Corp.</u>, 776 F.3d 11, 17 (D.C. Cir. 2015) ("We have previously held that a party seeking

to raise a new issue on appeal should first present it to the district court pursuant to a Rule 59(e) or 60(b)(6) motion."); *See also Cigar Ass'n of Am. v. United States Food & Drug Admin.*, 964 F.3d 56, 61 (D.C. Cir. 2020) (When a district court reviews agency action under the APA, Court of Appeals in turn reviews the district court's decision de novo.).[4]

Given the possible application of the special limitations period of the RFA [5 U.S.C. §611(a)(3)(A)], as a practical matter the Court's ruling will prevent a vast number of small businesses from ever challenging the Transition Tax Final Regulations. Furthermore, according to the Court's ruling, it may be impossible for any U.S. shareholder or CFC ever to bring an APA or RFA challenge to any Treasury regulations concerning CFCs or similar entities.  This manifest injustice warrants reconsideration. This is especially true where, as here, the merits of the case weigh heavily in favor of the Plaintiffs. The Court did not address any of the merit arguments in the Opinion and Order. However, it is unquestionable that Defendants' certification flies in the face of the RFA and makes a mockery of the regulatory flexibility process mandated by Congress. The "standing" obstacles – both constitutional and statutory –  preventing the Court from reaching the merits of the Government's defective Section 605(b) certification are, as we shall now show, important but nevertheless surmountable as a matter of law.

---

[4] Plaintiffs also intend to appeal the Court's ruling on Plaintiffs' request to seal portions of the record revealing Plaintiffs' tax returns [ECF 69]. However, the present Motion for Reconsideration concerns ECF 67 and 68 only.

### III.   ARGUMENT

### A.   PLAINTIFFS HAVE ARTICLE III STANDING TO MAINTAIN THIS LAWSUIT

#### 1.   THE COURT MISINTERPRETED THE RFA

In its December 24, 2019 Order denying the Government's motion to dismiss (ECF 29), the Court found that Plaintiffs have Article III standing. In that Order, the Court agreed with the parties that the injury at bar is best classified as a "procedural" injury, *i.e.*, "an injury resulting from the violation of a procedural right created by statute." *Id.* The "injury-in-fact" identified was Plaintiffs' cost of complying with "the TCJA's transition tax regulations." *Id.* The Court also found that there was a causal connection between the injury and Defendants' alleged failure to undertake an RFA analysis and determined that Plaintiffs established standing. *Id.* Notably, at the motion to dismiss stage, the "court did not address the element of redressability." Opinion, at *7.

At the summary judgment stage, the Court revisited the issue of Article III standing, noting that standing must be established at each phase of the litigation. Opinion, at *7. In this regard, the Court elected to analyze Plaintiffs' requested relief as retrospective and prospective. The Court's rationale is confusing and ultimately set the stage for an erroneous conclusion.  On the one hand, the Court described Plaintiffs' request that the Section 605(b) certification be declared insufficient and the Final Regulations be remanded back to the agency to comply with the RFA as "retrospective." On the other hand, Plaintiffs' request that enforcement of the Final Regulations be deferred was classified by the Court as "prospective" relief, akin to an injunction. The Court made this distinction even though both forms of relief are expressly referred to in 5 U.S.C. §611 without any qualification as to time. Nor does Section 611 make any reference to injunctive relief. Indeed, Plaintiffs never made any requests for retrospective or prospective/injunctive relief. Plaintiffs simply are asking for the relief provided for under the RFA, Section 611.

2. **FUTURE INJURY IS NOT A PREREQUISITE FOR RELIEF UNDER 5 U.S.C. §611**

From the outset, Plaintiffs have maintained that they are entitled to RFA-mandated relief without regard to future injury.  *See*, for example, ECF 61, at 4 ("As the Court made clear, standing in an RFA procedural case does not require future injury.").  Counsel for Plaintiffs reasserted this argument and expanded upon it during oral argument in response to a question raised by the Court. *See* Hr'g Tr., at 41-42. Counsel explained that the remand and deferral remedies under 5 U.S.C. §611 are not injunctions in the classical or conventional sense. Rather they are specific statutory remedies unique to the RFA, added by Congress in the 1996 Amendment precisely to give aggrieved small businesses the ability to seek judicial review of what Congress recognized as a blatant disregard by federal agencies of the procedural minima laid down in the original 1980 legislation.

During oral argument, the Court responded to this contention as follows:

> "So the question of whether, like an injunction, the statutory remedy that you've identified -- and I appreciate you flagging it -- for standing purposes, whether that requires future injury or not, I have to think about that."

Ultimately, however, the court declined to consider Plaintiffs' argument, concluding that Plaintiffs had waived the point having raised it "for the first time at oral argument," [Opinion, at fn. 5 *citing Physicians for Social Resp. v. Wheeler*, 956 F.3d 634, 647 (D.C. Cir. 2020)],[5] even

---

[5] *Physicians for Social Resp. v. Wheeler* dealt with appellate review, not oral argument at the district court level. That case, in turn, also cited an appellate review decision, U.S. ex rel. Davis v. D.C., 793 F.3d 120 (D.C. Cir. 2015).  At the district level, however, a legal point raised at oral argument in response to a court's *sua sponte* inquiry regarding a jurisdictional issue such as Article III standing *should* be ruled to preserve the legal issue for appellate review. We have found no case where the waiver rule has been applied at the district court level in connection with an Art. III standing argument.  While case law on this point in the district court is scant, the better practice would appear to be for the court to decide the issue in order to permit full and fair appellate review. *See Metlife, Inc. v. Financial Stability Oversight Council*, 177 F.Supp.3d 219, 234-236 (D.D.C. 2016) [referencing an APA merits issue raised for the first time on oral argument, the court stated:

though Plaintiffs have maintained throughout this litigation that RFA relief is not conditioned on

the assertion and proof of future injury. Moreover, Plaintiffs never requested injunctive relief and

nowhere in their original complaint (ECF 1) or in the amended complaint (ECF 5) is there any

prayer for injunctive relief as such. Plaintiffs only requested that the Court grant the remedies set

forth in Section 611.

Section 611 provides in relevant part:

> For any rule subject to this chapter, a small entity that is adversely affected or
> aggrieved by final agency action is entitled to judicial review of agency
> compliance with the requirements of sections 601, 604, 605(b), 608(b), and
> 610 in accordance with chapter 7 […]

> In granting any relief in an action under this section, the court shall order the
> agency to take corrective action consistent with this chapter and chapter 7,
> including, but not limited to—

> (A)      remanding the rule to the agency, and

> (B)      deferring the enforcement of the rule against small entities unless
> the court finds that continued enforcement of the rule is in the public interest.

5 U.S.C. §611(a)(1) & (4).

Nothing in the language of the statute suggests that Congress wished to treat Section 611

as equivalent to "prospective" relief equivalent to an injunction.  The plain meaning of Section

611 comports with the Congressional intent in amending the RFA to protect small businesses from

overreaching and burdensome government regulations.  *See* Small Business Regulatory

---

"[a]rriving so late, this argument could be disregarded completely. Oral argument gives parties a
chance to flesh out their existing theories of the case, but it does not properly serve as an
opportunity for either party to present an entirely new theory of the case. [The agency's] argument
was waived; the Court addresses it for the benefit of a reviewing court." (citations and quotations
omitted)]. This approach is even more compelling on issues concerning the court's subject matter
jurisdiction.

Enforcement Fairness Act--Joint Managers Statement of Legislative History and Congressional Intent, 142 CONG. REC. S3245 (daily ed. Mar. 29, 1996). From the very outset, Congress made it clear that forcing small entities to incur compliance costs routinely absorbed by large enterprises was an evil the RFA was intended to avert.[6] When the RFA was amended in 1996 to include judicial recourse for the very procedural misconduct complained of in this case [*i.e.,* mis-certification under Section 605(b)], Congress did not anticipate that courts would circumvent judicial review by reimposing procedural hurdles based on equity practice and the law of injunctions.[7]

Consequently, the case law requiring that a plaintiff allege and prove future injury as a condition for Article III standing for prospective relief is inapposite in the context of the RFA.

This Court should not treat the relief under Section 611 as prospective/injunctive relief, requiring plaintiffs to allege and prove future injury. Such an interpretation of the RFA would recreate, by judicial fiat, the same sort of procedural impediments and disincentives for small entities that the RFA was enacted to ameliorate.

---

[6] Congressional Findings and Declaration of Purpose, Pub. L. 96–354, §2, Sept. 19, 1980, 94 Stat. 1164, published as a Note to 5 U.S.C. §601 ("The Congress finds and declares that uniform Federal regulatory and reporting requirements have in numerous instances imposed unnecessary and disproportionately burdensome demands including legal, accounting and consulting costs upon small businesses […] with limited resources.").

[7] The result of applying the Court's logic to Section 611 is that plaintiffs who can prove past injury will be entitled to relief under 611(a)(4)(A), but **NOT** 611(a)(4)(B). Nothing in the statute suggests that Congress intended to bifurcate the different forms of relief and make them available to some small businesses, but not others.

**3. BOTH PLAINTIFFS HAVE ARTICLE III STANDING WITH RESPECT TO PROSPECTIVE RELIEF BECAUSE THEY WILL HAVE FUTURE REPORTING REQUIREMENTS AND COMPLIANCE COSTS**

Even assuming, for the sake of argument only, that RFA-mandated relief under Section 611 requires proof of future injury, Plaintiffs have shown that they will incur future injury as a direct result of Defendants' failure to comply with the RFA. The Court's conclusion to the contrary was based on a misunderstanding of the tax scheme created by the TCJA's Section 965, the Final Regulations thereunder and the interplay between Section 965, the Final Regulations and Sections 959 and 962 of the IRC, as amended by the TCJA.

As the Court accurately noted, the "tax scheme created by section 965 is complicated, to say the least." Opinion, at *3. The Court found that Plaintiff Silver's declaration includes "only one line regarding future injury" and that such an "unadorned statement of future injury is insufficient to carry Plaintiffs' burden at this stage of the case." Opinion, at *11.

Regarding the so-called 962 election, the Court found that Plaintiffs failed to show "how the section 965 regulations will impose future recordkeeping or reporting burdens." *Id*. This ruling ignores both the substance and effect of the Final Regulations.

In their briefs, at oral argument and in Plaintiff Silver's declarations, Plaintiffs explained in detail how Silver was required to make an election under the all-but-dormant Section 962 in order to offset liability for Transition Tax through the use of foreign tax credits and take advantage of a reduced U.S. corporation tax rate. The Final Regulations refer at length to these elections (fifty-four times(!)). Section 962 was amended together with the Transition Tax.

These regulations are highly complex and difficult to understand, even for an international tax expert like Plaintiff Silver. However, notwithstanding the complexity of the matter, one thing

is clear: the interplay between Sections 965 and 962 leads to the conclusion that Plaintiffs will incur future injuries as a result of the Transition Tax Final Regulations.

When a U.S. shareholder is faced with Transition Tax liability, Defendants anticipated that he may make a 962 election. It was for this reason that Section 962 was substantially amended and discussed extensively in the Final Regulations. By making a 962 election, the U.S. individual stockholder's share of deferred and undistributed CFC profits will be taxed at the U.S. corporation tax rate. In addition, by invoking the Section 962 election, taxpayers are also eligible to take foreign tax credit for corporate tax paid on the CFC's business profits. In the absence of a Section 962 election, this foreign tax credit is disallowed.

As a result of the application of IRC Section 965, 100% of Silver Limited's pre-1986 deferred (*i.e.*, undistributed earnings and profits) became "subject to" the one-time Transition Tax under the TCJA and payable by Plaintiff Silver, Limited's sole U.S. shareholder.  The Final Regulations allowed Plaintiff Silver to offset the Transition Tax due in respect of the deferred pre-1986 earnings and profits by foreign tax credits paid by Limited to the Israeli tax authorities prior to 2018.  This set off was accomplished through an election under IRC Section 962(d).   Plaintiffs Silver and Silver Limited incurred compliance costs in connection with the Transition Tax when Silver prepared, filed and amended his 2017 tax returns.  Thus far there is no dispute between the Parties.

The discussion here concerns the Plaintiffs' future information collection, reporting and compliance obligations in future tax years in respect of the Transition Tax under the Final Regulations.   Accompanying the present Motion for Reconsideration is Plaintiff Silver's Supplemental Declaration which explains these future obligations in greater detail in light of the Court's Article III standing analysis.

10

In the summary judgment briefing and at oral argument, Plaintiffs showed that their future compliance costs will arise when Plaintiff Silver Limited makes an actual distribution to Plaintiff Silver in the form of a dividend out of Limited's earnings and profits.  As the Court itself noted, when the CFC profits are ultimately extracted as dividends in the future, the shareholders will have to comply "with a wide variety of the most complex tax laws in the IRC […]" *See* <u>Opinion</u>, at *11. The Court discounted such future injury on two grounds.  *First*, the Court maintained that Plaintiffs had failed, as a factual matter, to show "*when* Silver Limited might issue a dividend to Silver that would trigger the claimed compliance obligations." *Id.* [Emphasis in original].  However, implicit in Plaintiffs' briefing and arguments is the fact that Silver, as sole owner and manager of Limited, will allocate dividends.  Moreover, Silver's Supplemental Declaration filed concomitantly herewith answers this concern explicitly.

> In 2021 due to certain education and housing commitments related to my children, I am forced to draw a dividend from Silver Limited.  This will be my first dividend since the enactment of the Transition Tax. As stated in Plaintiffs' reply brief to the motion for summary judgement: "What is certain is that complex and costly compliance will be required whether dividends are distributed tomorrow or in 20 years, and regardless of whether Plaintiffs owed Transition Tax. This is not speculative. This is a certainty.
>
> Indeed, it is a certainty, and this day has come.

Silver Supp. Decl., ¶¶ 3 – 4.

The Court's principal objection to Plaintiffs' future injury explanation was a legal one, saying that "it is far from evident that the section 965 regulations would be the cause of such costs." <u>Opinion</u>, at *12.    This is simply incorrect.  Plaintiffs' future compliance obligations will occur when Silver Limited makes an actual distribution out of pre- and post-2018 earnings and profits. That future obligation is directly traceable to the §962 election referred to above and that election

11

can only be made when Treasury issues regulations providing for the same.  IRC Section 962(b).
The Final Regulations provide the mechanism for making this election.

As a direct consequence of making the §962 election under the Final Regulations, once
Silver Limited makes an actual distribution of earnings and profits, as Limited will do in 2021, the
"special rule for actual distributions" set forth in §962(d) is triggered.  That section provides:

> The earnings and profits of a foreign corporation attributable to amounts which were
> included in the gross income of a United States shareholder under section 951(a) and
> with respect to which an election under this section applied shall, when such earnings
> and profits are distributed, notwithstanding the provisions of section 959(a)(1), be
> included in gross income to the extent that such earnings and profits so distributed
> exceed the amount of tax paid under this chapter on the amounts to which such election
> applied.

This statute specifically requires that undistributed profits that were subject to a §962 election and
therefore were excluded from being taxed previously will become taxable when the CFC actually
distributes such profits.  This special rule for actual distributions is a direct consequence of the
§962 election made possible by the Final Regulations.  The special rule for actual distributions
also expressly implicates Section 959(a) which deals with the exclusion of income attributable to
CFCs when such amounts are actually distributed.

The interplay of the various Code provisions referred to above is a direct and proximate
result of the election mechanism made possible by the Final Regulations.

As Plaintiff Silver explains in his Supplemental Declaration, when Silver Limited makes
an actual distribution in 2021, the CFC will have two principal sources of earnings and profits:
pre-2018 earnings and profits and post-2018 earnings and profits.  The pre-2018 earnings and
profits were **subject to** the Transition Tax under Section 965.  The post-2018 earnings and profits
were not. [*See* Suppl. Decl. at ¶¶6, 8-10].  But as the Government conceded in its summary
judgment briefing quoted in Silver's Supplemental Declaration, Silver Limited and Silver will

have to collect information and report on both pre-2018 and post-2018 income, even though Silver did not actually pay a Transition Tax thanks to the 962 election. Defendants acknowledge that when Limited issues its dividend (in 2021) Silver and Limited will need

> to track earnings of his CFC that have been subject to the transition tax and the section 962 election, as well as earnings not subject to the transition tax, so that when the CFC's earnings are distributed to him in the future, those earnings that were subject to the transition tax for which a section 962 election were made are distributed in the correct order and offset by any taxes previously paid on those earnings. Here, because Silver paid zero in transition tax on the accumulated post-1986 earnings and profits of the CFC he controls, pursuant to section 962(d), there is no offset to apply when those future earnings are distributed and included in his income. He still has to track the earnings subject to the transition tax and the section 962 election separately (unless he has no other previously taxed earnings and profits from prior years or in future years) because distribution rules under section 959 direct that the transition tax earnings are considered to come out "first" when a taxpayer receives a distribution of current or accumulated earnings and profits of a CFC.[8]

The Government does not dispute that Plaintiffs will have to comply with complicated income tracking rules when Silver Limited makes an actual distribution. It simply claims that these formidable obligations are attributable to IRC Section 959 and 962 and not to Section 965 and the Final Regulations. This is an argument about causation not injury. But this is an exercise in semantics. The fact remains that Plaintiffs' future compliance obligations in connection with actual distributions made by Limited are inextricably connected to and derive from the Final Regulations. But for the Final Regulations, Plaintiffs would not be able to make a 962 election; but for the 962 election, Plaintiffs' future compliance costs, if any, would have been significantly less. Accordingly, Plaintiffs' future obligations for recordkeeping and reporting (*i.e.,* future injury for purposes of Article III standing) are inescapable and incontrovertible with the Final Regulations.

---

[8] Footnote 2 of the Government's Reply in Support of their Cross-Motion for Summary Judgment (ECF 65).

In its Opinion, the Court conflated the Article III injury-in-fact analysis with redressability, stating, "Plaintiffs fail to explain how conducting an RFA analysis in connection with the 965 regulations could help him [*sic*] avoid costs imposed by other provisions of the tax code or a tax treaty." Opinion at *12. The answer is that had Defendants conducted a proper regulatory flexibility analysis it could have readily simplified, if not eliminated, the plight of small business taxpayers and their CFCs by providing clear guidelines; for example, by excusing small businesses from having to engage in income tracking when no Transition Tax was paid due to a §962 election.

In sum, Plaintiffs have shown that they are likely to incur significant compliance costs in the future upon the making of actual distributions by Silver Limited. The issue therefore is not whether Plaintiffs have shown a concretized and particular injury; they have done so. The only questions relate to whether the injury alleged and proven was caused by the Final Regulations and whether the prayed-for relief would redress that injury. As the foregoing discussion demonstrates, both prongs of the standing requirements have been adequately met in the present case. Finally, in cases where Article III standing is predicated upon a procedural injury, the courts have consistently held that where a plaintiff can demonstrate a concrete interest affected by the procedural deprivation, required showings for immediacy and redressability are significantly relaxed. *E.g.*, Center for Law and Educ. v. Department of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005); *California v. Trump*, 2020 WL 1643858 at *6-7 (D.D.C., Apr. 2, 2020).

4. **PLAINTIFFS' INJURIES CAN BE REDRESSED BY GRANTING THEM NOMINAL DAMAGES**

As it did on motion to dismiss (ECF 29), the Court held that Plaintiffs' compliance costs were a concrete and particularized injury which would support the all-important injury-in-fact

14

component of Article III standing in a "procedural injury" case like the one at bar.  This point is undisputed.

Turning to the redressability prong, the Court chose to characterize Plaintiffs' request for declaratory relief as "retrospective," concluding, however, that the remand and deferral relief prayed for by Plaintiffs would not remedy the harm incurred by the Plaintiffs in the form of compliance costs.  They had been expended and could not be recovered.  *See* Opinion, at \*9: "If the court were to grant the retrospective relief Plaintiffs seek – declaring unlawful the agency's failure to perform an RFA analysis […] – such relief would do nothing to redress Plaintiffs' claimed concrete injury."

The Court's redressability concerns, raised for the first time at oral argument, could be readily rectified through an award of nominal damages.   Plaintiffs have not prayed for nominal damages thus far, for two simple reasons:  (1) they concluded that Article III standing exists based on compliance costs and the plain meaning of Section 611, as discussed above; and (2) at the time the case was filed and through the briefing on motion to dismiss and at summary judgment, the Supreme Court had not ruled that nominal damages would be sufficient to satisfy Article III's redressability requirement in a case where a constitutional or statutory procedural right had been violated.   On March 8, 2021, the Supreme Court resolved this issue in an 8-1 decision in *Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021), where the Court held a request for nominal damages satisfies the redressability element necessary for Article III standing where a plaintiff's claim is based on a violation of a legal right.

The basic principle that a violation of a right imports damage is not confined to constitutional harms, like those at issue in *Uzuegbunam*. The violation of procedural-statutory rights will also give rise to claims that that can be redressed by nominal damages. *Cf. Carey v.*

*Piphus*, 435 U.S. 247 (1978); *Zinermon v. Burch*, 494 U.S. 113, 126 n. 11 (1990) (*Carey* established "that in cases where the deprivation would have occurred anyway, and the lack of due process did not itself cause any injury (such as emotional distress), the plaintiff may recover only nominal damages."). This is certainly true with the RFA, the purpose of which is to protect small business from unduly burdensome regulations and which provides judicial redress for failure to comply with its provisions.  In addition, nothing in the language of the RFA precludes an award of nominal damages.

Because nominal damages is an appropriate remedy for the violation of a legal right such as that created by the RFA, such damages can serve as Art. III standing purposes.

Plaintiffs realize that the First Amended Complaint (ECF 5) does not contain a request for nominal damages. However, Plaintiffs now seek leave to file a Second Amended Complaint, adding this specific form of relief. This simple amendment would resolve the Court's concern about redressability and would go far to give effect to the Congressional intent to protect small entities like the Plaintiffs in this case by allowing the Court to reach the merits under 5 U.S.C. §605(b).

Accordingly, Plaintiffs respectfully request the Court to grant Plaintiffs' Motion for Reconsideration under FRCP 59(e) and 60(b)(6) and, thereafter grant Plaintiffs leave to amend their complaint under FRCP 15.

FRCP 59(e) and 60(b) authorize the court to set aside the judgment. The question whether an amendment then should be allowed is governed by Rule 15. "As a practical matter, the motions under the two rules will be made simultaneously and decided together, since it would be a needless formality for the court to grant the motion to reopen the judgment only to deny the motion for

leave to amend." 6 Charles Alan Wright et al., FEDERAL PRACTICE & PROCEDURE §1489.1 (3d ed. April 2021 Update).

The standard for assessing a motion to amend a pleading is well established. Under FRCP 15(b), a "court should freely give leave when justice so requires." Rule 15(b)'s "mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178 (1962). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Id*. Denying leave to amend is thus an abuse of discretion and inconsistent with the spirit of the Federal Rules unless the court provides a sufficient reason for so doing, such as "futility of amendment, undue delay, bad faith, dilatory motive, undue prejudice, or repeated failure to cure deficiencies by previous amendments." *Gilliam v. U.S. Dep't of Just*., 128 F. Supp. 3d 134, 143 (D.D.C. 2015) [*per* Mehta, J.], citing *Boyd v. District of Columbia*, 465 F.Supp.2d 1, 3 (D.D.C. 2006).

Here, there is no sufficient reason to deny Plaintiffs' motion to amend:

1. The amendment would not be futile: as argued above, adding a request for relief in the form of nominal damages will rectify the Art. III standing redressability obstacle.

2. There is no undue delay: Plaintiffs make this request to amend in a timely fashion in connection with a Rule 59(e) and 60 Motion for Reconsideration. The Court itself acknowledged that redressability was never discussed, briefed or otherwise an issue until the hearing on summary judgment. *See Berger v. Ohio Table Pad Co.*, 539 F.Supp.2d 1069, (N.D. Indiana 2008) (permitting the amendment of a complaint after ruling on summary judgment in order to avoid subject matter jurisdictional defects); *and see Darney v. Dragon Products Co., LLC*, 266 F.R.D. 23, 27-29 (D. Me. 2010)

17

(adding new liability claim after discovery, scheduling orders and partial summary judgment). For the same reason, this request is not based on a dilatory motive.

3. The request to amend is being made in good faith, *i.e.*, in order to overcome Art. III standing and to allow the Court to reach the merits of this case. *See New York State Rifle & Pistol Ass'n, Inc. v. City of New York, New York*, 140 S. Ct. 1525, 1533 (2020) ("[i]t is black-letter law that we have a 'virtually unflagging' obligation to exercise our jurisdiction.); *See also Edge Inv., LLC v. D.C.*, 927 F.3d 549 (D.C. Cir. 2019) (same); *See also* 28 U.S.C. §1653.

4. The request to amend does not unduly prejudice Defendants: The proposed amendment is simple and, by large, opens the door to additional legal arguments concerning Article III standing. Plaintiffs only wish to add relief for nominal damages. The arguments of the merits of the case have already been briefed.

5. The current request is not a repeated failure to cure deficiencies by previous amendments: Plaintiffs were never required to amend to cure any substantial deficiencies. Now, however, Plaintiffs propose to amend their complaint to add relief that will likely change the Court's Article III standing analysis and conclusion.

Accordingly, Plaintiffs respectfully move this Court to grant them leave to amend their complaint.[9]

---

[9] Note that a demand for nominal damages will not be barred by a claim of sovereign immunity on the part of the United States. Little Tucker Act, 28 U.S.C. §1346(a)(2). *See United States v. Bormes*, 568 U.S. 6, 10 (2012)(Little Tucker Act does not create substantive rights but are jurisdictional provisions that operate to waive sovereign immunity for claims premised on other sources of law.").

In light of all the above, Plaintiffs request that the Court reconsider its ruling on Art. III standing. Reconsideration of this point will allow the Court to exercise its unflagging obligation to adjudicate matters within its jurisdiction, especially in this case where the merits weigh in favor on the Plaintiffs.

## B.  PLAINTIFFS ARE REGULATED ENTITIES FOR THE PURPOSES OF THE RFA

### 1.  PLAINTIFFS FALL WITHIN THE ZONE OF INTERESTS OF THE RFA

Preliminarily, we note that Defendants have never contended that the Plaintiffs are not "regulated" entities for purposes of the RFA.[10] In fact, Defendants admitted that Silver Limited, as a CFC, is "subject to" the challenged regulations. *See* Opinion, at *13 (discussing Defendants' apparent concession in this matter).

As the Supreme Court explained, the question at issue is whether the Plaintiff falls within the "zone of interests" of the statute. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131 (2014); *See also*, *Permapost Prod., Inc. v. McHugh*, 55 F. Supp. 3d 14, 30 (D.D.C. 2014) (describing the "regulated" entity issue in terms of "zone of interests.").  Thus, Limited's "statutory standing" is a function of whether it falls within the "zone of interests" to be protected by the RFA. That, as we show below, is a very lenient inquiry that sets a low bar.

Under the "zone of interests" approach, a statutory cause of action extends only to plaintiffs whose interests "fall within the zone of interests protected by the law invoked." *Id*., *citing Allen v. Wright*, 468 U.S. 737 (1984). In the APA/RFA[11] context, that test is not "especially demanding."

---

[10] Defendants' arguments focused exclusively on whether Plaintiffs are "small entities," not whether they are "regulated" entities.

[11] RFA-related challenges are reviewed in accordance with the APA. 5 U.S.C. §611(a)(2).

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (analyzing APA statutory standing). The "zone of interest" test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that" Congress authorized that plaintiff to sue. *Id. See also Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, 2021 WL 184359, at \*10 (D.D.C. Jan. 18, 2021) (*per* Mehta, J.) (finding that pro bono or low-cost counsel are within the "zone of interests" of the INA even though they are not regulated by it).

Had the Court applied this standard to the case at hand, it would have concluded that a CFC like Silver Limited falls well within the "zone of interests" of the statutes and regulations at issue.

(i)      **Plaintiff Silver Limited**:

Here, Plaintiff Limited is within the "zone of interests" of the RFA because its interests are related to and consistent with the purposes set forth in the RFA and Final Regulations such that it can be reasonably assumed that Congress authorized that type of plaintiff to sue. *Cf. Lexmark*, at 130. One need only glance at the Transition Tax statute to see how deep within the RFA/Transition Tax zone a CFC like Limited is. Plaintiffs respectfully refer the Court to a chart attached here as **Exhibit "A"** describing the various essential obligations imposed on a CFC like Silver Limited under the Transition Tax. The following are just a few examples demonstrating the CFC's integral part in the Transition Tax process:

(1) First stage: Calculating the retained earnings of the CFC in 2017.  This gives is the "gross income" on which the tax will be imposed.
(2) Second stage: Calculating the allowable deductions, which are calculated directly based on two asset types of the CFC – CFC cash and CFC non-cash assets.
(3) Third stage: Calculating US Shareholder entitlement to the CFC foreign tax credits. This is based on what the CFC paid in in foreign taxes.
(4) Fourth stage: Section 78 adjustments related directly to the amount of foreign taxes paid by the CFC.

(5) Fifth stage: Only after all that is done **at the CFC level** can the US shareholder start computing tax liability on the CFC profits.

To be sure, the tax is ultimately paid by the U.S. shareholder. However, all the highly complex accounting and compliance work which causes significant costs is done at the CFC level. In recognition that the "zone of interest" test sets a "low bar" (*Cath. Legal Immigr. Network, Inc.*, at 10.), a CFC in the Transition Tax context is far more within the "zone of interests" of the RFA than pro bono counsel in the INA context. Without investing substantial resources in tax/accounting work, the CFC cannot provide the end data to the U.S. shareholder.  Without this data, the U.S. Shareholder cannot comply.  To say that the CFC does not have to comply is, simply stated, fictional.

The Court cited *Mid-Tex Elec. Co-op., Inc. v. F.E.R.C.*, 773 F.2d 327 (D.C. Cir. 1985) for the proposition that an entity is not "subject to" a regulation unless the regulation "imposes responsibilities directly on" the entity. Opinion, at *14. That case is clearly distinguishable. There, end-user wholesale customers of electric utilities whose wholesale rates were regulated by the Federal Energy Regulatory Commission challenged proposed rule allowing electric utilities to include in their rate bases amounts equal to 50% of their investments in construction work in progress. In *Mid–Tex*, FERC was not required to consider the indirect economic effects on the wholesale customers of the utilities or on the ultimate retail consumers, **neither of which was regulated by the challenged rule**.

*Mid-Tex* and its progeny stand for the proposition that only "regulated" entities fall within the "zone of interests" of the RFA and may file suit. The plaintiffs in *Mid-Tex* and similar cases were neither the subject nor the target of the challenged regulation.  Clearly, that is **NOT** the case in the Transition Tax context where the foreign CFC is directly impacted by the challenged

21

regulation, targeted by the challenged regulation and required to comply with the information collection and reporting requirements imposed by the Transition Tax Regulations and, as a result, will incur compliance costs.

(ii)   **Plaintiff Silver**:

There is no dispute that Plaintiff Silver, as the taxpayer, is a "regulated" entity for purposes of the Final Regulations. As a shareholder of the CFC, Silver is directly regulated by the Transition Tax Final Regulations. *See also*, <u>Opinion</u>, at *13 (finding that Silver is "subject to" the transition tax regulations).

However, in a case of first impression anywhere in the United States, the Court held that Silver was not a "small business concern" for the purposes of the RFA (5 U.S.C. §601(6)) and SBA (15 U.S.C. §632(a)(1)) because he is not "individually owned and operated."[12] *See* <u>Opinion</u>, at *15.  In other words, the Court held that a natural person cannot be a small business concern for the purposes of the SBA and, therefore, the RFA. This is plainly wrong. Silver, as the sole shareholder and operator of Limited, is not only "individually owned and operated," but is also in the business of managing and operating his professional corporation. Nothing in the statute or in the legislative history indicates that natural persons cannot qualify as "independently owned and

---

[12] 15 U.S.C. §632(a)(1) defines a small business concern as follows:

> For the purposes of this chapter, a small-business concern [...] shall be deemed to be one which is independently owned and operated and which is not dominant in its field of operation.

There is no issue in this case regarding the "dominant in its field" prong. Silver is not dominant in his field of operation.

operated."[13] Indeed, the most independently owned and operated business is, in fact, a natural individual. In this case of first impression, the Court did not support its naked conclusion with any legal, statutory, or administrative authority.[14]

The Government itself treats Plaintiff Silver as a corporate entity for purposes of his 962 election.[15] Because Silver has made a 962 election, he is treated for tax purposes as a domestic corporation and is therefore entitled to foreign tax credits. That is the very essence of the 962 election. An individual shareholder who uses a Section 962 election is taxed as if the shareholder was a domestic "C" corporation, putting the individual U.S. shareholder on a level playing field with a corporate U.S. shareholder. The individual is then taxed on any Subpart F income, including the Transition Tax, at corporate tax rates with the benefit of foreign tax credits.

Therefore, because Silver is treated like a corporate business for the purposes of the 962 election, and hence for Section 965, he should be considered a business for the purposes of the RFA, falling within the "zone of interests" of the statutes and regulations at issue. If the very regulation at issue treats Silver as a business for tax purposes, certainly he should be deemed a business to challenge it.

---

[13] Indeed, the SBA has included in the definition of a small business concern a "sole proprietorship." This shows incontrovertibly that a natural person can, in fact, be a small business concern. The statute does not require the to be entities. 13 C.F.R. §121.105.

[14] The Court also concluded that Silver, as a sole proprietor, lack statutory standing because "whatever status Silver may hold in relation to his real estate business is irrelevant to whether he qualifies as a small entity under the RFA for the purposes of this case." Opinion., at *15. However, Silver's capacity as a real-estate investor is not determinative. What is relevant is Silver's capacity as a shareholder in his CFC, Silver Limited.

[15] We are not suggesting that only individuals that make a 962 election are deemed "small business concerns" for the purposes of the RFA. As we already stated, natural individuals as such are considered "independently owned and operated" without regard to a 962 election.

Accordingly, both Plaintiffs fall within the "zone of interests" of the RFA in the Transition Tax context.

## 2.  IN THE CASE OF SUBPART F STATUTES AND REGULATIONS, WHERE TAX LAW DISREGARDS THE CORPORATE ENTITY, PLAINTIFFS ARE ONE-IN-THE-SAME FOR RFA PURPOSES

The Court also sought to justify its holding that neither Plaintiff is regulated for RFA purposes on the basis of the common law rule that treats a corporation and its shareholders as distinct juridical persons. The Court stated as follows:

> Such an argument—that a shareholder and a corporation should be viewed as one and the same—flies in the face of the longstanding principle that "[a] corporation is ordinarily to be viewed as a distinct entity, even when it is wholly owned by a single individual."

Opinion, at *14.

The application of the common law doctrine in the context of the RFA and the Final Regulations is manifestly incorrect and warrants reconsideration. The Court's analysis ignores the manner in which CFCs and their U.S. stockholders are treated by the Government under Subpart F of the IRC.

In arguing that both Plaintiffs should be viewed as a "package" deal, Plaintiffs were simply stating that *for the purposes of RFA standing to challenge the Final Regulations,* distinguishing between corporation and shareholder flies in the face in the manner in which the entity and the shareholder are treated under Subpart F of the IRC.  As is the case here, the Transition Tax statute and Final Regulations disregard the corporate veil doctrine for tax purposes. This is the very nature of the CFC.   Plaintiffs never suggested, nor do they suggest now, that courts should ignore the corporate veil separating shareholders from their corporation *for general liability purposes.*   In

24

this case, the IRS treats the foreign corporation and its U.S. stockholder as an integrated enterprise.[16]

    With the passage of the TCJA and the creation of the Transition Tax, the IRS **undid** the corporate veil between U.S. shareholders and their CFCs in order to impose a tax of all undistributed and deferred earnings and profits. The Final Regulations and the statute which they implement make no sense unless they apply both to the U.S. stockholder and the foreign corporation as an integrated enterprise.  They are inseparable for tax purposes.  They should be treated no differently for the purposes of the RFA.

---

[16] *See* https://www.irs.gov/irm/part4/irm_04-061-007:

> The taxation of foreign income earned by foreign corporations owned by U.S. persons drastically changed with the introduction of subpart F into the Internal Revenue Code (IRC) in 1962. Subpart F deals with the U.S. taxation of amounts earned by CFCs. It provides that certain types of income of CFCs, though undistributed, must be included in the gross income of the U.S. shareholder in the year the income is earned by the CFC. Taxation of foreign income earned by CFCs also significantly changed with the passage of TCJA in late 2017. Certain previously deferred earnings were immediately taxable under the IRC 965 transition tax, and going forward, a new taxation subpart F regime was established for global intangible low-taxed income (GILTI) and a dividends received deduction for foreign source dividends were enacted.

*See also*, William W. Park, *Fiscal Jurisdiction and Accrual Basis Taxation: Lifting the Corporate Veil to Tax Foreign Company Profits*, 78 COLUM. L. REV. 1609 (1978).

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, the Plaintiffs request that the Court reconsider its holdings both with respect to Article III standing and statutory standing.

The Court is also requested to grant Plaintiffs' request for leave to file a Second Amended Complaint, adding a prayer-for relief in the form of nominal damages.

Respectfully submitted,

<u>Date</u>: April 23, 2021.

/s/ *Lawrence Marc Zell*
_____
Lawrence Marc Zell (DC Bar # 959437)
Noam Schreiber, *of counsel*
**ZELL & ASSOCIATES INTERNATIONAL ADVOCATES LLC**
1345 Ave. of the Americas,
2nd Floor,
New York, NY 10105
e-mail: mzell@fandz.com
*Counsel for Plaintiffs*

26